UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOODWARD PIER, LLC and
MI EXPRESS LLC,

     Plaintiffs,                         Case No: 2:25-cv-13499

                                             Hon.

v.

CITY OF ROYAL OAK,                    JURY DEMANDED
MICHIGAN, a Michigan
municipal corporation,

     Defendant.
_____

Gregory D. Hanley (P51204)
Jamie Warrow (P61521)
Edward F Kickham III (P70332)
Attorneys for Plaintiffs and the Class
40950 Woodward Ave., Suite 306
Bloomfield Hills, MI 48304
(248) 544-1500
ghanley@kickhamhanley.com
jwarrow@kickhamhanley.com
ekickhamjr@kickhamhanley.com

_____

**PLAINTIFFS' COMPLAINT AND JURY DEMAND**

     Plaintiffs Woodward Pier, LLC ("Woodward Pier") and MI Express LLC ("MI Express") (collectively "Plaintiffs"), by their attorneys, state as follows for their Complaint against Defendant City of Royal Oak, Michigan (the "City"):

## INTRODUCTION

1.     This is an action challenging unconstitutional conditions the City imposed on the grant of a land use permit applicable to Plaintiffs' property located at 31800 Woodward Avenue in the City (the "Property").

2.     Plaintiff Woodward Pier acquired and sought to redevelop the Property as a car wash facility to be operated by MI Express pursuant to a lease.  As a condition of its approval of the redevelopment plans, the City impermissibly required Plaintiffs to pay for and install on the property an enormous underground "retention basin" to receive stormwater runoff during rain events, even though Plaintiffs' redevelopment of the Property would not – and did not -- increase the volume of stormwater the Property contributes to the City's combined sewer system.

3.     The City's actions constitute a taking of Plaintiffs' property that the U.S. Constitution requires the City to pay just compensation to Plaintiffs.  Plaintiffs seek a money judgment against the City to compensate Plaintiffs for the amounts they expended to comply with the City's unconstitutional condition, which are in excess of $250,000.

4.     Plaintiff MI Express also challenges the City's method of charging MI Express for sewage disposal services and the method of charging MI Express for the disposal and treatment of "stormwater."  These improper methods of charging have resulted in the imposition and collection of sewer rates and charges (the "Rates" and "Charges") that have generated revenues far in excess of the costs the City incurs to

provide the associated services to MI Express.  As a result, the City's Rates, as applied to MI Express and viewed as a whole, have been excessive and therefore unreasonable.

5.     The City has overcharged MI Express in three distinct ways:  First, the City's Rate methodology wrongly assumes that 100% of the treated water the City provides to MI Express is returned to the City's combined sewer system as sanitary sewage when, in fact, a significantly lower percentage of the treated water the City provides to MI Express is returned as sanitary sewage.  Second, the City recovers millions of dollars it pays Oakland County to treat and dispose of the City's stormwater through the Rates which are based on metered water usage, even though stormwater enters the City's combined sewer system from the surface of the land and the volume of the stormwater "generated" by any particular property has absolutely no relationship with the amount of water the property owner draws from the tap.  Third, the City impermissibly collects a "Non Residential Surcharge" based on the size of the water meter servicing MI Express's facility by using a wrong and exaggerated meter size, which results in an additional overcharge.  The overcharges described in this Paragraph are collectively referred to as the "Overcharges."

6.     MI Express seeks a refund of all Overcharges received by the City since MI Express began its operations in 2022 and all such Overcharges collected during the pendency of this action.

## JURISDICTION AND VENUE

7.      Plaintiff Woodward Pier is the owner of improved real property situated at 31800 Woodward Avenue in the City of Royal Oak, Oakland County, Michigan (the "Property").  Since 2022, Plaintiff MI Express has leased the Property from Woodward Pier and operated a "Tommy Car Wash" on the Property.  MI Express has paid the Charges at issue in this case.  A copy of a recent water and sewer bill the City sent to MI Express is attached hereto as Exhibit A.

8.      Defendant City of Royal Oak (the "City") is a municipality located in Oakland County, Michigan.

9.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1331, because this Court has original subject matter jurisdiction of all civil actions arising under the U.S. Constitution and Plaintiffs' claims include a claim arising under the 5th Amendment Takings Clause of the U.S. Constitution, which applies to the City through the 14th Amendment to the U.S. Constitution.  Plaintiffs are entitled to enforce these rights through a civil action under 42 U.S.C. § 1983.

10.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiffs' takings claim.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the City is located in this District and the actions which gave rise to Plaintiffs' causes of action occurred in this District.

## GENERAL ALLEGATIONS

12.     The City maintains and operates a water supply system (the "Water Supply System") to provide treated water to inhabitants of the City.   The City purchases its water at wholesale from a regional authority known as Southeast Oakland County Water Authority ("SOCWA").   Per its ordinance (Section 752-12), the City assesses water rates (the "Water Rates") against the "land or premises" receiving water service, and obligates the owner or occupant of such land or premises to pay the Water Rates.   MI Express has received water service from the City and paid the Water Rates imposed by the City.   The City characterizes water service as an "essential service" (Royal Oak Ordinance Section 770-8) and the City's ordinances and other applicable laws and regulations require or effectively require the structures used by its citizens to be connected to the City's Water Supply System.

13.     Pursuant to its statutory authority, MCL 141.104, the City maintains and operates a "combined" sewer system (the "Sewer System") to provide sanitary sewage treatment and disposal services to inhabitants of the City and to collect snowmelt and rainwater ("stormwater") runoff.   The City contracts with Oakland County (the "County") for the treatment of the sanitary sewage and the County, in turn, contracts with the Great Lakes Water Authority ("GLWA") for treatment of the sanitary sewage and ultimate discharge of the effluent.   The City also contracts with the County for stormwater disposal and the County, in turn, contracts with GLWA for

disposal of the stormwater. The County's stormwater disposal services are of a general public nature and are furnished to the City at large.

14. Sanitary sewage – *i.e.*, spent water from a municipal water supply system which may be a combination of liquid and water-carried wastes -- enters a combined system directly from residences, commercial buildings, industrial plants, institutions and other structures. Owners and/or occupiers of such structures which generate the sewage are "users" of the sanitary sewage disposal services provided by the City.

15. Stormwater, in contrast, does not originate from any use of the water supply system or sanitary sewer system, and its presence in the combined system is wholly unrelated to the amount of tap water used, or sanitary sewage generated, by users of the system whose structures are physically connected to that system. Stormwater collects on both private and public land, roads and other physical surfaces during rainfall events, and the runoff enters the combined sewer system through catch-basins and other collection devices.

16. Even though they have different origins, both sanitary sewage and stormwater collected in a combined sewer system need to be disposed of. The City's combined sewer system flows to the Southeastern Oakland County Sewage Disposal System (the "County System"), which is owned and maintained by the County. Except during heavy rainfall when high volumes of combined sanitary sewage and stormwater exceed the outlet capacity to GLWA causing excess flow to be diverted to the Kuhn Facility (as described below), the entire flow from the County System is

conveyed to the GLWA treatment plant through Detroit's Dequindre Interceptor, which contains a master meter which measures the total flow passing from the County System into the GLWA treatment plant.  GLWA charges the County for disposing of the sanitary sewage and stormwater and, in turn, the County charges the municipalities who contribute flow to the County System for such disposal.  Those municipalities which have a combined sewer system, including the City, are charged a flat rate per month for stormwater disposal per a formula determined by the County. Those municipalities serviced by separate sanitary and stormwater systems do not incur charges from the County for stormwater disposal, since the stormwater collected by those municipalities does not enter the GLWA system but rather is discharged into neighboring watercourses.

17.     Most of the time, combined sewer systems transport all of their sanitary sewage and stormwater to a sewage treatment plant, where it is treated and then discharged to a water body.  During periods of heavy rainfall or snowmelt, however, the sanitary sewage and stormwater flow rate in a combined sewer system can exceed the capacity of the sewer system or treatment plant.  For this reason, combined sewer systems were designed to overflow occasionally and discharge excess sanitary sewage and stormwater directly into nearby streams, rivers, or other water bodies. Historically, combined sewer overflows ("CSOs") were among the major causes of beach closings and other water quality impairments.

18.     Following the passage of the Federal Clean Water Act, the Federal Government developed a nationwide CSO Control Policy and required local communities to implement interim and long-term control plans for combined sewer overflow events.

19.     There are two recognized forms of corrective action to address CSOs: (1) separate the sewer system into two separate types of sewers: (a) sanitary sewers designed to carry only sanitary sewage to a wastewater treatment plant, and (b) storm water sewers designed to convey stormwater to nearby rivers, lakes or streams, or (2) install a retention and treatment system ("RTF"), which is designed to capture and treat the combined sanitary sewage and stormwater that would otherwise flow to surface waters untreated.  The City is serviced by an RTF, the "Kuhn Facility", as described below.

20.     The City is a member of the George W. Kuhn Drainage District (the "District"), which was originally established in 1942 (it was then called the Twelve Towns Drain District), and now includes the City and the cities of Berkley, Birmingham, Clawson, Ferndale, Hazel Park, Huntington Woods, Madison Heights, Oak Park, Pleasant Ridge, Southfield, Troy, and Royal Oak Township and the Village of Beverly Hills.  The District encompasses a drainage area of 24,500 acres upstream of the Red Run Drain, a tributary of the Clinton River.

21.     The original RTF servicing the members of the District was constructed in the early 1970s in the bed of the former Red Run Drain.  This RTF runs 2.2 miles

from Twelve Mile and Stephenson Highway in a northeastern direction to Dequindre Road south of Whitcomb where it empties into the Red Run Drain. The sole purpose of this RTF is to ameliorate the environmental effects of CSOs.

22.     During dry weather, all flow from the combined sewer systems of the communities in the District is routed directly to the GLWA Waste Water Treatment Plant, but during heavy rainfall, high volumes of combined sanitary sewage and stormwater (typically more than 93 percent stormwater) exceed the outlet capacity to GLWA causing excess flow to be diverted to the RTF, where it is stored, screened, and disinfected prior to discharge to the Red Run Drain. Thus, the RTF is utilized only when CSO events occur, and the vast majority of the flow treated (approximately 93%) constitutes stormwater runoff. Indeed, it is stormwater, not sanitary sewage, which causes the CSO events and thereby creates the need for the RTF.

23.     Even with the RTF, the County System still overflows during some heavy rain events. In order to ameliorate or avoid CSO events, communities like the City have taken steps to decrease the volume of stormwater which enters their combined sewer systems during rain events, and therefore limit the volume that reaches the RTF. One step taken by the City is to require certain property owners to "detain" stormwater on-site. Toward that end, in 1991, the City enacted a Stormwater Detention Ordinance (the "Ordinance").

24.     With limited exceptions, the Ordinance applies to "[a]ny development, renovation or addition to an existing development within the City, excluding property

in the Central Business District Zones and properties used for one- and two-family residential purposes," which are required to "detain the stormwater runoff from the improvement on-site." Ordinance, Section 644-4.  The Ordinance provides that the detention of stormwater runoff "is a prevailing need" and "the absence of detention could endanger the property, health, safety and general welfare of the residents and property owners of the City." *Id.*, Section 644-2.

### THE CITY'S UNCONSTITUTIONAL CONDITIONS

25.  Prior to 2022, the Property was primarily occupied by a "Pier One" retail store and its associated parking lot.  In 2022, Plaintiffs sought to redevelop the Property by demolishing the existing structures and constructing a car wash facility.

26.    Under the City's Charter and ordinances, Plaintiffs required the City's approval for the redevelopment.  As a condition of the approval, the City required Plaintiffs to comply with the Ordinance.

27.    Applying the Ordinance, the City required Plaintiffs to construct, at Plaintiffs' sole expense, an 18,250-gallon Retention Basin (the "Basin") under the car wash on the Property.  The Basin basically is a giant bathtub that collects stormwater through catch-basins or other collection devices located on the surface of the Property.  The purpose of the Basin is to detain stormwater runoff during rain events in order to reduce the City's sewage flow rates and total sewage flow volumes to the County System.  The Basin is designed so that the stormwater collected during a rain event can be detained during those events and later released into the City's sewer

system after the events are concluded and the capacity of the system is no longer challenged.

28. Pursuant to the Ordinance, the City further required Plaintiffs to grant the City easements (the "Easements") for discharge piping for the Basin and for the Basin itself. *See* Ordinance, Section 644-11. The Easements provide the City "the rights to access, inspect and to rectify any City ordinance violation within the easement[s]" under certain defined circumstances. *Id.* The Ordinance provides that "[a]ll grants of easement shall be executed by the property owner prior to the City issuance of occupancy permits for the development." *Id.* As the Ordinance requires, Plaintiffs granted the Easements, further conveying property rights to the City that the City did not pay for.

29. Prior to the redevelopment of the Property, the surface of the Property consisted almost entirely of "impervious" surfaces which did not absorb precipitation. At all times prior to 2022, there was no Basin and therefore the City assumed that all or virtually all of the stormwater that fell on the Property entered the City's combined sewer system. The redevelopment therefore imposed no additional burdens on the sewer system, even without the Basin. In fact, the redevelopment replaced some of the impervious surfaces with "pervious" surfaces, which absorb precipitation and therefore reduce the volume of stormwater that enters the City's sewer system even in the absence of the Basin.

30. The City has recognized that the Ordinance imposes egregious burdens on Plaintiffs and other property owners who are subject to the Ordinance. In 2018, the City Manager told the Mayor and the members of the City Commission that (1) "stormwater is everyone's problem," (2) "[e]veryone should be responsible for stormwater that falls on their own property," and (3) "[w]e will never solve our stormwater problem until we are willing to impose stormwater requirements on all properties." *See* Exhibit B hereto (emphasis in original). Yet, the City's "current stormwater detention ordinance exempts all one and two-family residential property and all property in the central business district (CBD) from its requirements." *Id.*

31. Given these circumstances, the City Manager concluded that the Stormwater Detention Ordinance "is grossly unfair in putting most of the stormwater burden on a relatively few property owners" and it "desperately needs to be revised." *See* Exhibit B hereto. Among other problems, the Ordinance "exempts 77 percent of all land in Royal Oak from its requirements." *Id.*

32. Despite the City Manager's protestations, the City has not amended the Ordinance, but instead has continued to apply its "grossly unfair" provisions to property owners like Plaintiff, who seek to redevelop property in the City.

## THE CITY'S SEWER OVERCHARGES

33. Plaintiff MI Express, at all relevant times, has received sanitary sewage disposal service from the City and paid the sewage disposal rates ("Sewage Disposal Rates" or the "Rates") imposed by the City. MI Express is required or effectively

required by Michigan law, the City's ordinances, and other laws and regulations to utilize the City's Sanitary Sewer System. *See, e.g.,* MCL 333.12753.

34.    The City establishes Sewage Disposal Rates from time to time through legislative action, and revenues generated by the Sewage Disposal Rates are deposited into the City's Water and Sewer Fund.   A copy of the City's Water and Sewer Ordinances is attached hereto as Exhibit C and incorporated herein by reference.  The Sewage Disposal Rates are based directly and exclusively on the units of water the sewer customer purportedly uses from the City's water supply system.

35.    Establishing Water and Sewer Rates first requires a municipal utility to determine its "Revenue Requirement," which is a summation of the operation, maintenance, and capital costs that a utility must recover during the period for which the rates were applied. The Revenue Requirement is the total costs that need to be recovered through rates and charges.

36.    The City currently uses an "inclining block" tiered Rate structure to recover the purported costs it incurs to operate, maintain and improve its Water and Sewer Systems. As of July 1, 2024, the City's Water Rates per 100 cubic feet (approximately 748 gallons) were $4.930 for the first 2000 cubic feet and were $5.670 per 100 cubic feet in excess of the first 2000 cubic feet.  As of July 1, 2024, the City's Sewer Rates per 100 cubic feet were $9.220 for the first 2000 cubic feet and were $10.610 per 100 cubic feet in excess of the first 2000 cubic feet.

## THE CITY'S USE OF WATER VOLUMES AS A PROXY FOR MI EXPRESS' SEWER USAGE IS UNREASONABLE.

37.     MI Express operates a car wash utilizing technology and equipment developed by Tommy Car Wash System.  The City's use of metered water usage as a proxy for sewer usage results in excessive Sewer Charges to MI Express because of the unique way MI Express uses water in its car wash operations.

38.     In the operation of its car wash, City water is fed into MI Express's reverse osmosis system to remove contaminants and provide spot-free water with very low Total Dissolved Solids ("TDS").  This water is used for the final Spot-Free Rinse and is stored in a tank.  Reject water from the reverse osmosis system is used in the High-Pressure Rinse earlier in the wash process.

39.     A "reclaim" system in the "Tommy Tunnel" collects, treats, and reuses water that enters the pit below the vehicle conveyor.  This water is reused in the Tommy Tunnel for Pre-Blasters, High Pressure Wheel Blasters, and Conveyor Flush. The Conveyor Flush reclaim water goes back into the pit and reclaim system so that volume of water is not included in the overall water usage. Tommy Car Wash Systems has determined (based on flow meter data) the system used by MI Express uses 13.81 gallons of reclaim water per vehicle.

40.     Studies have been done nationally on what the car wash industry calls "carryout" and "evaporation" ("C&E").  The consistent C&E average nationwide is 20% of the total water usage per vehicle.

41.     Based on data compiled by Tommy Car Wash Systems, the average City water usage per vehicle is 28.11 gallons per vehicle.

42.     In addition, MI Express uses 13.81 gallons per vehicle of reclaim water, which brings the total gallons per vehicle to 41.92 gallons (28.11 gallons of City water + 13.81 gallons of reclaim water).  Reclaim water thus represents 33% of the total volume of water MI Express uses for car washing.

43.     With 20% C&E applied to total water volume used per vehicle, the reclaimed volume per vehicle is then 33.54 gallons per vehicle (28.11 gallons of City water + 13.81 gallons of reclaim water x 0.80).  Because the 13.81 gallons of reclaim water constantly refills the pit, the total discharge into the City sewer per vehicle is no more than 19.73 gallons (33.54 gallons reclaimed minus 13.81 reclaim water replaced).

44.     For every 28.11 gallons MI Express draws from the City's water system, a maximum of  19.73 gallons are discharged into the City's sewer system.  This means that MI Express's sewer "usage" volume is significantly less than the volume MI Express draws from the City's water system.

45.     Tommy Car Wash systems has conducted water usage and discharge studies to validate the sewer "usage" volumes.

46.     The City thus has charged, and continues to charge, MI Express significantly more for sewer usage than is warranted based on MI Express's actual sewage flows into the City sewer system.

47.     And it gets worse.  The City's Sewer Charges are even more egregious because the City improperly recovers the costs it incurs to dispose and treat stormwater through the Sewer Rates, which are nonsensically based on how much water each user draws from the City's water supply system.

### THE CITY FORCES SEWER CUSTOMERS TO FINANCE THE CITY'S ENTIRE COST OF STORMWATER MANAGEMENT AND DISPOSAL

48.     The City's stormwater (and the stormwater of other communities in the District) is conveyed by the County to the GLWA for ultimate disposal. GLWA charges the County a flat annual rate (currently in excess of $20 million) to dispose of the stormwater.  The County, in turn, allocates the annual GLWA stormwater charge among all of the municipalities in the District, including the City, and charges each municipality a flat annual rate for stormwater disposal.  The GLWA stormwater charge to the County, and the County's pass-through stormwater charge to the City, are based on a formula tied to the amount of rainfall and the volume of surface water that enters the County system for ultimate disposal by DWSD.

49.     While the charges for sanitary sewage disposal are based upon tap water usage and sanitary sewage volumes, the charges for stormwater disposal have no connection to usage of the City's water supply system or sanitary sewage disposal. The County charges the City in excess of $8 million per year for such services.  The City charges all of that cost to the Water and Sewer fund and imposes Stormwater Charges in order to recover the entire amount of that cost on an annual basis.  By

virtue of the Stormwater Charges, the City has imposed and plans to continue to impose upon water and sanitary sewage disposal customers, all of the cost of stormwater treatment.

50.     The Stormwater Charges are being used to fund costs for services which provide a benefit to the City and all its citizens.  The revenues being derived from the Stormwater Charges are clearly in excess of the direct and indirect costs of the current "use" of the stormwater disposal services by the persons paying those exactions.

51.     By imposing the cost of the Stormwater Charges only on water and sanitary sewage disposal customers, the City's charges do not correspond to the benefits conferred for at least two reasons.  First, stormwater disposal services do not confer a unique benefit upon MI Express and other sewer users based upon their status as water and sanitary sewage disposal customer.  Stormwater obviously does not originate from the use of the water supply system.  It collects on land, roads and other physical surfaces, and the runoff enters the combined sewer system through catch-basins and other collection devices.  Indeed, the storm waters collected in a combined sewer system are not "used" in any meaningful sense by any particular landowner or user.

52.     Any "benefit" of stormwater disposal conferred on the City's water and sanitary sewage disposal customers is no different than the benefit conferred on the general public.  Storm water systems help prevent erosion, collect contaminated water for cleansing, keep roadways from flooding, and prevent the formation of standing

pools of stagnant water.  The benefits resulting from this management are shared by nearly every member of the public.

53.     The City's use of the revenues generated by the Stormwater Charges to pay for stormwater disposal has the effect of forcing one subset of the citizenry (water and sanitary sewage disposal customers) to bear all of the costs of a public service, even though there are other "users" of those services and even though the services benefit the general public.  Importantly, the Water and Sanitary Sewer Rates are based exclusively on the volume of water each user extracts from the water supply system. A property owner's "use" of stormwater treatment services, however, is not dependent upon the volume of tap water the owner extracts from the water supply system, but rather by a number of other factors, including the amount of rainfall and the area of impervious surface that is present on his or her property.

54.     Second, imposing the stormwater disposal costs only on water and sanitary sewage disposal users also allows other "users" of those facilities and services, including more intensive "users," to receive the benefit of those facilities and services without cost, including the City itself.  In fact, the City's method of financing these costs fails to distinguish at all between those responsible for greater and lesser levels of runoff, which determine the volume of stormwater which enters the combined sewer system.  For example, a property owner with a parking lot with no water or sanitary sewer service incurs no charge for stormwater management, yet the impervious surface of a parking lot contributes much higher volumes of rainwater

run-off to the combined system than does the same sized residential parcel. The City's method of financing these costs also fails to take into account the high volumes of rainwater run-off generated by public and private road surfaces.

55. The City has repeatedly conceded that Stormwater Charges that are based on tap water usage are not proportionate to each property's stormwater contributions. In 2017, the City stated in a mailing to its citizens that "[t]he cost of treating stormwater is related to water that flows to drains outside your house, NOT the drains inside your house. As a water customer, you currently fund the treatment of stormwater based on how much water you consume." *See* Exhibit D hereto. The City further informed its citizens that it "has determined that the current way stormwater is billed to water customers is **inequitabl**e." *Id.* (emphasis added).

56. Since around 2018, the City's website has touted a planned "Stormwater Utility" that would recover stormwater expenses through land-based charges designed to allocate those expenses based on estimates of stormwater volumes "running off" each parcel of land in the City. *See* Exhibit E hereto.

57. The City acknowledges that "the method of funding this operation [stormwater management] and the associated costs for treatment has been determined to be outdated by current standards." Exhibit E at p. 9. The City further acknowledges that "billing for stormwater costs based upon the amount of stormwater that a property contributes to the stormwater system is more rational and

more equitable than billing for stormwater costs based upon the amount of water consumed at that property." *Id.* at pp. 11-12.

58.     In 2018, the City's Stormwater Task Force (formed by the City in 2016 and headed by the City Manager) issued a Report (Exhibit F hereto) which acknowledged the following:

A.     The City needed a "more equitable stormwater management ordinance that can be consistently applied."

B.     The current funding model also presents exposure to potential legal challenges.

59.     Unfortunately, to date, the City has not implemented the Task Force's recommendations, and has continued to recover its stormwater management costs through Sewer Charges based on each user's water consumption, which the City concedes is "inequitable."

## PAYMENT OF THE CHARGES IS MANDATORY

60.     Payment of the Sewer Charges, including the Stormwater Charges, is not voluntary because MI Express is actually or effectively required to connect to the City's water supply and sanitary sewer system and, by virtue of that connection, is required to pay the charges at issue in this case.

61.     Similarly, Royal Oak Ordinance 600-2 provides in pertinent part with respect to Sanitary Sewer Charges.

A. All sewage disposal charges shall be a lien upon the premises from and after the due date thereof, and a penalty of 5% shall immediately attach thereto. All unpaid sewage disposal charges which upon the 31st day of December have remained delinquent for a period of two months shall be placed on the delinquent water roll and shall have appended thereto a five-percent penalty charge. If the items on the delinquent water roll remain unpaid as of February 28, they shall be reported by the City Clerk to the City Commission, and the City Commission may require such charges to be transferred by the City Treasurer to the delinquent tax rolls. In the process thereof, an additional, five-percent penalty charge shall be added. Said delinquent charges shall then be dealt with by the City Treasurer and enforced in the same manner and by the same means as are similar lien interests.

### THE CITY'S OVERCHARGES FOR "IWC" CHARGES

62. GLWA imposes an Industrial Waste Control ("IWC") Charge on certain end-users of sewer services in the City. GLWA imposes the IWC Charge primarily in order to pay the cost of monitoring the discharge of industrial waste by a small set of Significant Industrial Users ("SIUs") and to finance other activities of GLWA's "Industrial Waste Control Division." Upon information and belief, there are about 250 SIUs under GLWA's jurisdiction.

63. In GLWA's own words, the purpose of the IWC Charge is "to offset the cost incurred in administering regulatory activities under the Sewer Use Ordinance/Industrial Waste Control Ordinance as required in the National Pollutant Discharge Elimination System (NPDES) Permit Program and the Clean Water Act."

64. The IWC Charge has nothing to do with the actual treatment costs of industrial waste. Instead, the IWC Charge purportedly finances, among other things, the costs associated with inspections, issuance of notices of violation or

noncompliance, and other enforcement activities related to industrial waste generated by SIUs.

65.     GLWA finances its purported cost of monitoring the discharge of industrial waste by approximately 250 SIUs by imposing the IWC Charge on approximately 52,000 owners of non-residential property.

66.     GLWA's regulatory activities are funded through the IWC Charges applied to commercial and industrial sewer accounts based on the size of their water meter.  The larger the meter, the larger the amount of the IWC Charge.

67.     The municipalities which receive sewage disposal services from GLWA inform GLWA of the number of non-residential customers subject to the meter fee and the aggregate number of meters.  GLWA informs the municipalities the amounts of IWC Charges that should be collected from the non-residential customers based upon that information.   The municipalities collect the Charges from the non-residential customers in their jurisdictions and remit them to GLWA.   This arrangement also existed during the time the City was imposing and collecting the Charges.  Currently, the City imposes and collects IWC Charges (it calls these "Non-Residential Surcharges") from non-residential properties in the City and then remits the associated revenues to GLWA.

68.     The City has overcharged MI Express because the City has imposed and collected the IWC Charges from MI Express based upon the assumption that

Plaintiff's property is serviced by a 3-inch water meter.  The current IWC Charge for 3-inch meters is $51.91 per month.

69.    Plaintiff's property is actually serviced by a 2-inch water meter and should be incurring a maximum monthly charge of $28.61.

### COUNT I
### TAKING OF PROPERTY WITHOUT JUST COMPENSATION
### 28 U.S.C. SECTION 1983

### ALL PLAINTIFFS

70.    Plaintiffs incorporate Paragraphs 1 through 3 and 7 through 32 of this Complaint, as if fully set forth herein

71.    "The Fifth Amendment's Takings Clause, as incorporated against the states by the Fourteenth Amendment, provides: 'nor shall private property be taken for public use, without just compensation.'" *Knight v. Metro. Gov't of Nashville & Davidson Cnty*, 67 F.4th 816, 822 (6th Cir. 2023) (quoting U.S. CONST. AMEND. V and citing *Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897)).

72.    One recognized form of taking is an "unconstitutional condition." *Id.* at 823–24.  In this context, the government "does not . . . directly interfere with constitutional rights," but rather "indirectly interferes with them by offering a benefit that it has no duty to provide on the condition that a party waive a right." *Id.*  In the land-use context, "the typical 'benefit' consists of a permit that allows an owner to develop a property for a specific use (such as a residence . . . )." *Id.* at 824 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 601–02 (2013); *Dolan v. City of*

*Tigard*, 512 U.S. 374, 379– 80 (1994); and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 828 (1987)).

73.     At bottom, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz*, 570 U.S. at 599. For example, "if a proposed development will 'substantially increase traffic congestion,' the government may condition the building permit on the owner's willingness 'to deed over the land needed to widen a public road.'" *Sheetz v. County of El Dorado*, 601 U.S. 267, 274–75 (2024) (citing Koontz, 570 U.S. at 605). "In evaluating the constitutionality of a[] [condition], [courts] must balance (1) the vulnerability of 'land-use permit applicants' who can be strongarmed by government entities with 'broad discretion' with (2) legitimate government interests in 'landowners internaliz[ing] the negative externalities of their conduct.'" *Ballinger v. City of Oakland*, 24 F.4th 1287, 1298 (9th Cir. 2022) (quoting *Koontz*, 570 U.S. at 604–05).

74.     The Supreme Court has enunciated a two-part test for determining whether a condition for the granting of a land use permit is unconstitutional.  First, "permit conditions must have an 'essential nexus' to the government's land-use interest." *Sheetz*, 601 U.S. at 275 (citing *Nollan*, 483 U.S. at 837); see also *Knight*, 67 F.4th at 825 ("[T]he government must show a 'nexus' between the condition [imposed] and the project's social costs; that is, the government must impose the

condition because of those costs and not for other reasons." (citing *Nollan*, 483 U.S. at 837)). "The nexus requirement ensures that the government is acting to further its stated purpose . . . ." *Sheetz*, 601 U.S. at 275 (citing *Nollan*, 483 U.S. at 841). When "conditions lack a sufficient connection to a legitimate land-use interest, they amount to 'an out-and-out plan of extortion.'" *Id.* (quoting *Nollan*, 483 U.S. at 837).

75.     Second, "[t]he government next must show a 'rough proportionality' between the condition and the project; that is, the condition's burdens on the owner must approximate the project's burdens on society." *Knight*, 67 F.4th at 825 (citing *Dolan*, 512 U.S. at 391). This additional step in the analysis exists because "[a] permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose." *Sheetz*, 601 U.S. at 276 (citing *Dolan*, 512 U.S. at 393). Although rough proportionality requires no "precise mathematical calculation," it still requires the government to "make some sort of individualized determination that the [condition imposed] is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391.

76.     Notably, the government need not actually physically occupy the Property. Instead, a taking can occur if the government requires a developer to pay money for improvements that are not proportional to the project's impacts. In *Koontz*, for example, the Supreme Court rejected the lower court's conclusion that an asserted takings claim failed "because [the government unit] asked [the plaintiff] to

spend money rather than give up an easement on his land." 570 U.S. at 611–612.  It did not matter that "the subject of the exaction . . . was money rather than a more tangible interest in real property." *Id.* at 612 (citation omitted).

77.     Here, there is no 'rough proportionality' between the condition and the project, because the condition's burdens on Plaintiffs do not even remotely "approximate the project's burdens on society."

78.     First, with respect to stormwater runoff, the redevelopment of the Property imposed **no** additional burdens on society beyond the burdens that already existed on the Property prior to the redevelopment.  The redevelopment of the Property did not increase the volume of stormwater runoff which would necessitate the installation of the Basin.  To the contrary, the impervious surfaces present on the Property were actually reduced by the redevelopment.  Thus, with respect to stormwater runoff volumes, there were no "harms" or "impacts" posed by the redevelopment that were required to be ameliorated through installation of the Basin.

79.     Second, the burden of the condition requiring the construction of the Basin was grossly disproportionate to any additional stormwater runoff "burdens" imposed on society by the redevelopment of the Property.

80.     42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. …

81.     The City is a "person" under 42 U.S.C. Section 1983.

82.     The City's actions were taken under color of federal and state law pursuant to an official policy and practice of the City.

83.     The City's actions deprived the Plaintiffs of rights owed to them and secured by the Constitution.

84.     The City's actions have deprived Plaintiffs of their property rights in violation of the Fifth Amendment because the City has not paid "just compensation" for its invasion of Plaintiffs' property rights.

85.     Plaintiffs' property was taken for a "public use" within the meaning of the Takings Clause.

86.     The purported purpose of the Retention Basin is to enhance the City's management of stormwater. The City's Ordinance expressly recognizes that stormwater detention is a "prevailing need" and "the absence of detention could endanger the property, health, safety and general welfare of the residents and property owners of the City." City Ordinance Chapter 644-2.

87.     Stormwater management and disposal benefits the public at large, and not any particular landowner.  In *County of Jackson v. City of Jackson*, 302 Mich. App. 90 (2013), the Michigan Court of Appeals observed in invalidating a "stormwater charge" imposed on landowners in the City of Jackson:

**In the present cases, we cannot readily identify any particularized benefit the charge confers on the property owners that is not also conferred upon the general public. The city indicated in its original response to plaintiffs' complaints that the charge "assur[es] cleanliness and safety of the State's waters and watercourses." The city also indicated that the management charge enables the city to protect the public health and safety, to reduce the likelihood of flooding caused by excessive storm water runoff, to reduce the potential for land erosion, which can damage roads, bridges and other infrastructure and thereby endanger the public, and to prevent sewer overflows by providing a mechanism to collect and divert rain water runoff from the sanitary sewer system. We do not doubt that a well-maintained storm water management system provides such benefits. Nevertheless, these concerns addressed by the city's ordinance, like the environmental concerns addressed by Lansing's ordinance in *Bolt*, benefit not only the property owners subject to the management charge, but also everyone in the city in roughly equal measure, as well as everyone who operates a motor vehicle on a Jackson city street or roadway or across a city bridge, everyone who uses the Grand River for recreational purposes downriver from the city, and everyone in the Grand River watershed. This lack of a correspondence between the management charge and a particularized benefit conferred to the parcels supports our conclusion that the management charge is a tax**. *Bolt,* 459 Mich at 166. [302 Mich. App. at pp. 108-109 (emphasis added)].

88.     Similarly, in *Dekalb County v. U.S.*, 108 Fed. Cl. 681 (U.S. Court of Claims 2013), the court observed:

> **The purposes of the stormwater ordinance, and of the stormwater system -- *i.e.*, flood prevention and the abatement of water pollution -- are benefits that are enjoyed by the general public. For that reason, the charge is more properly viewed as a tax than as a fee**. *See San Juan Cellular,* 967 F.2d at 685 (noting that the revenue from a tax "is spent for the benefit of the entire community"). Those benefits are public; they are not individualized services provided to particular customers.

The presence of a stormwater management system, and the imposition of charges to fund that system, create reciprocal benefits and burdens for nearly all owners of developed property within the unincorporated areas of DeKalb County. **While each property owner is burdened by payment of the charge, and enjoys no special benefit by virtue of the connection of its own property to that system, the property owner does derive a benefit from the fact that stormwater runoff from other properties is collected and diverted by the system. That benefit, however, is one that is shared with nearly every other member of the community. In short, flood control is a public benefit, and charges to pay for that benefit are typically viewed as taxes.** *See, e.g., United States v. City of Huntington, W.V.,* 999 F.2d 71, 73 (4th Cir. 1993) (explaining that because flood control and fire prevention are both "core government services," assessments to pay for those services are taxes).

**The abatement of water pollution is also an important benefit of the system, and it is likewise a public benefit that is shared with the rest of the community. The owners of developed property, who pay the stormwater management charges, receive no special benefit from clean rivers, streams, and lakes that is not also enjoyed by the general public.** *Cf. Mildenberger v. United States,* 91 Fed. Cl. 217, 245-47 (2010) (noting that water pollution is a harm that is experienced not only by riparian landowners, but by the public as a whole), *aff'd,* 643 F.3d 938 (Fed. Cir. 2011).

The stormwater system is a local infrastructure improvement that provides benefits -- *i.e.,* drainage, flood protection, and water pollution abatement -- not only to the owners of developed property who pay stormwater utility charges, but also to the owners of undeveloped property, who do not pay the charge, and to other members of the general public who may not own any property in the county at all. The Supreme Court has noted that "[a]ssessments upon property for local improvements are involuntary exactions, and in that respect stand on the same footing with ordinary taxes." *Hagar v. Reclamation Dist. No. 108*, 111 U.S. 701, 707, 4 S. Ct. 663, 28 L. Ed. 569 (1884).

89.     WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against the City in an amount deemed to be just compensation for the City's taking of Plaintiffs' property in violation of the U.S. Constitution.[1]

## COUNT II
### ASSUMPSIT – MONEY HAD AND RECEIVED
### UNREASONABLE SEWER RATES
### MI EXPRESS

89.     MI Express incorporates Paragraphs 1 through 23 and 33 through 69 of this Complaint, as if fully set forth herein.

90.     Sewer Rates must be reasonable.  *Mapleview Estates v. City of Brown City*, 258 Mich. App. 412.

91.     A municipal utility charge is "unreasonable" if "viewed as a whole" it has been "excessive."  *See Youmans v. Bloomfield Township*, 336 Mich. App. 161, 219, 969 N.W.2d 570 (2021).  As applied to MI Express, the City's Sewer Rates and Charges are arbitrary, capricious, and unreasonable.

92.     The City's Sewer Rates contain illegal or improper expenses because the City, through the Overcharges, is recovering sewer and stormwater costs from MI Express that should be recovered from other users, or from the City itself, as required by the common law, the City's Charter and the City's Ordinances.  *Trahey v. City of Inkster*, 311 Mich. App. 582, 595; 876 N.W.2d 582 (2015).

---

[1]     Plaintiffs and the City have an agreement which tolled the applicable statute of limitations for all of Plaintiffs' claims.  *See* Exhibit G hereto.  Therefore, even if certain of the events which give

93.     As a direct and proximate result of the City's improper conduct, the City has collected monies to which it is not entitled.  By paying the Overcharges, MI Express has conferred a benefit upon the City.

94.     A claim to recover amounts paid to a governmental unit in excess of the amount allowed under law is properly filed as an equitable action in assumpsit for money had and received.

95.     By virtue of the City's inclusion of the Overcharges in the Sewer Rates, the City has collected amounts in excess of the amounts it was legally entitled to collect.  Therefore, MI Express is entitled to maintain an equitable action of assumpsit to recover back the amount of the illegal exaction.  *See, e.g.*, *Bond v. Public Schools of Ann Arbor*, 383 Mich. 693, 704, 178 N.W.2d 484 (1970).

WHEREFORE, the City should be required to disgorge the revenues attributable to the Overcharges imposed or collected by the City between January 1, 2022 and the date of the filing of this action, and during the pendency of this action, and refund all Overcharges it has collected to MI Express.  In addition, the Court should permanently enjoin the City from collecting any past Overcharges and from imposing or collecting Sewer Rates in the future which result in Overcharges to MI Express.

---

rise to the claims in Count I occurred more than three years prior to the filing of this Complaint, Count I still is timely.

## COUNT III
## UNJUST ENRICHMENT – UNREASONABLE SEWER RATES
## MI EXPRESS

96.     MI Express incorporates Paragraphs 1 through 23 and 33 through 69 of this Complaint, as if fully set forth herein.

97.     Sewer Rates must be reasonable.  *Mapleview Estates v. City of Brown City*, 258 Mich. App. 412.

98.     A municipal utility charge is "unreasonable" if "viewed as a whole" it has been "excessive."  *See Youmans v. Bloomfield Township*, 336 Mich. App. 161, 219, 969 N.W.2d 570 (2021).  As applied to MI Express, the Sewer Rates and Charges are arbitrary, capricious and unreasonable.

99.     The City's Sewer Rates contain illegal or improper expenses because the City, through the Overcharges, is recovering sewer and stormwater costs from MI Express that should be recovered from other users, or from the City itself, as required by the common law, the City's Charter and the City's Ordinances.  *Trahey v. City of Inkster*, 311 Mich. App. 582, 595; 876 N.W.2d 582 (2015).

100.    As a direct and proximate result of the City's improper conduct, the City has collected monies to which it is not entitled.  By paying the Overcharges, MI Express has conferred a benefit upon on the City.

101.    The City has been unjustly enriched because it received Overcharges to which it was not entitled, and it would be unfair for the City to retain the Overcharges under the circumstances.

102. The City should be required to disgorge the amounts by which it has been unjustly enriched.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Overcharges imposed or collected by the City between January 1, 2022 and the date of the filing of this action, and during the pendency of this action, and refund all Overcharges it has collected to MI Express. In addition, the Court should permanently enjoin the City from collecting any past Overcharges and from imposing or collecting Sewer Rates in the future which contain Overcharges.

## PRAYER FOR RELIEF

Plaintiffs request that the Court grant the following relief:

A. With respect to Count I, enter judgment in favor of Plaintiffs and against the City in an amount deemed to be just compensation for the City's taking of Plaintiffs' property in violation of the U.S. Constitution.

B. With respect to Counts II and III, enter judgment in favor of Plaintiff MI Express and against the City, and order and direct the City to disgorge and refund all Overcharges collected since January 1, 2022 through the date of final judgment;

C. Find and declare that the City's act of conditioning Plaintiffs' land use approvals on Plaintiffs' construction, at Plaintiffs' expense, of the Basin constituted a taking of Plaintiffs' property for which the City must pay just compensation to Plaintiffs;

D.      Find and declare that the Overcharges violate the common law, the City's Charter and the City's Ordinances and permanently enjoin the City from imposing or collecting the Overcharges;

E.      Award Plaintiff and the Class the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

F.      Grant any other appropriate relief.

KICKHAM HANLEY PLLC

By: */s/ Gregory D. Hanley*
        Gregory D. Hanley (P51204)
        Jamie Warrow (P61521)
        Edward F Kickham III (P70332)
Attorneys for Plaintiffs and the Class
40950 Woodward Ave., Suite 306
Bloomfield Hills, MI 48304
(248) 544-1500

Date: November 3, 2025

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

KICKHAM HANLEY PLLC

By: */s/ Gregory D. Hanley*
        Gregory D. Hanley (P51204)
        Jamie Warrow (P61521)
        Edward F Kickham III (P70332)
Attorneys for Plaintiffs and the Class
40950 Woodward Ave., Suite 306
Bloomfield Hills, MI 48304
(248) 544-1500

# EXHIBIT A

# CITY OF ROYAL OAK QUARTERLY WATER/SEWER BILL



City of Royal Oak, Water
PO Box 64
Royal Oak, MI 48068-0064

**Billing Questions? Please call 248.246.3160**
**Monday-Thursday 8am - 4:30pm, Friday 8am-noon**

**Website:**   **www.romi.gov/311/Water-Billing**

Pay online at www.InvoiceCloud.com/RoyalOakMI

MI EXPRESS LLC
AF JONNA DEVELOPMENT LLC
4036 TELEGRAPH RD STE 201

BLOOMFIELD HILLS          MI  48302-2073

| SERVICE INFORMATION | |
|---|---|
| Account Number: | 1104400601 |
| Service Address: | 31800 WOODWARD AVE |
| Service Period: | 04/01/2025  to 07/09/2025 |
| Previous Read: | 29009A |
| Current Read: | 33527A |
| Consumption: | 4518 |
| Yr Ago Cons: | 4985 |
| Meter Type: | RADIO READ |

**Water is a lien on the property when provided.**
**You must obtain a FINAL WATER BILL when there is**
**a change in ownership or tenancy.**
**See www.romi.gov/water for instructions.**

The average family of 4 uses 30 units/quarter.  If this bill shows "0" Consumption and your property is occupied, call us TODAY to have your meter checked to avoid receiving an estimated bill and/or a large "catch-up" bill in the future which you will be liable for paying.

| BILLING INFORMATION | |
|---|---|
| SEWER AMOUNT DUE | $45,993.24 |
| WATER AMOUNT DUE | $26,068.86 |
| RTS - 3" | $108.80 |
| NON RESIDENTIAL 3" | $169.23 |

## UTILITY RATES

*Water Rate, starting 7/1/25:  $5.77 per unit of water delivered.*
*Sewer Rate, starting 7/1/25: $10.18 per unit of water delivered.*
*Ready to Serve Fee (RTS): Based on meter size -  covers engineering costs, insurance, technology, billing services and staff, and meter costs.*
*$35 for returned payments, $50 no show fee on customer-scheduled service call, $25 turn water on/off at curb, $15 duplicate bill fee, $20 refund overpayment fee, $75 non-registering/serviced meter.*
*\*\* We suggest mailing your payment in ten (10) days prior to the due date, since we cannot guarantee the postal delivery service. \*\**

*PLEASE READ IMPORTANT INFORMATION ON BACK OF BILL.*

| DUE DATE | 08/25/2025 |
|---|---|
| CURRENT AMOUNT DUE | $72,340.13 |
| PREVIOUS BALANCE | $32,607.20 |
| PLEASE PAY THIS AMOUNT | $104,947.33 |

**A 5% late fee is added if not paid in full by due date.**



Mail this stub with your payment.  Please write your water account and phone number on your check.

| ADDRESS | 31800 WOODWARD AVE |
|---|---|
| ACCOUNT NUMBER | 1104400601 |



CITY OF ROYAL OAK WATER
PO BOX 64
ROYAL OAK  MI  48068-0064

| DUE DATE | 08/25/2025 |
|---|---|
| AMT AFTER DUE DATE | $110,194.70 |
| PLEASE PAY THIS AMOUNT | $104,947.33 |

**AUTO PAY: WWW.INVOICECLOUD.COM/ROYALOAKMI**

55488211044006010010494733 4

**Please make your check payable to:  City of Royal Oak**

MOVING OUT?  You must obtain a Final Water Bill to clear the lien on your property if you are selling, or if the property is otherwise changing tenants.  Check online to obtain a Final Bill at www.romi.gov/water - or call us ten (10) days in advance of your desired reading date at 248-246-3160 to schedule a Final water reading.

MOVING IN?  Verify that a Final reading was done so that you are not paying for someone else's water use!

ZERO CONSUMPTION?  The average family of four uses 30 units in a quarter.  If you receive a Zero usage bill, and your property is occupied, it is likely that your outside device reading the meter is not functioning properly and needs to be replaced.  Call us ASAP for service and avoid getting a large "catch-up" bill in the future.

DO YOUR INSIDE AND OUTSIDE METERS MATCH?  All water registered by the inside water meter will be billed, but our equipment reads the outside reading device.  Over time, the outside device slows down or stops working, due to being exposed to the elements.  At least once per quarter, check the meter against the reading device and compare their reads.  If there is a discrepancy, call us immediately at 248-246-3160 for service.

WANT TO AVOID HIGH WATER BILLS?  Keep a record of your inside water meter reads on a calendar - at least monthly - to determine your "normal" seasonal use.  YOU are the best monitor of your property's water use!  If you see an unusual increase or spike in your usage, first check your toilets for silent leaks - they are normally the culprits!  Call a professional plumber if you need help making repairs to your property when needed.

DROP BOX?  The drop box is located in front of City Hall and at the side of the building, off of Troy Street, next to the Farmers' Market. Checks only please - Cash in the drop box is not safe for you or us!

DID NOT RECEIVE YOUR BILL?  Look online for your balance at www.bsaonline.com or call us for a replacement bill to avoid a $15 duplicate bill fee for not providing a bill stub with your payment. Your payment must be received on time to avoid a penalty, and failing to receive your quarterly bill does not waive the 5% penalty that is applied to any outstanding balance after the due date.

UNPAID WATER BILL?  Water and sewer charges are a lien on your property.  Bills due before March 1st and unpaid after 60 days will receive a 5% penalty on May 1 and June 1.  On June 1, the delinquent amount will be added to the July tax bill.  Bills due before August 1st unpaid after 60 days will receive a 5% penalty on October 1 and November 1.  On November 1, the  delinquent amount will be added to the December tax bill.

## BILLING CODE EXPLANATIONS

| | | |
|---|---|---|
| A = Actual Read | M = Manual Read | O = Other |
| E = Estimated Read | C = Customer Read | R = Reread |

One (1) Unit of Consumption = 100 Cubic Feet = 750 Gallons

---

### Paying by Credit card, Debit card, or E-check?

Visit www.InvoiceCloud.com/RoyalOakMI or call 1-844-627-2396 (Invoice Cloud payment number) and follow the prompts for credit card, debit card, and e-check payments.  You will need to provide your account number (located on the front of this water bill).  Please note that you will pay a CONVENIENCE FEE to pay by credit/debit card, in the amount of $3.95 per $400 charged.  There is NO CHARGE for a payment by e-check or direct debit to your bank account if you enter your routing number (ABA #) and account number.

---

**Keep the upper portion of this billing statement for your records.**
**Detach and include the lower portion of this statement with your payment.**
**Send your payment and stub to the P.O. Box listed on the reverse side in the enclosed envelope.**
**Be sure to add postage to the payment envelope, and write your account number on your check.**
**Checks or other payments returned unpaid will be assessed a $35 processing fee.**

# EXHIBIT B



**Office of the City Manager**
211 South Williams Street
Royal Oak, MI 48067

**Stormwater Task Force Report and Recommendations**

July 17, 2018

The Honorable Mayor Fournier and
Members of the City Commission:

Presented herewith is the long-awaited report of the Royal Oak Stormwater Task Force (Attachment 1). This task force was put together by me to assist in preparing a report and recommendation in response to an objective adopted by the commission in February 2016.

This is a long, complex report which includes several appendixes. For those who do not have the time or interest to plow through it all, I've tried to summarize it as briefly as possible below.

1. **The August 11, 2014 rain event**.

   The August 11, 2014 rain event, and the increasing instability of weather patterns highlights the necessity for a comprehensive stormwater ordinance.

   Prior to the August 2014 rain event a business led task force argued for relaxing storm water detention standards because the current standards discourage property owners from making improvements which trigger the stormwater detention requirements The August 2014 rain event, made it absolutely clear that relaxing standards is not an appropriate option. We need a comprehensive look at storm water management and an ordinance that doesn't tie stormwater improvements to other property improvements.

2. **Stormwater is everyone's problem.**

   Our current stormwater detention ordinance exempts all one and two family residential property and all property in the central business district (CDB) from its requirements.  Further, it ties compliance to a property owner-instigated improvement trigger allowing those who are subject to the ordinance to delay compliance for years, or even decades.

   We will never solve our stormwater problem until we are willing to impose stormwater requirements on all properties. Stormwater is everyone's problem. Everyone needs to be part of the solution.  Fair and equitable stormwater management codes are a first step to achieve this objective.

3. **Royal Oak's current stormwater detention ordinance is unfair and hinders reinvestment.**

   While it has resulted in 21.1 million gallons of stormwater detention facilities being constructed, it doesn't solve the underlying problem. It can't ever possibly solve the problem because it exempts 77 percent of all land in Royal Oak from its requirements, it is grossly unfair in putting most of the stormwater burden on a relatively few property owners, and it is a significant impediment to property maintenance and improvements. Also, the code has not been adapted to recognize newer methods for managing storm water. It desperately needs to be revised.

   Everyone should be responsible for stormwater that falls on their own property**.**  It is a common practice in Royal Oak, especially for new homes, to grade property to send stormwater onto a neighbor's property. This should be illegal. Property owners should also be required to pay for stormwater that flows from their property into the city streets or directly into city sewers.

www.romi.gov

4. **The design capacity of the George W. Kuhn drain.**

The George W. Kuhn drain (GWK), originally known as the 12 Towns Drain, was built to convey the region's storm and sanitary sewer flow to treatment facilities. Under normal conditions, it does just that. Like the city's sewers, this county drain also has capacity limitations on the amount of storm and waste water that can be accepted.

Royal Oak is one of the last communities to discharge into the GWK drain. It is important to understand that the due to the size of the GWK drain and the amount of water that enters from upstream communities, the city does not have an unlimited ability to discharge stormwater. This creates limits upon the types of improvements that can be made to our system.  In the end, all our stormwater and all of our sewage must discharge into the GWK drain.

While we are limited by the capacity of the GWK drain, we also don't believe upstream communities are doing enough to reduce their stormwater from entering the GWK drain.

5. **Royal Oak's method of recapturing stormwater debt has been altered by litigation.**

As part of the settlement agreement in Schroder vs City of Royal Oak, the city was required to must alter the methodology for recapturing the debt component of the stormwater system.   We can no longer do this through sewer charges based on water consumption.   The new methodology had to be in place by July 1, 2018.

The city is authorized through the Michigan Drain Code to levy an ad valorem tax to fund debt service and that is what we are doing for 2018-19.  We see this as a short-term solution only. An ad valorem tax is not a desirable means of paying for the GW Kuhn debt or any stormwater costs. It does not result in a fair distribution of cost as there is no relationship between taxable value and stormwater put into the city sewers. It does not encourage property owners to manage their own stormwater as there is no financial benefit for them to do so. It also exempts institutions such as schools, churches and hospitals which contribute significant amounts of runoff.

We believe the best long-term solution is to establish a stormwater utility with charges based on stormwater runoff which credit property owners who reducd stormwater runoff from their property.

**Recommendations**
The list below is a summary of recommendations from the report. We've organized them into three categories: stormwater detention ordinance amendments; stormwater management planning; and stormwater project funding.

**Stormwater detention ordinance Amendments**
- The ordinance should include green infrastructure as an acceptable method to achieve compliance. Currently, green infrastructure is allowed under the variance provisions of the code and engineering has already approved some engineered green systems. Engineering recommends an easement requirement be part of the green infrastructure to allow monitoring and inspecting to prevent removal or alteration. It should be noted that these systems are not necessarily less costly than traditional "grey" detention systems, and they often require significantly more space to implement. Additionally, most green infrastructure requires more regular and intensive maintenance efforts.

It should be noted that green infrastructure does not necessarily function the same as standard detention systems, as far as being an equivalent and reliable means of keeping water out of city sewers. Green infrastructure systems must meet appropriateness of soil

conditions and amount of stormwater to be detained. Such systems should be engineered for specific site and soil conditions to be effective.

- The ordinance should be reviewed and updated to include current and accurate descriptions of the various detention methods that are acceptable to meet ordinance requirements; including underground storage facilities and surface lot detention areas.

- The ordinance sections that establish the numerical requirements for detention should be reviewed and updated. This may include a review of standard base line storm frequency values in light of climate change trends.

- The current exemption for one- and two-family residential uses should be removed. The ordinance should require compliance with stormwater management by all new and renovated properties within the city regardless of zoning category, including one- and two-family residential properties. This stormwater management should include both green and grey infrastructure. Remove the current exemptions for single- and two-family residential.

- The ordinance should have a requirement for new residential builds to implement stormwater management. When building new homes on parcels where older, smaller homes once stood, the new home would be required to detain the stormwater runoff or participate via payment in lieu of detention.

- All properties will participate in the management of storm water. This will be accomplished on older properties through the implementation of a storm water utility. New, and renovated, properties will be required to utilize either current accepted methods of detention or through payments in lieu to develop offsite detention.

- This or another city ordinance should be revised to prohibit property owners from conveying their stormwater runoff onto neighboring properties. To comply with this new provision, builders would have to prepare and submit a site grading plan to be reviewed by the city engineer as a component of site plan approval and/or a request for a building permit.

- The ordinance should be revised to require that properties in the CBD comply with the stormwater management program either through installation of detention systems, green infrastructure or payments in lieu of detention.

- The exemption from compliance for projects that are less than 6,100 sq. ft. or 0.14 acres in size should be eliminated. This part of the ordinance is very poorly drafted, and it is questionable that this was really originally intended to be an exemption.

- The ordinance should more clearly describe the types of repairs or renovations allowed before triggering the need for detention. Property owners need to have the ability to make repairs to their property without triggering new detention systems.

**Stormwater management planning**
Develop, adopt and implement a stormwater management plan to address and include the following:
- a program to include every property in some manner

- the use of green infrastructure, especially when cost effective

- a reduction in the overall imperviousness of the city

- an increase green space and tree canopy

- consistent city commission goals, objectives and direction

- a vigorous program of public education

- an effective and reliable source of funding

- address the required elements identified in the Michigan Stormwater Utility Act if it is enacted

**Stormwater management funding**
- Create and implement a stormwater utility user fee.

- The stormwater utility user fee will apply to all privately-owned property in the city.

- The stormwater utility user fees will be sufficient to cover the distribution and transmission costs (including debt on the transmission system). Revenue from stormwater utility user fees will replace the revenue lost from the required reduction of the sewer fees.

- The ordinance shall encourage and provide credits to those who install approved stormwater detention.

- The stormwater utility user fee should be assessed based on parcel size and estimated run-off, including the area of impervious surfaces.

- The stormwater utility fee should incentivize private property owners to comply with detention. The fees would encourage the use of green infrastructure and make all property owners responsible for stormwater management.

- The stormwater utility user fee would cover the costs associated with management of the utility; fund operations, maintenance, and replacement of the distribution system; and the revenue requirements of the transmission, retention and treatment system allocated to Royal Oak customers. These fees will be a replacement of the current revenue generated for these purposes through the wastewater fees.

The following resolution is recommended for approval:

**Be it resolved**, the city commission accepts the report of the Royal Oak Stormwater Task Force and directs staff to proceed towards implementing the recommendations.

Respectfully submitted,
James Krizan
Assistant to the City Manager

Approved,

Donald E. Johnson
City Manager

1 Attachment

# EXHIBIT C

City of Royal Oak, MI

**§ 600-2.  Enforcement of charges; penalty; charge to turn on water. [Amended 1-5-1976 by Ord. No. 76-2]**

A.  All sewage disposal charges shall be a lien upon the premises from and after the due date thereof, and a penalty of 5% shall immediately attach thereto. All unpaid sewage disposal charges which upon the 31st day of December have remained delinquent for a period of two months shall be placed on the delinquent water roll and shall have appended thereto a five-percent penalty charge. If the items on the delinquent water roll remain unpaid as of February 28, they shall be reported by the City Clerk to the City Commission, and the City Commission may require such charges to be transferred by the City Treasurer to the delinquent tax rolls. In the process thereof, an additional, five-percent penalty charge shall be added. Said delinquent charges shall then be dealt with by the City Treasurer and enforced in the same manner and by the same means as are similar lien interests.

B.  If any premises to which sewage disposal charges shall be made shall constitute a part only of any parcel of land assessed as a single unit upon the tax roll, then any such delinquent charges shall be entered against the entire parcel.

C.  Whenever the water is turned off from any premises at the request of the owner or because of default in payment of the water charges and/or sewage disposal charges by the owner or occupant thereof, the same shall not be turned on again until the owner has deposited with the City the sum estimated by the Department of Public Service for such actual labor. That portion of the deposit in excess of the actual labor costs to the City shall be refunded to the owner. The owner shall be liable for labor costs not covered by the deposit. **[Amended 1-24-2005 by Ord. No. 2005-01]**

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

# Chapter 644

## STORMWATER DETENTION

§ 644-1.      Short title.
§ 644-2.      Purpose.
§ 644-3.      Definitions.
§ 644-4.      Scope.
§ 644-5.      Temporary exemption.
§ 644-6.      Method used.
§ 644-7.      Submittal procedure.
§ 644-8.      General basin construction.
§ 644-9.      Open pond basin construction.

§ 644-10.     Pumped basins.
§ 644-11.     Easements.
§ 644-12.     As-built plans.
§ 644-13.     Permit required for installation of parking lot pavements.
§ 644-14.     Enforcement; variance.
§ 644-15.     Violations and penalties.
§ 644-16.     Ownership and registration.

[HISTORY: Adopted by the City Commission of the City of Royal Oak 8-12-1991 by Ord. No. 91-8; amended in its entirety 11-15-2004 by Ord. No. 2004-20. Subsequent amendments noted where applicable.]

### GENERAL REFERENCES

Fences — See Ch. 323.

Flood damage prevention — See Ch. 351.

Property maintenance — See Ch. 556.

Weeds — See Ch. 757.

Zoning — See Ch. 770.

## § 644-1. Short title.

This chapter shall be known and cited as the "Stormwater Detention Ordinance of the City of Royal Oak" and will be referred to herein as "this chapter."

## § 644-2. Purpose.

This chapter is intended to specifically apply to stormwater detention which is a prevailing need and which the absence of detention could endanger the property, health, safety and general welfare of the residents and property owners of the City.

## § 644-3. Definitions.

As used in this chapter, the following terms shall have the meanings indicated:

ADDITION — Any addition to an existing building.

APPROVAL — Written approval by the City Engineer of the City of Royal Oak, Michigan, or by his duly authorized agents, assistants, or representatives, limited to the specific duties assigned or entrusted to them.

BASIN — All designated or specified areas or devices where stormwater is detained to meet the requirements of this chapter.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

CITY — The City of Royal Oak, Michigan. When used in this chapter in connection with any filing, submittal, delivery or payment to, or review, approval or other action, refers to the City Engineer.

CITY'S RIGHT-OF-WAY OR RIGHT-OF-WAY — Any and all public rights-of-way, streets, highways, roads, sidewalks, alleys, thoroughfares, public easements and public places located within the City, including within any curbs, shoulders, landscaped areas and/or other areas incidental and/or appurtenant.

DEVELOPMENT — Any new building, or paved driveway, parking lot or sidewalk, not including public roadways.

ENGINEER or CITY ENGINEER — City Engineer of the City of Royal Oak, Michigan, or his duly authorized agents, assistants or representatives, limited to the specific duties assigned or entrusted to them.

PUBLIC EASEMENT — Any area of land which has been granted or dedicated to the City or to public use, including, but not limited to, road or right-of-way, utility, water main, sewer line, access, drainage, recreation, conservation and other public areas, whether in easements or in fee.

RENOVATION — Any existing building converted to other use or structurally altered, and which requires a City building permit and/or site plan for City Plan Commission review and approval as described in § 770-12, Site plan review, or any similar ordinance. Also, any paved parking lot, private street, drive or sidewalk removal and replacement. Renovation shall also include the pulverizing and/or crushing of existing pavement for use as a new pavement base material.

SITE IMPROVEMENTS — Additions, developments and renovations proposed for a specific property as defined.

STORM DETENTION SYSTEM — All features that comprise the requirements of this chapter, including but not limited to storm detention basins and their required components and finishes, restrictors, pumps and freeboard structures; and all collection and outlet piping, drainage structures and conveyance features, including curbing, swales, ditches; and all fences, gates and signage.

## § 644-4.  Scope.

Any development, renovation or addition to an existing development within the City, excluding property in the Central Business District Zones and properties used for one- and two-family residential purposes, must detain the stormwater runoff from the improvement on-site.

## § 644-5.  Temporary exemption.

A.  Developments, renovations or additions less than 0.14 acre or 6,100 square feet in area will not require stormwater detention at the time of the improvement. For such case, a recordable lien to the City must be executed by the property owner. The recordable lien shall state that when the next future improvement occurs on the property which will make the accumulated area of the recorded lien(s) and the future improvement greater than 0.14 acre or 6,100 square feet, the property owner will make the stormwater detention improvements as specified in this chapter on the accumulated area.

B.  Renovations and additions that do not involve parking lot, private street, drive or sidewalk removal and replacement will not require stormwater runoff detention at the time of the improvement, unless adequate undeveloped land is available for detention on the property. If stormwater detention is not included as part of the renovation, a recordable lien to the City must be executed by the property owner. The recordable lien shall state that when the next future improvement occurs on the property, the property owner will make the stormwater detention improvements as specified in this chapter on the accumulated area.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

C.   Lien(s) shall be prepared by the property owner using the standard form available from the City Engineering Department.

## § 644-6.  Method used.

The Oakland County Method of Detention Basin Design, as made available by the Oakland County Drain Commissioner's office, shall be utilized in determining the volume of detention required. Basins with orifice or pumped outlets will be required to hold the volume for a ten-year storm while basins with no outlets will be required to hold two one-hundred-years storms. Discharge on an orifice or pumped outlet must be throttled to a restricted rate of 0.2 cfs per acre, or throttled to a restricted flow of 0.3 cfs if the total property area requiring detention is 1.5 acres or less.

## § 644-7.  Submittal procedure.

For City approval of stormwater detention, the applicant shall furnish the City Engineering Department three sets of detention plans, 24 inches by 36 inches, with detention calculations shown on the plans.

A.   A professional engineer, licensed in the State of Michigan, shall affix his or her seal on the plans.

B.   The plans shall not be drawn to a scale smaller than one inch equals 30 feet. The City Engineer shall review the plans and calculations for conformity to the standards set forth in this chapter, and certify that they are consistent with the overall utility plans of the City, after which he will return a letter of review with appropriate comments. The applicant, after making any changes requested, shall resubmit three sets of the revised plans to the Engineering Department for approval. The applicant may be required to obtain approval of the City of Royal Oak Building Department, Oakland County Drain Commissioner, the Road Commission for Oakland County or the Michigan Department of Transportation when the outlet discharges to facilities under their jurisdiction.

C.   The detention plans shall clearly indicate the perimeter of all acreage contributing to the detention basin. The perimeter of the water surface for the volume of detention provided shall also be indicated on the plans including the water surface elevation.

D.   The plans shall include the calculation of an overall coefficient of runoff for the acreage contributing to the detention basin. The range of this coefficient shall vary from 0.15 for completely grassed areas to 0.90 for completely paved areas.

E.   The detention calculations for each site shall include the number of total acres calculated to the nearest hundredth contributing to the detention basin. The total cumulative volume of required detention shall be calculated using all areas of proposed site improvements and shall include previous site improvement areas covered by this chapter.

F.   The detention calculations shall include the sizing of the restricting orifice or structure cover. The calculations for the restricting orifice size or restricted structures cover openings shall be made using a coefficient for a sharp-edged orifice entrance. Details for the restrictor are to be clearly indicated on submitted plans. The smallest pipe orifice size allowed is 2.5 inches in diameter. The orifice size shall be rounded down to the nearest one-half inch from the actual calculated size.

G.   Calculations for the volume of detention provided shall be included on submitted plans. The volume calculations shall be made using standard geometric formulas to determine the volume between appropriate contour elevations. For irregular-shaped basins, the geometric formula for the volume of a frustum of a cone or pyramid shall be used to estimate the volume between appropriate contour elevations.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

H.  Plan approval constitutes conformance with this chapter in regards to calculations and method used to control runoff and achieve the required detention. Plan approval does not infer sanction or approval of construction governed by any other permit or subsequent approvals.

I.  After approval of plans, any change to the storm detention system shall be submitted to the City Engineer for approval prior to its construction.

## § 644-8.  General basin construction.

A.  All basin design shall incorporate components that allow for visual inspection and maintenance by mechanical means of all areas designated for stormwater storage or restricted outflow.

B.  Acceptable means of detention can be achieved through standing water in parking areas, landscaped ponds, or buried vaults, chambers, pipes or other approved buried device. Either one or any combination of these designs may be utilized to achieve the required detention.

C.  All components of storm detention systems shall be constructed entirely on the private property of the proposed development, except for discharge piping and connections to public sewers. No portion of a basin shall be installed within a publicly owned utility easement. Connections to public sewers shall be at locations as approved by the City Engineer.

D.  Basins with orifice or pumped outlets must be constructed to drain entirely unless designed to retain a permanent water level that conforms to a Plan Commission approved landscape plan.

E.  Basins with no outlets must be constructed in soils that have a saturated hydraulic conductivity of at least 0.004 feet per minute.

F.  A minimum of 12 inches of freeboard must be provided above the retained water surface of all detention basins and below the finished floor of all adjacent buildings. A minimum of six inches of freeboard must be provided above the maximum water surface created by the required positive nonerodable overflow to both adjacent buildings and adjacent properties.

G.  A positive nonerodable overflow capable of handling the capacity of a one-hundred-year storm must be provided and clearly identified on the plans, which shall not discharge onto abutting private property.

H.  Drainage from a development, renovation and addition shall not be diverted onto abutting private property. Drainage from a development, renovation and addition requiring detention shall be directed to the detention basin. Discharge from the basin and overflow shall not be diverted onto abutting private property.

I.  The City requires a building permit for all piping and drainage structures for compliance with other codes and ordinances including the current Michigan Plumbing Code requirements for approved materials and drainage pipe cleanouts. Section P-708 of the code requires that manholes be provided as cleanouts at each major change of direction for underground piping over 10 inches in diameter.

J.  All storm detention systems shall be maintained in proper working order, free of debris, trash or anything else that may adversely affect the operability of the system, the required volume and outlet capacity. The storm detention systems shall be kept free of vermin and any creatures that may cause the system to become inoperable or harm the public. Maintenance of the storm detention system also requires treatment to prevent and control insects and microbes.

## § 644-9.  Open pond basin construction.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

A.    A paved open channel must be provided along the bottom of all detention basins designed to drain entirely. The open channel shall begin at the outlet for the basin and shall run the entire length of the basin with the channel extending to all pipes discharging into the basin. The channel shall be sized to equal the capacity of the outlet for the basin when flowing full with no pressure head. The channel shall provide a minimum velocity of two feet per second when the basin outlet is flowing full with no pressure head.

B.    The entire basin must be either sodded, paved, or have some other City approved method of stabilization. The maintenance of all stabilization and fencing in and around the detention basin shall be the responsibility of the property owner.

C.    All grass and noxious weeds growing in or around the basin shall be maintained in accordance with Chapter 757, Weeds, as amended, or other similarly adopted property maintenance code.[1] No hydrophilic plants such as rushes, reeds, water iris, willow or cattails shall be allowed to grow or thrive within an open basin, or any tree, shrub or plant not specifically shown and approved on the required plans.

D.    Minimum grade on the bottom of the detention basin shall be 1.2% when sodded. For paved open channels in basins, the minimum grade shall be 0.5%.

E.    All pipes entering a detention basin shall have either a headwall or end section at the end of the pipe. Bar screens must be installed on all open ends of pipe 12 inches or larger in diameter. Restricting orifices shall be located in an accessible structure outside of the basin limits.

F.    Fencing.

(1)    All open pond detention basins must be fenced if the side slopes exceed one vertical to six horizontal, or if the basin is designed to hold water to a depth of more than 18 inches when filled to capacity. This requirement may be waived by the City Plan Commission when the design is an integral part of the landscaping and the location and depth does not present a potential hazard.

(2)    A three-foot minimum shoulder shall be provided between the fence and the side slopes for the basin. The side slopes shall not exceed one vertical to three horizontal.

(3)    Fences shall be a minimum of four feet high chain link or other fencing material of comparable durability and safety as approved by the City Plan Commission with a locked access gate, 10 feet wide with double opening. A key for a City Engineer approved lock shall be supplied to the City Public Service Department.

(4)    Depending upon location in relation to adjoining properties or rights-of-way, the City Plan Commission may require a landscape screen in front of the fencing.

(5)    All gates constructed directly in front of a paved roadway are to have an end of roadway marker (ER-1) and a "road ends" sign (W-14-2-a) securely fastened to the gate in accordance with the "Michigan Manual of Uniform Traffic Safety Control Devices." The sign material shall be high intensity reflectorized Scotchlite on 0.080 aluminum.

(6)    All fencing related shall be maintained to conform to Chapter 323, Fences, or other similarly adopted ordinance, as amended.

---

1.   **Editor's Note:** See also Ch. 556, Property Maintenance.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

## § 644-10. Pumped basins.

In cases where the drain outlet for the detention basin is not deep enough to completely dewater the basin by gravity, pumps must be installed. The pumps shall be installed in duplicate with each pump capable of handling the flow. Controls shall be set in the receiving water to regulate the flow.

A. The controls may be electrodes placed inside a galvanized pipe stilling well at a location adequately protected from the backwater curve during discharge.

B. A bubbler system in a stilling well protected as in Subsection A above. The operating controls and pumps shall be set in a fully designed pump house with adequate dimensions for working area. The pump house and west well must be located inside the fenced area.

C. Pump controls shall be designed in a manner that accounts for the water level in the receiving sewer.

D. Complete specifications for the pumps and controls and performance curves for the pumps called for must be submitted to the City Engineer for approval, including two operation manuals provided from the manufacturer.

E. The City requires a building permit for all piping, electrical work and concrete structures for compliance with other codes and ordinances.

F. A manhole with inside diameter of six feet is required between the lift station and the outlet. The twin discharge lines shall be ductile iron. They shall enter the manhole and a storm sewer shall be installed from the manhole to the outlet. The manhole cover shall be East Jordan Iron Works (EJIW) No. 8247A hinged type or equivalent.

G. The pump house and gate to the detention basin shall be locked at all times. A key for a City Engineer approved lock to the pump house shall be supplied to the City Department of Public Service and Recreation.

## § 644-11. Easements.

A. Easement for discharge piping. The property owner of any development, renovation or addition that contains a detention basin, excluding surface basins within vehicular parking areas, shall grant the City an easement for the detention basin discharge piping and all discharge piping appurtenances. The easement shall be a minimum 12 feet wide, unless otherwise determined by the City Engineer. The grant of easement shall provide the City the rights to access, inspect, and to rectify any City ordinance violation within the easement if the property owner fails to commence work on compliance within 21 days from the date of written notification by the City of a violation unless emergency circumstances dictate immediate compliance. All costs incurred by the City in rectifying an ordinance violation shall be assessed to the property owner.

B. Easement for basin. The property owner of any development, renovation or addition that contains a detention basin, excluding surface basins within vehicular parking areas, shall grant the City an easement encompassing the detention basin. The limits of the easement shall be a minimum three feet outside any fencing, or six feet from the tip of the side slope for the detention basin and shall include a minimum twelve-foot width to access the gate for the basin. The grant of easement shall provide the City the rights to access, inspect, and to rectify any City ordinance violation within the easement if the property owner fails to commence work on compliance within 21 days from the date of written notification by the City of a violation unless emergency circumstances dictate immediate compliance. All costs incurred by the City in rectifying an ordinance violation shall be assessed to the property

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

owner.

C.  Easement grants. The property owner shall be responsible for providing the City Engineering Department with all property and easement descriptions. All grants of easement shall be executed by the property owner prior to City issuance of occupancy permits for the development.

## § 644-12.  As-built plans.

A.  Prior to formal written acceptance by the City of the storm detention system, all turf must be established in open basins. In addition, a licensed professional engineer must furnish the City Engineer two sets of sealed as-built detention plans. As-built plans shall verify that the required detention volume has been provided using calculations based on newly constructed elevations within and surrounding the basin(s). Newly constructed elevations within and surrounding the basin shall be shown on the plans in sufficient quantity and interval to verify and correspond to the calculations. The required outlet, pump or restrictor installation, grading that conforms to the approved plans, and freeboard features constructed with overflow provided shall also be indicated on the as-built plans.

B.  All differences and deficiencies shall be noted. Plans to correct deficiencies in detention volume, outlet, pump or restrictor, freeboard and overflow features shall be submitted for City Engineer approval and included with the as-built plans. All deficiencies in detention volume, outlet, pump or restrictor, freeboard and overflow features shall be corrected prior to City issuance of occupancy permits for the development.

## § 644-13.  Permit required for installation of parking lot pavements.

A permit will be required from the City for the installation of all parking lot pavements as addressed under this chapter. The permit allows for one post construction site inspection by the City Engineer upon submittal of the required as-built plans to verify compliance with the permit provisions. The City Commission shall establish the permit fee by resolution.

## § 644-14.  Enforcement; variance. [Amended 8-20-2007 by Ord. No. 2007-13; 6-15-2015 by Ord. No. 2015-13]

A.  The City Engineer is charged with the enforcement of this chapter. The City Engineer shall have the authority to grant variances from the stormwater detention regulations contained in this chapter upon a showing of practical difficulty by a property owner. A property owner requesting a variance shall submit a written request specifically stating which provision a variance is being requested from and describing the practical difficulty involved in strict compliance.

B.  The City Engineer shall have the authority to promulgate rules to allow for pilot projects that may vary from the stormwater detention regulations contained in this chapter as long as any development, renovation or addition to an existing development within the City, excluding property in the Central Business District Zones and properties used for one- and two-family residential purposes, detains stormwater runoff from the improvement on site. The City Commission shall adopt the rules before they become effective.

## § 644-15.  Violations and penalties.

A.  Any person, permittee, owner, developer or subsequent property owner who violates any provision of this chapter, including failure to submit plans, obtain permits, pay any fees, charges or surcharges imposed, or any condition or limitation of a permit issued pursuant or who knowingly makes false

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

statements, representations or certification in any application, record, report or plan or other document filed or required to be maintained pursuant to this chapter or who tampers with, alters or fails to maintain, or knowingly renders inoperable any detention basin, restrictor, fence or freeboard required under this chapter is guilty of a civil infraction and shall, upon conviction, be punished by the following:

(1) A person violating this chapter for the first time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $100 for each day of the violation, plus costs.

(2) A person violating this chapter for the second time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $250 for each day of the violation, plus costs.

(3) A person violating this chapter for the third time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $500 for each day of the violation, plus costs.

B. The City Engineer, Royal Oak Building Official and City of Royal Oak Code Enforcement are hereby authorized to seek, through any authorized prosecutorial official, prosecution of charges against any person violating any provision of this chapter.

## § 644-16. Ownership and registration.

Ownership of a storm detention system and its subsequent maintenance and liability fall to the legal ownership of the property. In the case of condominiums or other development where shared ownership of the storm detention system is owned by multiple property owners, associations or entities, the association or joint owners of the detention system shall register the legal owner's name(s), contact representative, current address and telephone numbers with the City Clerk office annually before January 30 or 30 days after any change in ownership.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

# Chapter 752

# WATERWORKS

§ 752-1.        Rules and regulations.

§ 752-2.        Permit required for service connections.

§ 752-3.        Fees.

§ 752-4.        Supplying water to others; unnecessary waste.

§ 752-5.        Installation of service pipes; supervision.

§ 752-6.        Connections supplying more than one building.

§ 752-7.        Meters.

§ 752-8.        Disconnection; discontinuance of service.

§ 752-9.        Fire hydrants.

§ 752-10.       Inspections; authority to require repairs and make repairs.

§ 752-11.       Fee to turn water on.

§ 752-12.       Payment of water rates; delinquent water roll; penalty charge.

[HISTORY: Adopted by the City Commission of the City of Royal Oak 6-18-1917 by Ord. No. 72; amended 8-18-1926 by Ord. No. 157. Subsequent amendments noted where applicable.]

### CHARTER REFERENCES

Water supply — See Ch. 13.

### GENERAL REFERENCES

Southeastern Oakland County Water Authority — See Ch. 160.

Flood damage prevention — See Ch. 351.

Sewers and sewage disposal — See Ch. 600.

Stormwater detention — See Ch. 644.

Wastewater — See Ch. 740.

Water — See Ch. 745.

## § 752-1. Rules and regulations.

The rules and regulations hereinafter named shall be considered a part of the contract with every person, company or corporation that is supplied with water through the water system of the City of Royal Oak, Michigan.

## § 752-2. Permit required for service connections.

Before any service connection shall be made or any work performed upon old or new connections, a permit shall be obtained from the City Clerk. No permit shall be issued to any person who is not licensed as a master plumber in the City of Royal Oak.

## § 752-3. Fees. [Amended 3-16-1942 by Ord. No. 404]

The City Commission shall, from time to time, establish fees to be charged for services rendered by the

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

officers, agents and employees of the City incident to the granting of the permit herein provided for, which fees shall be paid before the permit is issued. Such fees shall include the cost of tapping the main, installing the curb stop and laying the pipe to the curb stop, which curb stop and pipe shall be and remain the property of the City of Royal Oak.

### § 752-4.  Supplying water to others; unnecessary waste.

No owner or occupant of any building or premises shall be allowed to supply water to other persons or families, firm, company or corporation except by permission of the City Manager, or permit any unnecessary waste of water. If found doing so, the supply of water may be shut off at the option of the City.

### § 752-5.  Installation of service pipes; supervision.

All service pipes connecting with the distributing pipes of the Royal Oak water mains shall be laid in accordance with the provisions of this article and rules and regulations of the City of Royal Oak pertaining to its waterworks and shall be under the supervision of the proper officers of said City.

### § 752-6.  Connections supplying more than one building.

In all cases where the connection is intended to supply more than one tenement, shop, store or building, it shall be the duty of the person making such connection or causing the same to be made to lay down a branch with a stop cock for each branch outside the line of premises so to be supplied, to be suitably protected and marked as to be easily found. In no case shall one service supply more than one lot unless occupied by a single building used for a single industry or enterprise.

### § 752-7.  Meters. [Amended 3-16-1942 by Ord. No. 404]

Meters shall be installed by the City upon all premises supplied with water. Any damage sustained by said meter resulting from the neglect or carelessness of the agent, owner or tenant to properly secure and protect the same shall be paid by the owner to the City. It shall be unlawful for any person to interfere with or remove the water meter from any service where it has been attached without permission from the proper officers of the City, and it shall be unlawful for anyone to interfere with the reading of said meters by duly authorized officers of the City.

### § 752-8.  Disconnection; discontinuance of service.

Any premises may be disconnected from the distribution pipes of the Royal Oak water system and the supply of water withheld from said premises when the ordinances, rules and regulations of the City pertaining to the water system have in any manner been violated by the owner or occupant of said premises.

### § 752-9.  Fire hydrants.

Proprietors of manufacturing institutions, lumberyards, hotels, stores, elevators, warehouses, halls and other public buildings wishing to lay large pipes with hydrant and hose coupling to be used only in case of fire will be permitted to connect with the street main at their own expense, upon application to the City Manager and under his direction, and will be allowed to use all water for fire purpose free of charge, but all such pipes must be provided with suitable valve which must be sealed by the City when building. When the seal is broken for the extinguishments of fire, such owner or party or proprietor shall immediately give notice to the City Manager, and in case the said seal shall have been broken for any other purpose, the owner or proprietor of such property shall be liable to the penalties prescribed herein for the breach of any of the provisions of this article. No standpipe will be allowed on any premises where the water is not taken

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

for other than fire purposes.

## § 752-10.  Inspections; authority to require repairs and make repairs.

The duly constituted authorities of the City of Royal Oak shall have power and authority at all reasonable hours to enter upon any premises where water service is established for the purpose of inspecting and making an examination of all pipes and fixtures connected with the said waterworks, and they shall have power and authority to require any pipes or fixtures to be repaired, removed, replaced or changed where the same are defective or not in compliance with the provisions of the ordinances of said City, or the rules and regulations in relation to the waterworks of said City, and they may make such alterations and repairs or do such other acts with relation thereto as they shall deem necessary.

## § 752-11.  Fee to turn water on.

Whenever the water is turned off from any premises at the request of the owner or because of default of the owner or occupant thereof, the same shall not be turned on again until the owner has deposited with the City Manager the sum of $1 be cover the labor cost, and in cases where extraordinary labor is required such additional sum as will compensate for such additional labor.

## § 752-12.  Payment of water rates; delinquent water roll; penalty charge. [Amended 5-18-1936 by Ord. No. 302; 1-5-1976 by Ord. No. 76-3]

A.   The owner or occupant of any land or premises against which water rates shall be assessed shall pay same to the City Treasurer quarter-annually or more frequently as may be required according to such rules and regulations as may be adopted from time to time by the City Commission.

B.   All water charges shall be a lien upon the premises from and after the due date thereof and a five-percent penalty shall immediately attach thereto. All unpaid water charges which upon the 31st day of December have remained delinquent for a period of two months shall be placed on the delinquent water roll and shall have appended thereto a five-percent penalty charge. If the items on the delinquent water roll remain unpaid as of February 28, they shall be reported by the City Clerk to the City Commission, and the City Commission may require such charges to be transferred by the City Treasurer to the delinquent tax rolls. In the process thereof, an additional five-percent penalty charge shall be added. Said delinquent charges shall then be dealt with by the City Treasurer and enforced in the same manner and by the same means as are similar lien interests.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

## ARTICLE II
## Definitions; Rules Applying to Text

### § 770-7. Rules applying to text.

The following rules shall apply to the text and language of this chapter:

A.   The particular shall control the general.

B.   In case of any difference of meaning or implication between the text of this chapter and any caption, the text shall control.

C.   The word "shall" is always mandatory and not discretionary. The word "may" is permissive.

D.   Words used in the present tense shall include the future, words used in the singular number shall include the plural, and the plural shall include the singular, unless the context clearly indicates the contrary.

E.   The word "used" or "occupied," as applied to any land or building, shall be construed to include the words "intended, arranged, or designed to be used or occupied."

F.   Any word or term not defined herein shall be used with a meaning of common or standard utilization.

### § 770-8. Definitions.

For the purpose of this chapter, certain words and terms are herewith defined.

ACCESSORY BUILDING — A supplementary building or structure on the same lot or parcel of land as the principal building, occupied by or devoted exclusively to an accessory use.

ACCESSORY USE — A use reasonably and customarily incidental and subordinate to the principal use of the premises.

ADULT FOSTER CARE FACILITY — A governmental or nongovernmental establishment that provides foster care to adults. It includes facilities and foster care homes for adults who are aged, mentally ill, developmentally disabled, or physically handicapped who require supervision on an ongoing basis but who do not require continuous nursing care. An adult foster care facility does not include nursing homes, homes for the aged, hospitals, alcohol or substance abuse rehabilitation centers, residential centers for persons released from or assigned to a correctional facility, or any other facilities which have been exempted from the definition of adult foster care facility by the Adult Foster Care Facility Licensing Act, MCLA § 400.701 et seq.; MSA 16.610(61) et seq., as amended. The following additional definitions are provided:

A.   ADULT FOSTER CARE FAMILY HOME — A private residence with the approved capacity to receive six or fewer adults to be provided with foster care for five or more days a week and for two or more consecutive weeks. The adult foster care family home licensee shall be a member of the household and an occupant of the residence.

B.   ADULT FOSTER CARE SMALL GROUP HOME — A facility with the approved capacity to receive 12 or fewer adults who are provided supervision, personal care, and protection in addition to room and board, for 24 hours a day, five or more days a week, and for two or

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                 § 770-8

more consecutive weeks for compensation.

C.   ADULT FOSTER CARE MEDIUM GROUP HOME — A facility with the approved capacity to receive between seven and 12 adults who are provided supervision, personal care, and protection in addition to room and board, for 24 hours a day, five or more days a week, and for two or more consecutive weeks for compensation.

D.   ADULT FOSTER CARE LARGE GROUP HOME — A facility with approved capacity to receive at least 13 but not more than 20 adults to be provided supervision, personal care, and protection in addition to room and board, 24 hours a day, five or more days a week, and for two or more consecutive weeks for compensation.

E.   ADULT FOSTER CARE CONGREGATE FACILITY — An adult foster care facility with the approved capacity to receive more than 20 adults to be provided with foster care.

ADULT-ORIENTED COMMERCIAL ENTERPRISE — An establishment which draws its customers from one or more classes of the public, including, but not limited to the following:

A.   ADULT BOOKSTORE — An establishment which has a substantial or significant portion of its stock-in-trade sexually explicit verbal material. "Sexually explicit verbal material" is defined as a book, pamphlet, magazine, video, movie, printed matter reproduced in any manner, or sound recording that contains an explicit and detailed verbal description or narrative account of sexually explicit activity.

B.   ADULT CABARET — An establishment whose principal activity is the conducting or presenting of any sexually explicit performance. "Sexually explicit performance" is defined as a motion picture, video, digital presentation, exhibition, show, representation, or other presentation that, in whole or in part, depicts sexually explicit activity.

C.   ADULT VIDEO/MOTION-PICTURE THEATER — An establishment which, as its principal activity, presents or offers for sale or rents any sexually explicit visual material. "Sexually explicit visual material" is defined as a picture, photograph, drawing, sculpture, motion-picture film, or similar visual representation that depicts sexually explicit activity, or a book, magazine, or pamphlet that contains such a visual representation. An undeveloped photograph, mold or similar visual material may be sexually explicit material notwithstanding that processing or other acts may be required to make its sexually explicit content apparent.

D.   ADULT RETAIL STORE — An establishment which has a substantial or significant portion of its stock-in-trade in items used or advertised as sexually explicit entertainment gimmicks, novelties, paraphernalia, any sexually explicit matter or any combination thereof. "Sexually explicit matter" is defined as any sexually explicit verbal material, sexually explicit visual material, or sexually explicit performance.

E.   BODY PAINTING or NUDE MODELING STUDIO — Any building, structure, premises or part thereof used primarily as a place which offers as its principal activity the providing of models to exhibit, display or perform any sexually explicit performance for a fee, or which provides the services of body painting of the human body in conjunction with any sexually explicit activity.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                                    § 770-8

F.   SEXUALLY EXPLICIT ACTIVITY — Any presentation, exhibition, narrative, show, representation, depiction, or other description of any of the following:

(1)   EROTIC FONDLING — The touching of a person's clothed or unclothed genitals, pubic area, buttocks or, if the person is female, breasts, for the purpose of sexual gratification or stimulation.

(2)   NUDITY — The showing of the male or female genitals, pubic area, vulva, anus, the showing of the female breast with less than a fully opaque covering of any part of the nipple, the showing of the covered male genitals in a discernibly turgid state or any lewd display of the human male or female genitals or pubic area.

(3)   SADOMASOCHISTIC ABUSE — Either of the following:

(a)   Flagellation, or torture, for sexual stimulation or gratification, by or upon a person who is nude or clad only in undergarments or in a revealing costume; or

(b)   The condition of being fettered, bound, or otherwise physically restrained for sexual stimulation or gratification, of a person who is nude or clad only in undergarments or in a revealing costume.

(4)   SEXUAL EXCITEMENT — The condition of human male or female genitals when in a state of sexual stimulation or arousal.

(5)   SEXUAL INTERCOURSE — Intercourse, real or simulated, whether genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex or between a human and an animal; or any intrusion, however slight, into the genital or anal openings of another's body.

G.   ESCORT — A person who, for consideration, agrees or offers to act as a companion, guide, or date for another person, or who agrees or offers to privately model lingerie or to privately perform a striptease for another person.

H.   ESCORT AGENCY — A person or business association that furnishes, offers to furnish, or advertises to furnish escorts as one of its primary business purposes for a fee, tip or other consideration.

I.   PAWNBROKERS and PAWNSHOPS —

(1)   PAWNBROKER — Any person, corporation or member or members of a copartnership or firm, who loans money on deposit, or pledge of personal property, or other valuable things, other than securities or printed evidence of indebtedness, or who deals in the purchasing of personal property or other valuable thing on condition of selling the same back again at a stipulated price.

(2)   PAWNSHOP — Any location where a pawnbroker conducts business.

J.   TATTOO, BODY PIERCING, BRANDING PARLOR — An establishment which provides external body modification, through the application of a tattoo, body-piercing, or branding.

K.   BODY PIERCING — The perforation of human tissue other than an ear for a nonmedical

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

purpose.

L.   BRANDING — A permanent mark made on human tissue by burning with a hot iron or other instrument.

M.   TATTOO — An indelible mark made upon the body of another individual by the insertion of a pigment under the skin or an indelible design made upon the body of another by production of scars other than by branding.

ALLEY — Any dedicated public way other than a street, providing a secondary means of access to a property.

AUTOMOBILE — Unless specifically indicated otherwise, "automobile" shall mean any vehicle, including, by way of example, cars, trucks, vans, motorcycles, and the like.

AUTOMOBILE DEALERSHIP — A building or premises used primarily for the sale of new or used automobiles.

AUTOMOBILE FILLING STATION — A place used for the retail sale and dispensing of fuel or lubricants together with the fixed equipment from which the fuel is dispensed directly into motor vehicles. Automobile filling stations may also incorporate additional uses as permitted and regulated by this chapter.

AUTOMOBILE REPAIR GARAGE — An enclosed building where the following services may be carried out: general repairs, engine rebuilding, reconditioning of motor vehicles; collision services, such as frame or fender straightening and repair; painting and undercoating of automobiles; and similar repair activities.

AUTOMOBILE SERVICE STATION — A place used for the retail sale and dispensing of fuel or lubricants together with the fixed equipment from which the fuel is dispensed directly into motor vehicles, including the sale of minor accessories (such as tires, batteries, brakes, shock absorbers, window glass) and the servicing of and minor repair of automobiles.

AUTOMOBILE WASH ESTABLISHMENT — A building, or portion thereof, the primary purpose of which is the washing of vehicles either by automatic or self-service means.

A.   AUTOMATIC WASH — Any facility, its structures, accessory uses, or paved areas used wholly or partly to wash, clean and dry the exterior of automobiles, using conveyors to move the vehicle, or equipment that moves over or around the vehicle, or other automated equipment intended to mechanically wash such vehicles.

B.   SELF-SERVICE WASH — Any facility, its structures, accessory uses or paved areas used wholly or partly to wash, clean and dry the exterior of automobiles using hand-held equipment.

BASEMENT — That portion of a building having more than one-half of its height below finished grade. (See Figure 1.[1])

BED-AND-BREAKFAST OPERATIONS — A use which is subordinate to the principal use of a dwelling unit as a single-family dwelling unit and a use in which transient guests are provided a sleeping room and board in return for payment.

---

1.   **Editor's Note: Figure 1 is included at the end of this chapter.**

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

BILLBOARD or OFF-PREMISES SIGN — As defined in Chapter 607, Signs, Article II, Sign Regulations.**[Added 3-16-2015 by Ord. No. 2015-07]**

BROADCAST OR RECORDING STUDIO — A facility for the production and broadcasting of television, radio, or internet programs and similar products, or the recording of music, including, but not limited to, sound stages, sets, recording and broadcasting studios, production facilities, and administrative offices.**[Added 1-24-2011 by Ord. No. 2011-01]**

BUILDING — A structure having a roof supported by columns or walls.

BUILDING AREA — The horizontal area measured from the outside of the exterior wall of the ground floor of all principal and accessory buildings on the lot, including all covered porches.

BUILDING CODE — The currently adopted code or codes regulating building construction in the City of Royal Oak.

BUILDING HEIGHT — The vertical distance measured from the finished grade level to the roof surface as follows: 1) the top of the roof for flat roofs, 2) the deck lines for a mansard roof and 3) the average height of the highest roof peak as measured between the eaves and ridge of a gable, hip and gambrel roof, including dormer additions. Where the building may be situated on sloping terrain, this height shall be measured from the average level of the finished grade at the building wall. (See Figure 2.[2])

BUILDING OFFICIAL — The administrative official designated by the City Commission to enforce the Building Code.

BUILDING SETBACK LINE — The line established by the minimum required setbacks forming the area within a lot in which a building may be located. (See Figure 3.[3])

CHILD FOSTER CARE FACILITY — A private home or residence which is used for any of the following categories of foster care:

A.  CHILD FOSTER FAMILY HOME — A private home or residence, other than a hospital, hotel, or motel, and which is licensed by the State of Michigan as a full-time foster family home pursuant to Public Act 116 of 1973[4] for one but not more than four minor children who are unrelated to the other occupants thereof and are given care and supervision for 24 hours a day, for four or more days a week, for two or more consecutive weeks, and unattended by parent or legal guardian, by or under the supervision of the licensee under said state law, who is a resident of the facility.

B.  CHILD FOSTER FAMILY GROUP HOME — A private home or residence, other than a hospital, hotel, or motel, and which is licensed by the State of Michigan as a full-time foster family group home pursuant to Public Act 116 of 1973[5] for more than four but less than seven minor children who are unrelated to the other occupants thereof and are given care and supervision for 24 hours a day, for four or more days a week, for two or more consecutive weeks, and unattended by a parent or legal guardian, by or under the supervision of the licensee under said state law, who is a resident of the facility.

---

2.   Editor's Note: Figure 2 is included at the end of this chapter.
3.   Editor's Note: Figure 3 is included at the end of this chapter.
4.   Editor's Note: See MCLA § 722.111 et seq.
5.   Editor's Note: See MCLA § 722.111 et seq.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

CIGAR BAR — An indoor establishment or area within an indoor establishment that is open to the public and is designated for the smoking of cigars, purchased on the premises or elsewhere, or as otherwise defined in the Dr. Ron Davis Smoke-Free Air Law, Michigan Public Act 188 of 2009.[6] **[Added 10-1-2012 by Ord. No. 2012-15]**

CLINIC, OUTPATIENT MEDICAL — A building or portion thereof providing diagnostic, therapeutic, or preventive medical care, surgical or invasive procedures not requiring inpatient admission, and/or emergency or urgent care to ambulatory patients on an outpatient basis only, including customary laboratories and pharmacies incidental or necessary to its operation or the service of its patients, but without facilities for inpatient care or surgical procedures that require inpatient admission.**[Added 10-1-2012 by Ord. No. 2012-16]**

CONVALESCENT CENTER — A state-licensed facility for the care of children, of the aged or infirm, or a place of rest for those suffering bodily disorders. Said home shall conform to and qualify for license under state law even though state law has different size regulations.

DAY-CARE FACILITIES — The following definitions shall apply in the construction and application of this chapter:

A.   FAMILY DAY-CARE HOME, CHILD — A private residence in which one but not more than six minor children are received for care and supervision for periods less than 24 hours a day unattended by a parent or legal guardian, excepting children related to an adult member of the family by blood, marriage or adoption. It includes a home that gives care to an unrelated child for more than four weeks in a calendar year.

B.   GROUP DAY-CARE HOME, CHILD — A private residence in which seven but not more than 12 children are received for care and supervision for periods less than 24 hours a day unattended by a parent or legal guardian, excepting children related to an adult member of the family by blood, marriage or adoption. It includes a home that gives care to an unrelated child for more than four weeks in a calendar year.

C.   DAY-CARE CENTER, CHILD — A facility, other than a private residence, receiving one or more children for care and supervision for periods less than 24 hours, and where the parents or guardians are not immediately available to the child.

D.   DAY-CARE, ADULT — A facility providing care for the elderly and/or functionally impaired adults in a protective setting for a portion of a twenty-four-hour day.

DENSITY — The number of dwelling units per gross acre of land.

DENSITY BONUS — The granting of the allowance of additional density in a development as regulated by this chapter.

DISTRICT — A portion of the City within which certain uses of land and/or buildings are permitted and within which certain regulations and requirements apply under the provisions of this chapter.

DRIVE-THROUGH — An establishment that dispenses products or services to patrons who remain in vehicles.

DRIVEWAY — A passageway (primarily for use by vehicles) over private property, leading from

---

6.   Editor's Note: See MCLA § 333.12601 et seq.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                        § 770-8

a street or other public way to a garage or parking area. A horseshoe-shape drive or a T-shape drive located within a front yard is included within this definition.

DWELLING — A building or portion thereof which is used exclusively as a residence, and containing no less than a kitchen, bathroom and bedroom/living quarters. The following additional definitions are provided:

A.   DWELLING, MULTIPLE-FAMILY — A building consisting of three or more dwellings.

B.   DWELLING, SINGLE-FAMILY DETACHED — A detached building designed for, or occupied exclusively by, one family.

C.   DWELLING, SINGLE-FAMILY ATTACHED — An attached building consisting of no more than eight dwelling units, each with individual entries and designed for or occupied exclusively by one family.

D.   DWELLING, TWO-FAMILY — A building consisting of two dwellings.

E.   SITE-BUILT DWELLING — A structure constructed in accordance with the Michigan State Construction Code as promulgated by the Michigan State Construction Code Commission under the provisions of 1972, PA 230, as amended,[7] in which elementary building materials and parts are transported to the building site where they are used to construct the total dwelling unit, including its major individual components and systems.

F.   MANUFACTURED DWELLING — A structure constructed in accordance with Michigan State Construction Code, as promulgated by the Michigan State Construction Code Commission under the provisions of 1972, PA 230, as amended,[8] in which individual components, none of which in and of itself is suitable for occupancy, are preconstructed and transported to the building site where they are in need of further assembly in order to constitute a complete dwelling ready for occupancy.

EASEMENT — The right of an owner of property, by reason of such ownership, to use the property of another for purposes of ingress, egress, utilities, drainage and similar uses.

ELECTRONIC MESSAGE — A billboard or off-premises sign, or portion thereof, that can be electronically changed by remote or automatic means, or that appears to change or have movement caused by any method other than manually removing and replacing the billboard or its components, whether the apparent movement or change is in the display, the billboard's structure, or any other component of the billboard. This includes any video display, revolving, flashing, or animated displays, and displays that incorporate rotating or swinging panels, intermittent illumination or the illusion of such illumination, light-emitting diodes (LEDs) manipulated through digital input, "digital ink," or any other method or technology that allows the billboard face to present a series of images.**[Added 3-16-2015 by Ord. No. 2015-07]**

ESSENTIAL SERVICES — Services that are erected, constructed, altered, or maintained by public utilities or municipal agencies of underground, surface, or overhead gas, electrical, steam, or water transmission or distribution systems, collection, communication, supply or disposal systems, including mains, drains, sewers, pipes, conduits, wires, cables, fire alarm boxes, traffic

---

7.   **Editor's Note: See MCLA § 125.1501 et seq.**
8.   **Editor's Note: See MCLA § 125.1501 et seq.**

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8 §770-8

signals, hydrants, poles, and other similar equipment or accessories reasonably in connection therewith for the furnishing of adequate service by such public utilities or municipal agencies.

FAMILY — A family shall mean either of the following:

A.   A domestic family, that is one or more persons living together and related by the bonds of consanguinity, marriage or adoption, together with servants of the principal occupants and not more than two additional unrelated persons, with all of such individuals being domiciled together as a single, domestic, housekeeping unit in a dwelling.

B.   The functional equivalent of the domestic family, that is, persons living together in a dwelling unit whose relationship is a permanent and distinct character and is the functional equivalent of a domestic family with a demonstrable and recognizable bond which constitutes the functional equivalent of the bonds which render the domestic family a cohesive unit. All persons of the functional equivalent of the domestic family must be cooking and otherwise housekeeping as a single, nonprofit unit. This definition shall not include any society, club, fraternity, sorority, association, lodge, coterie, organization or group where the common living arrangement and/or the basis for the establishment of the functional equivalency of the domestic family is likely or contemplated to exist for a limited or temporary duration. There shall be rebuttable presumption enforceable by the Zoning Administrator in the first instance that the number of persons who may reside as a functional equivalent family shall be limited to four. Such presumption may be rebutted by application to the Plan Commission for a special land use based upon the applicable standards in this chapter.

FIREARM — Any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas, excluding, however:

A.   Any pneumatic gun, spring gun, or BB gun which expels a single globular projectile not exceeding 0.18 inch in diameter.

B.   Any device used exclusively for signaling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission.

C.   Any device used exclusively for the firing of stud cartridges, explosive rivets, or similar industrial ammunition.

D.   Model rockets designed to propel a model vehicle in a vertical direction.

FLOOR AREA — The sum of the gross horizontal areas of the several floors of the building measured from the exterior faces of the exterior walls or from the center line of walls separating two buildings.**[Amended 5-20-2013 by Ord. No. 2013-08]**

A.   In the case of residential uses, "usable floor area" is defined as the sum of the gross horizontal areas of each story, floor or level of a building measured from the exterior faces of the exterior walls without deduction for interior walls, closets, stairways, openings to lower floors, mechanical or utility rooms, or shafts at any level, excluding areas of unfinished attics, breezeways, basements, and unenclosed porches and areas within the building utilized for the required off-street parking spaces. **[Amended 4-21-2014 by Ord. No. 2014-04]**

B.   Nonresidential uses.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

(1)  In the case of nonresidential uses, "usable floor area" is defined as the sum of the gross horizontal areas of each story, floor or level of a building measured from the exterior faces of the exterior walls without deduction for interior walls, closets or shafts at any level, but excluding the following: common or multitenant hallways; stairways, stairwells, and elevator shafts; toilet rooms; mechanical equipment rooms; vaults; walk-in coolers and freezers; dressing or changing rooms; locker rooms; employee lounges or break rooms; demonstration rooms; and other similar areas not utilized for continuous occupancy, as determined by the Zoning Administrator.

(2)  In determining "usable floor area" for nonresidential uses, portions of each story, floor or level of a building may be divided into their separate and respective uses (sales, services, manufacturing, offices, storage, etc.) when calculating required off-street parking, as determined necessary by the Zoning Administrator.

(3)  In the absence of floor plans or other detailed documentation, "usable floor area" for nonresidential uses may be calculated as a percentage of not less than 80% of the sum of the gross horizontal areas of each story, floor or level of a building measured from the exterior faces of the exterior walls without deduction for interior walls, closets or shafts at any level, as determined necessary by the Zoning Administrator.

FOOTCANDLES — The unit of illumination when the foot is the unit of length.

GARAGE, PARKING — A space or structure or series of structures for the temporary storage or parking of motor vehicles.

GARAGE, PRIVATE — An accessory building or portion of a main building designed or used primarily for the storage of motor-driven vehicles, boats, house trailers, and similar vehicles owned and used by the occupants of the building to which it is accessory.

GARDEN, COMMUNITY — An area of land managed and maintained by an individual or a group of individuals, and owned and operated in trust by the City, another governmental entity or a recognized nonprofit organization to grow and harvest food crops and/or non-food, ornamental crops, such as flowers, for personal or group use, consumption, donation, or sale, either through cooperative shares, a publically owned and operated farmers' market or directly to local grocers and restaurants. Community gardens may be divided into separate plots for cultivation by one or more individuals or may be farmed collectively by members of the group and may include common areas maintained and used by group members.**[Added 4-19-2010 by Ord. No. 2010-04]**

GARDEN, DOMESTIC — An area of land managed and maintained by the owner or occupant of a dwelling to grow and harvest food crops for personal use, consumption or donation. The growing of non-food, ornamental crops, such as flowers or other decorative plants, by the owner or occupant of a dwelling shall not be considered a domestic garden.**[Added 4-19-2010 by Ord. No. 2010-04]**

GARDEN, MARKET — An area of land managed and maintained by a business, an individual or group of individuals to grow and harvest food crops and/or non-food, ornamental crops, such as flowers, for sale, use or consumption by the business, individual or group.**[Added 4-19-2010 by Ord. No. 2010-04]**

GRADE — The degree of rise or descent of a sloping surface.

GRADE, FINISHED — The final elevation of the ground surface after development.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

GREENHOUSE — An accessory structure for a domestic, community or market garden constructed chiefly of glass, glass-like translucent material, plastic, fiberglass, cloth or lath, which is devoted to the protection or cultivation of food crops and/or non-food, ornamental crops, such as flowers, or other plants; including any hoop-house structure made of pipes or other material covered with translucent plastic, constructed in a half-round or hoop shape; or any unheated cold-frame structure consisting of a wooden or concrete frame and a top of glass or clear plastic, used for protecting seedlings and plants from the cold.**[Added 4-19-2010 by Ord. No. 2010-04]**

GUNSHOP —

A.   Any place, premises, room, building, or part thereof, from which there is conducted the retail sale, repairing or renting of firearms, or the sale of ammunition therefor;

B.   Any place, premises, room, building, or part thereof, from which there is conducted the wholesale sale of firearms, and which also includes within the place, premises, room, building, or part thereof, the storage of firearms or ammunition.

HOME OCCUPATION — An occupation, profession, activity, or use that is clearly a customary incidental use of a residential dwelling unit and which does not alter the exterior of the property or affect the residential character of the neighborhood.

HOSPITAL — A building or group of buildings providing diagnostic, therapeutic, or preventive medical care, surgical procedures, trauma centers, emergency and urgent care, and other health care services to patients on primarily an inpatient basis, including such related facilities as laboratories, outpatient departments, training facilities, staff offices and residences, central services facilities, gift shops, pharmacies, and restaurants.**[Added 10-1-2012 by Ord. No. 2012-16]**

HOTEL — A building or group of buildings containing rooms designed to provide transient lodging for compensation for periods of 30 days or less, with one or more common entrances for each building(s) serving all lodging units, where each lodging unit is accessed from interior lobbies, courts, or halls within the building(s), and in which building(s) there is a general kitchen and dining room for the accommodation of the occupants.**[Amended 10-1-2012 by Ord. No. 2012-13]**

KENNEL — Any place or premises where dogs, cats, or other domestic pets are boarded, bred, or cared for for a twenty-four-hour period in return for remuneration, or are kept for the purpose of sale. "Kennel" shall also mean the keeping of four or more pets over the age of four months.

LANDSCAPING — The following definitions shall apply in the construction and application of this chapter:**[Amended 2-12-2018 by Ord. No. 2018-02]**

A.   BERM — A landscaped mound of earth which blends with the surrounding terrain. (See Figure 4.[9])

B.   BUFFER — A landscaped area composed of living material, wall, berm, or combination thereof, established and/or maintained to provide visual screening, noise reduction, and transition between zones. (See Figure 4.[10])

---

9.   Editor's Note: Figure 4 is included at the end of this chapter.

10.   Editor's Note: Figure 4 is included at the end of this chapter.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                      § 770-8

C.   CALIPER — The diameter of a deciduous tree's perennial trunk measured at 12 inches above the existing grade.

D.   CONFLICTING NONRESIDENTIAL ZONES — Any nonresidential zone which abuts a residential zone. (See Figure 5.[11])

E.   CONFLICTING RESIDENTIAL ZONES — Any residential zone designated at a higher density (greater units per acre) or greater bulk (increased lot coverage) which abuts a residential zone designated at a lower density. (See Figure 5.[12])

F.   DIAMETER AT BREAST HEIGHT — The diameter of a deciduous tree's perennial trunk measured at 4 1/2 feet above the existing grade.

G.   DRIP LINE — An imaginary vertical line that extends downward from the outermost tips of a tree's branches or stems to the ground.

H.   GREENBELT — A landscaped area, established at a depth of the minimum required front yard setback within a zoning district, which is intended to provide a transition between a public road right-of-way and an existing or proposed land use. (See Figure 6.[13])

I.   OPACITY — The state of being impervious to sight.

J.   PLANT MATERIAL — A collection of living evergreen and/or deciduous, woody-stemmed trees, shrubs, vines and ground cover.

K.   SHRUB — A woody plant of up to six feet in height with several erect, spreading, or prostrate stems and a general bushy appearance.

L.   TREE, DECIDUOUS — A woody plant with an erect perennial trunk, a height of greater than six feet at maturity, and exhibiting a more or less definite crown of leaves or other foliage that is shed on a seasonal basis.

M.   TREE, EVERGREEN — A woody plant with an erect perennial trunk, a height of greater than six feet at maturity, and several erect, spreading or prostrate stems that retain their foliage throughout the year.

LOADING SPACE — An off-street space on the same lot with a building or group of buildings, for temporary parking of a commercial vehicle while loading and/or unloading merchandise or materials.

LOT — A parcel of land, excluding any portion in a street or other right-of-way, of at least sufficient size to meet minimum requirements for use, coverage, lot area, and to provide such yards and other open spaces as herein required. Such lot shall have frontage on a public street, or on an approved private street, and may consist of a single lot of record; a portion of a lot of record; any combination of complete and/or portions of lots of record; or a parcel of land described by metes and bounds. (See Figure 7.[14]) Two or more contiguous lots under the same ownership shall

---

11.  Editor's Note: Figure 5 is included at the end of this chapter.
12.  Editor's Note: Figure 5 is included at the end of this chapter.
13.  Editor's Note: Figure 6 is included at the end of this chapter.
14.  Editor's Note: Figure 7 is included at the end of this chapter.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

be considered a lot for purposes of this chapter. The following additional definitions are provided:

A.   LOT, CORNER — A lot with frontage on two intersecting streets. The narrower lot frontage shall be considered the front in determining building siting and side and rear yard setbacks.

B.   LOT, THROUGH or DOUBLE FRONTAGE — A lot other than a corner lot having frontage on two more or less parallel streets. In the case of a row of double frontage lots, one street will be designated as the front street for all lots in the plat and in the request for a zoning compliance permit. If there are existing structures in the same block fronting one or both of the streets, the required front yard setback shall be observed on those streets where structures presently front.

C.   LOT, INTERIOR — A lot other than a corner lot with only one lot line fronting on a street.

LOT AREA — The total horizontal area within the lot lines of a lot, but excluding that portion within a street right-of-way.

LOT COVERAGE — The percentage of the lot area covered by the building area.

LOT DEPTH — The mean horizontal distance from the front line to the rear lot line.

LOT LINE — Any line dividing one lot from another or from a public right-of-way, and thus constitutes the property lines bounding a lot.

LOT OF RECORD — A lot, the dimensions of which are shown on a subdivision plat recorded in the office of the Register of Deeds for Oakland County, or a lot or parcel described by metes and bounds, the accuracy of which is attested to by a professional engineer or registered surveyor, so designated by the State of Michigan, and said description so recorded with the Register of Deeds.

LOT WIDTH — The required horizontal distance between the side lot lines measured at the two points where the required front yard setback line intersects the side lot lines. For lots located on the turning circle of a cul-de-sac, the lot width may be reduced to 80% of the required lot width.

MANUFACTURING — The use of land, buildings or structures for the purpose of manufacturing, assembling, making, preparing, inspecting, finishing, treating, altering, repairing, fabricating or adapting for sale of any goods, substance, article, thing or service.

MARIHUANA ESTABLISHMENT — As defined in Chapter 435, Marihuana, Article I, Recreational Marihuana Establishments, including, but not limited to, the following: designated consumption establishment; event organizer; excess grower; grower; microbusiness; processor; retailer; safety compliance facility; secure transporter; and temporary event.**[Added 7-27-2020 by Ord. No. 2020-07]**

MASSAGE ESTABLISHMENT — As defined in Chapter 447, Massage Establishments, as amended.

MECHANICAL AMUSEMENT ARCADE — Any place, premises, room or establishment in which:

A.   A substantial and significant portion of the business carried on involves the operation of mechanical amusement devices; or

B.   Three or more mechanical amusement devices are located.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                                                  § 770-8

MECHANICAL AMUSEMENT DEVICE — Any machine which, upon the insertion of a coin, slug, token, plate or disc, or the payment of a price, may be operated by the public generally for use as a game, entertainment or amusement, whether or not registering a score. It shall include such devices as marble machines, pinball machines, skill ball machines, mechanical grab machines, coin-operated motion-picture machines, shuffle board game machines or devices, whether played with discs, weights, pucks, or balls, and all games, operations or transactions similar thereto under whatever name they may be indicated, and whether operated by hand or electric power, or a combination thereof.

MEZZANINE — An intermediate floor in any story occupying but not to exceed more than 1/3 of the floor area of such story.

MOBILE HOME — A detached portable single-family dwelling, prefabricated on its own chassis and intended for long-term occupancy. The unit contains sleeping accommodations, a flush toilet, a wash basin, a tub or shower, eating and living quarters. It is designed to be transported on its own wheels or flatbed arriving at the site where it is to be occupied as a complete dwelling without permanent foundation and connected to existing utilities.

MOBILE HOME PARK — Any parcel of land intended and designed to accommodate more than one mobile home for living use which is offered to the public for that purpose; and any structure, facility, area, or equipment used or intended for use incidental to that living use.

MOTEL — A building or group of buildings of rental units, in which each rental unit contains a bedroom and a bathroom, designed to provide transient lodging for compensation for periods of 30 days or less, where any number of lodging units may be accessed from a direct, independent entrance, and/or where off-street parking is provided directly adjoining any unit, provided that provision for cooking may be made in no more than 10% of the individual rooms or units within a building.**[Amended 10-1-2012 by Ord. No. 2012-13]**

MOTION-PICTURE STUDIO — A facility for the production of motion pictures, television programs, and similar products, including, but not limited to, sound stages, sets, cafeterias, production studios and facilities, research and development operations, training or education areas, and administrative offices.**[Added 1-24-2011 by Ord. No. 2011-01]**

MULTIMODAL TRANSPORTATION FACILITY — A facility intended to provide a transfer station for multiple modes of transportation, including but not limited to buses, trains, cabs, and cars.

NONCONFORMING STRUCTURE — A nonconforming building is a building or portion thereof lawfully existing at the effective date of this chapter, or amendments thereto, and which does not conform to the provisions of this chapter in the zoning district in which it is located.

NONCONFORMING USE — A use which lawfully occupied a building or land at the effective date of this chapter, or amendments thereto, and that does not conform to the use regulations of the zoning district in which it is located.

OFFICE, BUSINESS, ADMINISTRATIVE, OR PROFESSIONAL — A building or portion thereof used for general administrative offices of any of the following occupations: executive, administrative, or professional; accounting or financial management; writing, clerical, or stenographic; data processing and computer centers; design; sales; architectural and engineering; federal, state and local administration; and similar professions. Business, administrative, and professional offices shall not include medical offices, outpatient medical clinics, hospitals,

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                                                   § 770-8

veterinary hospitals, or automotive brokers and wholesalers.**[Added 10-1-2012 by Ord. No. 2012-16]**

OFFICE, MEDICAL — A building or portion thereof providing diagnostic, therapeutic, or preventive medical, osteopathic, chiropractic, dental, psychological and similar or related treatment by a practitioner or group of practitioners licensed to perform such services to ambulatory patients on an outpatient basis only, but without facilities for inpatient care, major surgical procedures, or emergency and urgent care.**[Added 10-1-2012 by Ord. No. 2012-16]**

OFF-STREET PARKING AREA — A hard-surfaced facility providing vehicular parking spaces along with adequate drives and aisles for maneuvering so as to provide access for entrance and exit for the parking of automobiles.

PARKING LOT, ACCESSORY — A tract of land other than a street, designed and used for the parking or storage of motor vehicles, for the use of occupants, employees and patrons of the building or premises to which it is accessory.

PARKING LOT, PUBLIC — A tract of land, other than an accessory parking lot or a street, used for the parking or storage of motor vehicles for general public use, either free or for remuneration.

PARKING SPACE — One unit of a parking area provided for the parking of one vehicle, and shall be exclusive of driveways, aisles, or entrances giving access thereto and shall be fully accessible for the storage or parking of permitted vehicles.

PAVEMENT, IMPERVIOUS — A surface material for parking lots, maneuvering aisles, driveways, loading areas, sidewalks, pedestrian pathways, and other areas which prevents the infiltration of surface water, including, but not limited to, asphalt, concrete, brick, stone, or similar materials. **[Added 10-14-2019 by Ord. No. 2019-11]**

PAVEMENT, PERVIOUS or PERMEABLE — A surface material for parking lots, maneuvering aisles, driveways, loading areas, sidewalks, pedestrian pathways, and other areas which allows the infiltration, treatment, and/or storage of surface water, including, but not limited to, porous asphalt, pervious concrete, permeable interlocking pavers, reinforced turf, or similar materials.**[Added 10-14-2019 by Ord. No. 2019-11]**

PORCH — A covered or uncovered floor, deck or platform at the entrance to a building, the height of which is eight inches or more above the average grade.

PRINCIPAL BUILDING OR STRUCTURE — The main building or structure in which the primary use is conducted.

PUBLIC UTILITY — Any person, firm, corporation, or municipal agency authorized under federal, state, county or municipal regulations to furnish electricity, gas, transportation, water, or sewer services.

RECREATIONAL VEHICLE/TRAILER — A motor vehicle (or trailer to be towed by a motor vehicle) constructed or altered to provide living quarters, including permanently installed cooking and sleeping facilities, and is used for recreation, camping, or other noncommercial use.

RECYCLING CENTER — A facility which recovers resources, such as newspapers, glassware, and metal cans, and collects, stores, flattens, crushes, or bundles, essentially by hand, and within a completely enclosed building.

RESTAURANT — Any establishment whose principal business is the sale of food and beverages

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

§ 770-8                                                                 § 770-8

to the customer in a ready-to-consume state, and whose method of operation is characteristic of a carry-out, drive-in, drive-through, fast-food, standard restaurant, or bar/lounge, or combination thereof, as defined below:

A.  RESTAURANT, CARRY-OUT — A restaurant whose method of operation involves sale of food, beverages, and/or frozen desserts in disposable or edible containers or wrappers in a ready-to-consume state for consumption primarily off the premises.

B.  RESTAURANT, DRIVE-IN — A restaurant whose primary business is serving food to the public for consumption on the premises by order from and service to vehicular passengers outside the structure.

C.  RESTAURANT, FAST-FOOD — A restaurant whose method of operation involves minimum waiting for delivery of ready-to-consume food to the customer at a counter or cafeteria line for consumption at the counter where it is served, or at tables, booths, or stands inside or outside of the structure, for consumption off the premises, but not in a motor vehicle at the site.

D.  RESTAURANT, STANDARD — A restaurant whose method of operation involves either:

(1)  The delivery of prepared food by servers to customers seated at tables; or

(2)  The acquisition by customers of prepared food at a cafeteria line and its subsequent consumption by the customers at tables.

E.  BAR or LOUNGE — A type of restaurant which is operated primarily for the dispensing of alcoholic beverages although the sale of prepared food or snacks may also be permitted. If a bar or lounge is part of a larger dining facility, it shall be defined as that part of the structure so designated or operated.

RETAIL ESTABLISHMENT — A commercial enterprise devoted in whole or in part to the sale, rental, and/or servicing of goods or commodities, where such goods or commodities are available for immediate purchase and removal from the premises by the purchaser.**[Added 5-20-2013 by Ord. No. 2013-08]**

RETAIL ESTABLISHMENT, LARGE-SCALE — A retail establishment with 100,000 square feet or more of gross floor area, with or without limited and/or separate accessory uses within the same building.**[Added 5-20-2013 by Ord. No. 2013-08]**

RIGHT-OF-WAY — A legal right of passage over real property typically associated with roads and railroads.

SELF-SERVICE STORAGE FACILITY — A building or group of buildings in a controlled access and fenced compound that contains varying sizes of individual, compartmentalized, and controlled access stalls or lockers to be leased or owned for the storage of customer's goods or wares.

SENIOR HOUSING — A building or group of buildings containing dwellings intended to be occupied by elderly persons, as defined by the Federal Fair Housing Act, as amended. Housing for the elderly may include independent and/or assisted living arrangements but shall not include nursing or convalescent homes regulated by the State of Michigan. Independent and assisted living housing are defined as follows:

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

A.   SENIOR INDEPENDENT LIVING — Housing that is designed and operated for elderly people in good health who desire and are capable of maintaining independent households. Such housing may provide certain services such as security, housekeeping and recreational and social activities. Individual dwellings are designed to promote independent living and shall contain kitchen facilities.

B.   SENIOR ASSISTED LIVING — Housing that provides twenty-four-hour supervision and is designed and operated for elderly people who require some level of support for daily living. Such support shall include meals, security, and housekeeping, and may include daily personal care, transportation and other support services, where needed. Individual dwellings may contain kitchen facilities.

SETBACK — The minimum required horizontal distance between the building or structure and the front, side, and rear lot lines. (See Figure 3.[15])

SHOPPING CENTER — Three or more commercial establishments with a total gross floor area of more than 10,000 square feet, planned, developed, owned, managed, and functioning as a single property or unit, with off-street parking provided on the property.**[Amended 5-20-2013 by Ord. No. 2013-08]**

SIGN — As defined in Chapter 607, Article II, Sign Regulations.

SITE CONDOMINIUM — A condominium development containing residential, commercial, office, industrial, or other structures or improvements for uses permitted in the zoning district in which located, in which each co-owner owns exclusive rights to a volume of space within which a structure or structures may be constructed, herein defined as a condominium unit, as described in the master deed. The following additional definitions are provided:

A.   CONDOMINIUM ACT — Act 59, Public Acts of 1978, as amended.[16])

B.   CONDOMINIUM DOCUMENTS — The master deed, recorded pursuant to the Condominium Act, and any other instrument referred to in the master deed or bylaws which affects the rights and obligations of a co-owner in the condominium.

C.   CONDOMINIUM LOT — The condominium unit and the contiguous limited common element surrounding the condominium unit, which shall be the counterpart of "lot" as used in connection with a project developed under the Subdivision Control Act, Act 288 of the Public Acts of 1967, as amended.[17]

D.   CONDOMINIUM UNIT — The portion of a condominium project designed and intended for separate ownership and use, as described in the master deed.

E.   GENERAL COMMON ELEMENTS — The common elements other than the limited common elements.

F.   LIMITED COMMON ELEMENTS — A portion of the common elements reserved in the master deed for the exclusive use of less than all of the co-owners.

---

15. **Editor's Note: Figure 3 is included at the end of this chapter.**

16. **Editor's Note: See MCLA § 559.101 et seq.**

17. **Editor's Note: See MCLA § 560.101 et seq.**

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

G.   MASTER DEED — The condominium document recording the condominium project to which are attached as exhibits and incorporated by reference the bylaws for the project and the condominium subdivision plan for the project, and all other information required by the Condominium Act.

SMOKING LOUNGE — An indoor establishment or area within an indoor establishment primarily used for the smoking of tobacco, tobacco products, cigars, or cigarettes, and/or the use of smoking paraphernalia, whether purchased or leased on the premises or elsewhere, where the more substantial and significant portion of the establishment's stock-in-trade and gross floor area is dedicated to smoking and/or the use of smoking paraphernalia instead of the retail sale of tobacco, tobacco products, cigars, cigarettes, smoking paraphernalia, and other related items, and such retail sales are reasonably and customarily incidental and subordinate to smoking and/or the use of smoking paraphernalia. A "smoking lounge" shall have a valid exemption certificate from the Michigan Department of Community Health for a "tobacco specialty retail store," comply with all required standards of the Dr. Ron Davis Smoke-Free Air Law, Michigan Public Act 188 of 2009,[18] and not be included as part of any outdoor cafe or outdoor dining area.**[Added 10-1-2012 by Ord. No. 2012-15]**

SOLAR ENERGY SYSTEM — An aggregation of parts including any base, mounts, tower, solar collectors, and accessory equipment such as utility interconnections and solar storage batteries, etc., in such configuration as necessary to convert solar radiation into thermal, chemical or electrical energy. The following additional definitions are provided:**[Added 6-15-2009 by Ord. No. 2009-06]**

A.   SOLAR COLLECTOR — A photovoltaic cell, panel or array, or a heated air or water collection device, which relies upon solar radiation as an energy source for the generation of thermal, chemical or electrical energy, i.e., solar cells or solar panels.

B.   SOLAR STORAGE BATTERY — A device that stores energy from solar radiation and makes it available in the form of thermal, chemical or electrical energy.

SPECIAL LAND USE — A use which is subject to special approval by the Plan Commission. A special land use may be granted only when there is a specific provision in this chapter. A special land use is not considered to be a nonconforming use.

STORY — That portion of a building included between the surface of any floor and the surface of the floor next above it, or if there is no floor above it, then the space between the floor and the ceiling next above it and including those basements used for the principal use. (See Figure 8.[19])

STORY, ONE-HALF — A space under a sloping roof that has the line of intersection of the roof and wall face not more than three feet above the floor level and in which space the possible floor area with head room of five feet or less, and occupies at least 40% of the total floor area of the story directly beneath.

STREET or HIGHWAY — The entire width between boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel or as a principal means of access to abutting property.

---

18.  **Editor's Note:** See MCLA § 333.12601 et seq.

19.  **Editor's Note:** Figure 8 is included at the end of this chapter.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

STRUCTURAL ALTERATION — Any change in the supporting members of a building such as bearing walls, columns, beams, or girders, or any substantial changes in the roof and exterior walls.

STRUCTURE — Anything constructed or erected above ground level or which is permanently attached to something located on the ground.

TENT — Any structure used for living or sleeping purposes or for sheltering a public gathering constructed wholly or in part from canvas, tarpaulin, or other similar material, and shall include shelter provided for circuses, carnivals, side shows, revival meetings, camp meetings, and all similar meetings or exhibitions in temporary structures.

TOBACCONIST — An indoor establishment primarily used for the retail sale of tobacco, tobacco products, cigars, cigarettes, smoking paraphernalia, and other related items. A "tobacconist" may include a "smoking lounge" as an accessory use, provided:**[Added 10-1-2012 by Ord. No. 2012-15]**

A.   The establishment has a valid exemption certificate from the Michigan Department of Community Health for a "tobacco specialty retail store" and complies with all required standards of the Dr. Ron Davis Smoke-Free Air Law, Michigan Public Act 188 of 2009;[20]

B.   The smoking lounge is reasonably and customarily incidental and subordinate to the retail sale of tobacco, tobacco products, cigars, cigarettes, smoking paraphernalia, and other related items; and

C.   The more substantial and significant portion of the establishment's stock-in-trade and gross floor area is dedicated to retail sales instead of a smoking lounge.

TOBACCO SPECIALTY RETAIL STORE — An indoor establishment in which the primary purpose is the retail sale of tobacco products and smoking paraphernalia, and in which the sale of other products is incidental, or as otherwise defined in the Dr. Ron Davis Smoke-Free Air Law, Michigan Public Act 188 of 2009.[21] A "tobacco specialty retail store" does not include a tobacco department or section of a larger commercial establishment or any establishment with any type of liquor, food, or restaurant license.**[Added 10-1-2012 by Ord. No. 2012-15]**

WAREHOUSE — A building used primarily for the storage of goods and materials.

WIND ENERGY SYSTEM — An aggregation of parts including the base, tower, generator, turbine, rotor, blades, and accessory equipment such as utility interconnections and battery banks, etc., in such configuration as necessary to convert the power of wind into mechanical or electrical energy, i.e., wind charger, windmill, or wind turbine. The following additional definitions are provided:**[Added 6-15-2009 by Ord. No. 2009-06]**

A.   ANEMOMETER TOWER — An aggregation of parts including the base, tower, anemometer or wind speed recorder, wind direction vanes, data logger, and accessory equipment such as any telemetry devices, etc., in such configuration as necessary to monitor or transmit wind speed and wind flow characteristics over a period of time for either instantaneous wind information or to characterize the wind resource at a given location.

---

20.  Editor's Note: See MCLA § 333.12601 et seq.

21.  Editor's Note: See MCLA § 333.12601 et seq.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

City of Royal Oak, MI

B.  NACELLE — The component of a wind energy system that sits atop the tower and houses the turbine.

C.  ROTOR — A multiple-bladed airfoil assembly of a wind energy system that extracts through rotation kinetic energy directly from the wind.

D.  TOWER — The vertical component of a wind energy system that elevates the turbine, rotor and blades above the ground.

E.  TURBINE — The component of a wind energy system that converts kinetic energy directly from the wind into mechanical or electrical energy, or the generator.

WIRELESS COMMUNICATIONS FACILITIES — All structures and accessory facilities relating to the use of the radio frequency spectrum for the purpose of transmitting or receiving radio signals. This may include, but shall not be limited to, radio towers, television towers, telephone devices and exchanges, microwave relay towers, telephone transmission equipment, building and commercial mobile radio service facilities. Not included within this definition are citizen band radio facilities; short-wave facilities; ham, amateur radio facilities; satellite dishes; and governmental facilities which are subject to state or federal law or regulations which preempt municipal regulatory authority. For purposes of this chapter, the following additional terms are defined:**[Amended 10-1-2012 by Ord. No. 2012-14]**

A.  ATTACHED WIRELESS COMMUNICATIONS FACILITIES — Wireless communication facilities that are affixed to existing structures, such as existing buildings, towers, water tanks, utility poles, and the like, including distributed antenna systems (DAS) or small cells. A wireless communication support structure proposed to be newly established shall not be included within this definition. **[Amended 3-30-2020 by Ord. No. 2020-03]**

B.  WIRELESS COMMUNICATION SUPPORT STRUCTURES — Structures designed, erected, or modified to support, or are capable of supporting, wireless communication equipment including antennas. Support structures within this definition include, but shall not be limited to, monopoles, self-supporting lattice towers, light poles, wood poles and guyed towers, water towers, utility poles, or buildings, or other structures which appear to be something other than a mere support structure.

C.  CO-LOCATION — The placement or installation of wireless communication equipment on an existing wireless communication support structure, tower, water tower, utility pole, building, or other structure, or within an existing wireless communication equipment compound, with the view toward reducing the overall number of wireless communication support structures required to support wireless communication antennas within the City. **[Amended 3-30-2020 by Ord. No. 2020-03]**

D.  WIRELESS COMMUNICATION EQUIPMENT — The set of equipment and network components used in the provision of wireless communications services, including, but not limited to, antennas, transmitters, receivers, base stations, equipment shelters, cabinets, emergency generators, power supply cables, and coaxial and fiber optic cables, but excluding wireless communications support structures.

E.  WIRELESS COMMUNICATION EQUIPMENT COMPOUND — An area surrounding or adjacent to the base of a wireless communications support structure and within which

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

wireless communications equipment is located.

YARD — An open space on the same lot with a building, unoccupied and unobstructed by any structure or portion of a structure from 30 inches above the general ground level of the graded lot, except as otherwise provided herein; provided, however, that fences and walls may be permitted in any yard, subject to the height limitation as indicated herein and in the Building Code. The measurement of a yard shall be construed as the minimum horizontal distance between the lot line and the building or structure.

YARD, FRONT — A yard extending across the full width of the lot, the depth of which is the minimum horizontal distance between the principal building and the front lot line, and measured perpendicular to the building at the closest point to the front lot line. In all cases, the front lot line shall be considered to be that portion of the lot which abuts a public road right-of-way or private road easement. (See Figure 3.[22])

YARD, REAR — A yard extending across the full width of the lot, the depth of which is the minimum horizontal distance between the rear lot line and the nearest point of the principal building. In the case of a lot which comes to a point at the rear, the rear lot line shall be that imaginary line parallel to the front lot line, not less than 10 feet long, lying wholly within the lot and the farthest from the front lot line. (See Figure 3.[23])

YARD, SIDE — A yard between any building and the side lot line, extending from the front yard to the rear yard. The width of the required side yard shall be measured horizontally from the nearest point of the side lot line to the nearest point of principal building. (See Figure 3.[24])

ZONE — A section of the City for which the regulations governing the height, area, use, structure, or size of buildings and premises are the same.

---

**22.** Editor's Note: Figure 3 is included at the end of this chapter.

**23.** Editor's Note: Figure 3 is included at the end of this chapter.

**24.** Editor's Note: Figure 3 is included at the end of this chapter.

Downloaded from https://ecode360.com/RO2029 on 2025-10-27

# EXHIBIT D

# Your Water/Sewer Bill is Changing

## Royal Oak is planning to launch a stormwater utility

Royal Oak is a vibrant and growing community with record numbers of new housing starts and a steady stream of economic development. While our city evolves, so do the challenges of maintaining and improving our aging sewer infrastructure at a time when climate change is causing higher intensity storms.

In 2015, the city launched a Stormwater Task Force to address this matter to protect better your property and our environment. For four years the task force has been studying ways to improve our current stormwater management practices. Its main goals are to evaluate our current sewer system and city codes, encourage impactful stormwater management, and adequately fund our sewer system to keep it in good working order.

Following in the footsteps of many other communities, Royal Oak has determined that the current way stormwater is billed to water customers is inequitable. Royal Oak is pursuing the adoption of a stormwater utility that will replace the existing billing method and assign costs based primarily on a property's hard surfaces which are measurable land features that contribute towards runoff. Credit programs will also be instituted that incentivize significant reductions of runoff. New stormwater and reduced sanitary sewer rates have yet to be determined, however water customers should expect to see changes to how water/sewer bills are calculated in the future.

# Why is stormwater so important?



The majority of rain and snowfall that flows off hard surfaces, such as rooftops and driveways, ends up in a complex network of pipes that lead to a wastewater treatment facility miles away.

Stormwater runoff comes from rain and melted snow that flows off our properties to the sewer system through more than 7,289 street catch basins. This runoff ultimately combines with wastewater (from toilets, washing machines, etc.) and needs to be treated at the Detroit Wastewater Resource Recovery Facility, which can be costly.

Maintaining the city's sewer system and installing green infrastructure are needed to reduce the city's stormwater treatment bills and to prevent basement backups by mantaining system capacities.

With the help of OHM Advisors, Royal Oak is evaluating how it will invest in stormwater management moving forward.



The cost of treating stormwater is related to to water that flows to drains outside your house; NOT the drains inside your house.

As a water customer, you currently fund the treatment of stormwater based on how much water you consume.

Royal Oak is considering a stormwater utiltiy fee that would be based on how much runoff your property creates; not how much water you use.

# How do we pay for stormwater?

Currently, Royal Oak property owners are billed quarterly for water consumption along with a combined charge for sanitary and stormwater sewer usage.  The city's Stormwater Task Force is proposing separating sanitary sewer costs (water from toilets, showers, laundry etc.) from stormwater costs (rainfall and melted snow) in a method that is well recognized and equitable.

Under the new fee structure, owners will receive a charge for stormwater based on multiplying the measured area of hard surface on their property by a stormwater rate (yet to-be-determined).

Property owners should see a reduction in sanitary sewer charges on their water bills along with a new line item just for stormwater.



**The stormwater utility fee is not a new charge.**
**It is an improved method of distributing sewer charges that are currently included in water rates.**

For billing purposes, hard surfaces of properties in Royal Oak have been measured using high-resolution aerial photography. You can view the measurement for your property at romi.gov/stormwater.

Please note that the map is a general depiction of hard surface area and not the means by which the square footage was calculated.

## What is my hard surface area?

The example below shows a property with a house, garage, deck and areas of brick, gravel and concrete pavement. The diagram next to it shows the calculated hard surface areas of this property in gray.

Gardens, lawns, green roofs and landscaping, which absorb stormwater, are non-billable. Sidewalks and the street right-of way (shown in yellow) are also NOT included in a property's stormwater measurement.







For more information, including a tool to look up your property's hard surface area, go to:
**romi.gov/stormwater** or call **248-246-3777**

Royal Oak

# EXHIBIT E

## What are the benefits of a stormwater utility?

A stormwater utility covers the critical service of carrying stormwater runoff away from properties, conveying it within the city's combined sewer system to treatment facilities and ultimately discharging it to the Detroit River. Properly operated stormwater infrastructure prevents flooding and backups, expensive repairs, and pollution of natural waterways. While the city currently operates a combined sewer system, the method of funding this operation and the associated costs for treatment has been determined to be outdated by current standards. The city's proposed stormwater utility will proportionally bill users for their use of the system and will encourage activities that promote better stormwater management and lessen the burdens of the system, making the existing infrastructure more adaptable to severe rain events.

## ▼ Stormwater Utility

Hide All Answers

1. **Who else has a stormwater utility?**

## Categories

- All Categories
- Boards and Committees
- Engineering
- Engineering - Sidewalk Improvement Program
- Engineering - Traffic Committee FAQ
- Financial | Economic Impact Questions
- Historical District Study Committee
- Human Resources Applicant
- Human Resources Employees
- Human Resources Miscellaneous
- Human Resources Retirees
- Image Questions
- Intranet - Green Team
- Jury Duty
- Law Enforcement Questions
- Lead Testing
- Legal Questions
- Library
- Marijuana
- Marijuana Application
- Parking Feedback
- Public Service
- Royal Oak Community Opportunity Fund Application
- Sentry Meters / Kiosks Platform Frequently Asked Questions
- Sewer Division
- Small Claims Court
- Small Claims Court Collections
- Stormwater Utility
- Sustainability
- Traffic Committee
- Treasurer
- Water Billing Department
- Water Maintenance & Service

Enable Google Translate

Case 2:25-cv-13499-GAD-APP   ECF No. 1, PageID.83   Filed 11/03/25   Page 83 of 154

More than 1,500 local
governments across 40 states
have enacted this type of utility,
including the cities of Detroit,
Ann Arbor and Birmingham.

- ▪ Water Service Cross
  Connection
- ▪ Yard Waste

2. **Why is stormwater run-off a problem?**


Enable Google Translate

Stormwater begins as rain or snowmelt that flows over land rather than seeping into the ground. It flows over hard surfaces (impervious surfaces) such as roofs, driveways, and walkways, as well as pervious surfaces such as grass, gardens, and woodlands into the city's combined sewer system. The more hard surface (impervious surface) on your property, the more stormwater runoff is contributed to the sewer system.

This drainage flows into the same underground pipes as sewage and must be treated at the Great Lakes Water Authority (GLWA) wastewater treatment plant before it can be released back into the environment.

The City of Royal Oak is billed by the Oakland County Water Resources Commissioner for the conveyance and treatment of combined sewage at GLWA.

# Pervious Surface versus Hard Surface



Enable Google Translate

3. **What are some examples of pervious & impervious surface areas**





Enable Google Translate

**Lawns and vegetation** have a limited ability to absorb water based on site specific conditions. Once saturated or frozen, water can no longer be absorbed into landscaped areas. Often, only a limited amount of impervious surface areas can be directed to an impervious area before its ability to absorb the additional water is diminished.

**Buildings, garages, sheds, houses, etc**. are hard surfaces that directly shed stormwater off their roofs. These surfaces eliminate large impervious areas where water can infiltrate.

**Pavements like concrete and asphalt** are designed to drain stormwater to a low point to prevent ponding on the surface. Water does not infiltrate standard pavements.

**Standard brick pavers** are typically installed over compacted base material, and the joints in between the pavers are also filled in with compacted material. These act similar to pavements, and typically do not allow any stormwater to infiltrate.

**Gravel materials used for parking, roads, driveways and walkways** is tightly compacted,


Enable Google Translate

and does not allow for
infiltration. Water will always
find the path of least resistance,
and will tend to run downhill
over compacted gravel rather
than infiltrate into the
underlying soils.

While stormwater may be
contained within **pools** during a
rain storm, the pool itself does
not allow water from other parts
of the property to soak into the
soil. When the pool is drained,
the stormwater that was
collected will be sent to the
sewer system. Considering
pools as impervious surfaces is
consistent with many other
stormwater utilities throughout
the country.

4. **<u>How is hard surface area
calculated?</u>**
For billing purposes, stormwater
charges will be based on the
amount of hard surface on your
property. Hard surfaces within
the city's right of way (roads,
boulevards and sidewalks) are
not included in your property's
hard surface area.

The hard surfaces of a property
will be measured using high-
resolution aerial photography.
This will provide the basis for
the quarterly bill. Due to the
possibility of error using aerial
photography, each property's
hard surface area was reduced
by 100 square feet before
calculating the stormwater

Enable Google Translate

Case 2:25-cv-13499-GAD-APP   ECF No. 1, PageID.88   Filed 11/03/25   Page 88 of 154

utility charges?

Newly-developed properties will have their hard surface area determined using the approved site plan. Property owners will have the opportunity to appeal the measurement. In these cases, the property owner can provide their own measurement and submit it to the city for review.



Enable Google Translate

Case 2:25-cv-13499-GAD-APP    ECF No. 1, PageID.89    Filed 11/03/25    Page 89 of 154



The example above shows a parcel with a house, garage, deck (with pavement below) and areas of brick, gravel and concrete pavement.

The diagram above shows impervious areas of the property above in gray and pervious areas in blue.

The hard areas (shown in gray in the example above on the right) of a property will be calculated to the square foot and are billable.

The area in yellow (the sidewalk and street right-of way) are non-billable.

5. **What are the benefits of a stormwater utility?**
A stormwater utility covers the critical service of carrying

Enable Google Translate

stormwater runoff away from properties, conveying it within the city's combined sewer system to treatment facilities and ultimately discharging it to the Detroit River. Properly operated stormwater infrastructure prevents flooding and backups, expensive repairs, and pollution of natural waterways. While the city currently operates a combined sewer system, the method of funding this operation and the associated costs for treatment has been determined to be outdated by current standards. The city's proposed stormwater utility will proportionally bill users for their use of the system and will encourage activities that promote better stormwater management and lessen the burdens of the system, making the existing infrastructure more adaptable to severe rain events.

6. **How did you measure the hard surface area on my property?**
The city used low-altitude, high-resolution aerial photography to determine the hard surface area on each property. The city will perform aerial flyovers every three years to update the hard surface database.

Using aerial photography is the best possible way to measure each property's individual hard surface area. However, mapping of aerial photographs does have a degree of inherent error. The hard surface area on each property was therefore reduced by 100 square feet to account for error in the measurements.

Enable Google Translate

The image below is an example of aerial photography. The area outlined in blue represents the hard surface area. The pop-up block indicates the Billable Hard Surface Area of this property is 91,215 sq. ft.

To view your property go to: https://royaloak.maps.arcgis.com/apps/webappviewer/index.html?id=88ea895ad7f34bdb885f3994d431f972



7. **How does the sewer system work?**
Royal Oak has a "combined" sewer system, which means that all the stormwater from rain and snow is mixed with all the sanitary sewage from private sewer leads into one pipe. Parts of the city do have separate stormwater pipes and sanitary sewer pipes, but these all ultimately drain to the same county drain and are combined. This means that the city has to pay to treat all the sewage AND stormwater that enters the system.

Enable Google Translate

8. **Are roads and public rights-of-way charged the stormwater utility fee?**
Roads and public rights-of-way maintained by the city are exempt from the stormwater utility fee because they function as part of the stormwater collection and conveyance system. City-owned properties such as parks and parking lots are subject to the stormwater utility fee.

9. **Why should I have to pay for rain falling on my property?**
While stormwater is a result of rain and snowmelt, the stormwater fee is not related to how much rain falls on your property, but rather the facilities used to manage stormwater such as sewers, manholes, catch basins and wastewater treatment. The more hard surface a property has, the more it uses the stormwater system components.

10. **As part of the settlement agreement in Schroeder vs. The City of Royal Oak, MUST the city implement a stormwater utility?**
The settlement was based upon language in the Drain Code that requires the city to bill for its portion of the debt on the Kuhn RTF on an ad valorem basis. However, billing for stormwater costs based upon the amount of stormwater that a property contributes to the stormwater system is more rational and more equitable than billing for stormwater costs based upon

Enable Google Translate

the amount of water consumed
at that property.

Government Websites by CivicPlus®

Enable Google Translate

# EXHIBIT F



Report of the Royal Oak
Stormwater Task Force
2018



One of the goals adopted by the Royal Oak City Commission in February 2016 was to review and possibly amend the city's stormwater detention ordinance (Royal Oak Municipal Code § 644). Concerns raised by members of the business community and condominium associations about the high cost of ordinance compliance; and the recent storm induced flooding event provide some parameters for the ordinance reviews.

The members of the task force were appointed due to their expertise in certain subjects, such as green infrastructure or principles of civil engineering. It should not be assumed that all members were experts, or provided insight, on all topics related to the subject.


In August 2016, Royal Oak City Manager Don Johnson appointed the following to the stormwater task force:

Jennifer Acevedo – Royal Oak Environmental Advisory Board; Marketing and Promotions Specialist, Michigan Department of Environmental Quality

Matthew J. Callahan, P.E. – City Engineer, City of Royal Oak

Jason Gittinger – Immediate Past President, Greater Royal Oak Chamber of Commerce

Kelly Karll – Engineer, Southeast Michigan Council of Governments

James Krizan – Assistant to the City Manager, City of Royal Oak

Shawn Lewis-Lakin – Retired Superintendent, School District of the City of Royal Oak

Ilene Orlanski – President, Coventry Park Homes Condominium Association

Patricia Paruch – City Commissioner, City of Royal Oak

Jim Schneider, AIA – President, Schneider Smith Architects

Greg Rassel –Director of Public Services, City of Royal Oak

Devan Rostorfer - Environmental Planner, Southeast Michigan Council of Governments

# History and Background

**Royal Oak's Current Stormwater Management System**

The City of Royal Oak has an intricate system for collecting and conveying both wastewater and stormwater to treatment facilities prior to discharging into a receiving body of water. Royal Oak's system is considered a combined sewer system with both the stormwater and wastewater collected in the same sewer. Some areas are served by separated storm sewers but even these ultimately empty into a combined sewer, so the entire system is considered a combined system. The combined wastewater and stormwater is treated at facilities in Oakland County and the City of Detroit and then discharged into the Detroit River or the Red Run Drain.



Above: Debris placed to a residential curb after the August 11, 2014 flood

Royal Oak is one of the fourteen Oakland County communities that make up the George W Kuhn (GWK) drainage district. The GWK drain, formerly known as the 12 Towns' Drain, is owned and operated by the Oakland County Water Resources Commission (OCWRC).

Royal Oak is one of the downstream communities along the OCWRC system. The City of Royal Oak has no ability to regulate the amount of stormwater flowing into this system from other communities. This highlights the importance of each community working together in concert with OCWRC to find ways to limit the amount of stormwater entering the system during rain events.

**1991-1993 Improvements to the Stormwater Management System**

In 1991, after two record rain storms on consecutive days, the city began a series of improvements to its stormwater management system. A four-pronged approach was adopted that involved performing detailed calculations on the city's sewer system to identify any capacity issues, implementing a catch basin restricted lid program to provide surface detention on local streets, constructing relief sewers where necessary and finally enacting an ordinance to require stormwater detention where cost effective and feasible.

Royal Oak's stormwater detention ordinance was implemented in 1991. Since that time, almost 21 million gallons of stormwater storage has been constructed on impervious surfaces such as parking lots and other paved surfaces throughout the city as well as in underground pipes and tanks on public and private property. Once detained during the storm event, stormwater is slowly released into sewers, freeing up sewer capacity during a storm event.

According to estimates from the city's engineering division, not including the cost of debt service for upgrades to the GWK drain, the city has spent over $10 million on improving, maintaining and increasing capacity in its combined sewer system since 1993. The Oakland County Drain Commissioner's Office (now the WRC) constructed the region's largest retention and treatment facility in Madison Heights which is connected to the GWK drain to mitigate and manage combined sewer overflows from the regional system. The city constructed numerous relief sewers where restricted catch basin covers could not improve capacity issues.

Attachment 1

The street catch basin lid restriction program also provides capacity relief in combined sewers across the city with a goal to maintain a 10-year rainfall capacity. Thousands of catch basins have been retrofitted on local streets. Such on-street detention slowly releases stormwater to the connected sewers resulting in temporary ponding on local streets, which frees up sewer capacity during the storm event.

The city needs to do a much better job explaining this program to residents. We commonly get complaints about flooded streets from residents who see that as a problem when it is part of a solution to a problem. We are flooding the streets on purpose to slow stormwater inflows into the sewer system and prevent basement flooding. One downside of the restricted catch basin covers is that they are much more easily plugged by debris.

Overall, efforts have been successful in handling stormwater under normal conditions (a 10-year storm). The city continues to implement stormwater management efforts to reduce the impact of stormwater runoff from impervious surfaces.

**OHM Advisors Study and the Major 2014 Stormwater Event**

The city contracted with OHM (Orchard, Hiltz and McCliment, Inc.) Advisors in 2014 to study select areas of combined sewers within the city. OHM was asked to determine how the larger system functions during rain events and whether stormwater detention efforts have been effective. The city also wanted to know if the data supported changes to current efforts and codes.

While OHM was conducting the study, a severe rainstorm on August 11, 2014 caused widespread combined sewer overflows and flooding across the entire Southeast Michigan Region. Over the course of just a few hours, approximately four to five inches of rain fell over Southeast Michigan with 5.04 inches of rain recorded as part of the sewer analysis study. The storm, which weather experts classified as having a probability of occurring once in 300 to 500 years, completely overwhelmed the sewer systems, open streams and depressed freeways. This was roughly three times the amount of rain that most sewer systems are typically designed to handle.

This storm was highly unusual not just for the total amount of water that fell in any given area but also for the broad geographic area that received this rainfall. Usually, rainstorms are isolated events that move across a region.

The damage caused by this event was staggering, with estimates of over $125 million to public and private property. It resulted in state and federal declarations of emergency. In Royal Oak alone, nearly 6,500 tons of household refuse was discarded and collected due to the event. Total costs for additional refuse collection neared $650,000.

The rain events in the late 1980s and early 1990s demonstrated a need for better regulation of the city's stormwater, just as now, we are seeing evidence of a need to limit the amount of stormwater entering the system. The question now is how the city can reduce or eliminate future stormwater damage. The task force proposes three avenues to explore: stormwater detention ordinance; stormwater management planning; and stormwater management funding.

# 1. Royal Oak's Stormwater Detention Ordinance

**Overview**

The City of Royal Oak adopted a stormwater detention ordinance (Chapter 644) in 1991. The stated objective of the ordinance is to "protect the health, safety and welfare" of the community

Attachment 1

by minimizing stormwater runoff from private property to reduce damaging effects of combined sewer overflows into basements.

It is a generally accepted best practice to manage stormwater runoff at the location where it falls. Allowing stormwater runoff to flow onto neighboring properties or the city's rights-of-way, only shifts the responsibility and liability for managing the stormwater to others at significant cost.

Most private properties in the city have the land area to store stormwater, either by utilizing the surface area of the property to "pond" the water or by constructing an underground detention facility. If adequate land and soil conditions exist, these properties may also infiltrate stormwater.

Royal Oak designed its ordinance to incorporate the recognized best practices at the time, detaining stormwater where it fell. The city's stormwater detention ordinance requires all new commercial, industrial, or multifamily developments where the area is at least 0.14 acre or 6,100 square-feet in size, detain the stormwater runoff on site. Existing commercial, industrial or multifamily developments renovating that would also meet the 0.14 acre or 6,100 square-feet size, are also required to comply with the ordinance. One and two-family properties and the CBD were exempted.

Representatives from the chamber of commerce, downtown development authority and school district, collaborated with the city to develop the 1991 stormwater detention ordinance. The parties agreed the ordinance was acceptable with its exemptions and tiered levels of compliance.

The ordinance considered many scenarios and options to alleviate a too heavy-handed nature. One option selected for inclusion into the final code was allowing those properties subject to the code the ability to renovate portions of their site, typically a previously developed site, up to 6,100 gsf before triggering the need to build detention. This leeway was termed a "temporary waiver". The improvements made were summarized in an "action lien" which was recorded with the registrar of deeds. The lien stated what work was done and what requirements would be required in the future. The lien was signed by the property owner acknowledging their understanding of the requirements. Because the lien was recorded against the property, future owners would have access to a legal notice indicating the previous owners had made improvements that counted against the 6,100 gsf. Most participants at the time felt this was a satisfactory compromise.

Royal Oak is not alone in requiring stormwater detention. Most communities in Oakland and Wayne counties have ordinances that require detention at the source. Most also have exemptions from their ordinance requirements. For instance, the following communities include these exemptions in their ordinances: Berkley excludes one and two-family homes; Ferndale excludes for green infrastructure projects; and Birmingham allows renovations at a capped amount to be excluded. Exemptions, no matter how well intended, create disparity and deficiencies.

**Residential Exemptions**

In 1991, the drafters of the ordinance cited two reasons to exclude properties zoned as one- and two-family residential. The first was overloaded sewers and basement flooding most negatively impact these types of properties causing damage and financial losses for the owners. Secondly, one- and two-family residential properties often have more surface area that is permeable, unlike commercial properties which are often 90 percent or more impermeable and are a major source of the runoff overloading the sewer system.

Condominium associations are classified as multi-family uses in the city's zoning ordinance and are not entitled to the residential exemption. This is appropriate for most condos because they

usually have little permeable surface area, more like commercial property than most single-family or two-family dwelling units. However, this isn't always the case. Detached condos may have a high a percentage of permeable land area. It would be better to make the distention based on percentage of permeable surface than type of ownership.

The cost of complying with the current ordinance can be burdensome for associations, especially those that were constructed prior to the code, with limited funds in their budgets for capital projects. Consequently, many associations must choose to put off or scale back necessary improvements because they would trigger ordinance requirements for additional detention and become cost prohibitive.

The current ordinance includes no requirement for one- and two-family residential properties to manage or detain stormwater, therefore stormwater can discharge onto their neighbor's property. In high volume, the runoff can create flooding to the neighbor's property. This needs to change.

## Central Business District (CBD) Exemptions

Royal Oak's zoning ordinance allows owners of properties in the CBD to build structures right up to the property line. Many of the downtown structures were built decades ago, meaning there is no surface or underground space available for onsite detention. The stormwater detention ordinance exempted properties in the CBD from compliance as a matter of practicality due to the difficulty and cost to structurally retrofit an existing building with stormwater management. However, the ordinance should require owners of such buildings to participate financially in the construction of remote detention facilities through a payment in lieu of detention. Such facilities would probably have to be constructed by the city but a privately operated, for profit, detention facility is not inconceivable.

## Commercial, Industrial, and Multi-Family Properties Temporary Exemptions

In Royal Oak, most existing commercial and industrial properties are relatively small and any improvements, renovations, or additions to the property fall within the allotted 6,100 square-feet and have been considered exempt, due to the interpretation of language we consider to be ambiguous in the code. Many of them have ninety percent or more impervious coverage and direct their runoff offsite.

Code applicable sites that make cumulative site improvements below the 6,100 square-feet measure must execute a recordable lien to the city. The lien shall state that when improvement occurs making the accumulated area of the lien and the improvements greater property greater than 6,100 square-feet, the owner will make the required stormwater detention improvements. Stormwater detention almost always is added to the parking lot, either on the surface of or below it.

While the stormwater detention ordinance has been in effect for over 25-years, it has long been a source of complaints from the business community, primarily from smaller developments. Property owners will often cite the cost of stormwater detention as an impediment to redevelopment. Claiming the requirement delays or cancels needed improvements due to the cost to make their property compliant. Established businesses may have difficulty financing with methods currently available.  Financing can require extensive use of capital investment, not readily available to small businesses. This is problematic from both an economic development and stormwater detention management standpoint.

Compliance with the stormwater detention ordinance has resulted in the creation of 21.1 million gallons cubic feet of additional detention area. The city's engineering division calculates an additional nine million cubic feet of stormwater detention area could be realized if the exemptions did not exist and every commercial, industrial and multi-family property were compliant with the ordinance.

## City and School District Property

City property is not covered by the ordinance, but the city chooses to comply with its provisions anyway. While the city does not currently have an accurate assessment of the total amount of impervious surface on city rights-of-way, it continues to implement innovative methods of stormwater detention management when feasible. The city uses its streets as a detention facility via the restricted catch basin cover program. The city is planning a comprehensive green infrastructure feasibility study for city owned or controlled area during the 2017-18 fiscal year.

Under state law, the city cannot mandate the school district comply with the ordinance for any of its building improvements or renovations. The district has, however, voluntarily included stormwater detention management in its most recent renovation projects. Both the city and the school district hold large amounts of property with considerable impervious areas, however, both also own large permeable land areas.

## Summary of Stormwater Detention Ordinance Deficiencies

The task force believes the stormwater detention ordinance has strengths and weaknesses. The ordinance provides a very clear and measurable method for calculating stormwater detention requirements for new and renovation projects. However, if the costs are too high for business owners to comply, they choose not to make the improvements which trigger the detention requirements. When this happens, we lose twice. No additional stormwater is detained and the property is not improved.  There are no financial incentives in the ordinance for increasing stormwater detention.

No city ordinance prohibits directing runoff onto neighboring properties, and when stormwater is diverted onto neighboring properties, causing damage, the victimized property owner is left to civil court to remedy the situation. Finally, the ordinance creates inequality by not requiring all property owners to participate in stormwater detention management.

## Recommendations for Royal Oak's Stormwater Detention Ordinance

We are reprinting the recommendations that appeared at the beginning of the document for the readers convenience below:

A primary focus of the stormwater task force has been evaluating the stormwater detention ordinance. The task force wanted to determine the importance of the ordinance as it relates to the overall strategy to of sewerage system. Does the ordinance provide the protection and enhancement the community expects? To answer this, the task force considered what an ideal stormwater detention management program would look like and identified potential amendments to the stormwater detention ordinance.

The task force concluded an ideal stormwater detention management program would have these objectives:

- include all properties in the city regardless of their use or zoning classification.
- promote green infrastructure where feasible and effective.
- be cost effective in its implementation for both private property owners and public entities such as the city and the school district.

To achieve these objectives, the task force recommends the following revisions to the ordinance:

- The ordinance should include green infrastructure as an acceptable method to achieve compliance or reduce the amount of detention required.

    The ordinance should be rewritten to include the use of green infrastructure in development projects as an appropriate method for satisfying the ordinance requirements. Green infrastructure, to be effective, must also be reliable. The task force believes that its use cannot be the only solution for stormwater management issues, but when appropriate, it can be an option. The appropriateness of the use of green infrastructure solutions should be based, among other factors, on soil conditions at the property and the amount of stormwater needed to be detained.

    Certain areas of the city are more amenable to green infrastructure than other areas. Generally, the areas south of 12 Mile Road have predominantly sandy soil. This soil is well suited to such projects since the water percolates easily through the soil. On the other hand, the areas in the city north of 12 Mile Road have predominantly clay soils which are not well suited for green infrastructure projects because of their low permeability capacity.

    There have been several proposals for green infrastructure alternatives to partially offset a developments requirement for storm detention that the city engineering department has reviewed and approved. In these instances, the approved systems were not necessarily less costly than traditional gray systems and require considerably more monitoring and maintenance.

    The city engineering department recommends that when green infrastructure is used as an approved method for meeting the ordinance requirement for stormwater detention, the property owner must dedicate an easement to the city to allow monitoring and inspection. This is consistent with all other private stormwater management systems in the city. This will prevent its removal or alteration and allows the city to inspect the area without trespassing.

- The section of the ordinance that describes the various gray infrastructure detention methods that are available and acceptable should be reviewed and updated if necessary.

    The current code establishes the numerical requirements for compliance and gives standards for certain types of detention methods. The ordinance should be reviewed and updated if necessary to include current and accurate descriptions of the various detention methods that are acceptable to meet ordinance requirements. This includes detention methods such as underground storage facilities and surface lot detention areas. The ordinance sections that establish the numerical requirements for detention should be reviewed and updated, if necessary.

- The ordinance should require compliance with stormwater management by all properties within the city regardless of zoning category, including one- and two-family residential properties, which may be done through a payment in lieu of detention option.

- City ordinances should be revised to prohibit one property owner from allowing runoff from its property to flow onto neighboring properties.

  To comply with this new provision, builders would have to prepare and submit a site grading plan to be reviewed by the city engineer as a component of site plan approval and/or a request for a building permit. Existing properties that are noncompliant with this provision will require significant staff time to investigate and remedy.

- The ordinance should be revised to require that properties in the CBD comply as best as possible with the stormwater management program which may be done through a payment in lieu of detention.

Small commercial properties and properties in the CBD will require more creative solutions as these sites are often entirely impervious. Green roofs and permeable surfaces in parking lots are two common actions that small and currently fully impervious sites could use.



The Detroit Zoo, the City of Southfield and Ford Motor Company are some local examples of owners using these types of innovative methods for managing stormwater. Both have both recently developed parking lots using permeable pavements

**Green Roof on Ford Rouge Center**
**Image courtesy of Ford Motor Company**

and bio-swales while, over a decade ago, Ford Motor Company installed North America's largest green roof at the Ford Rouge Center.

- The temporary exemption from compliance for projects that are less than 6,100 square feet or 0.14 acres in size should be eliminated. All properties will need to participate in the management of stormwater runoff, this might be accomplished through implementation of a stormwater utility.

- Clarify the types of renovations or repairs that would trigger the detention requirement.

  The ordinance should more clearly describe the types of repairs or renovations allowed before triggering the need for detention. For example, the current code allows property owners to resurface existing parking areas indefinitely which consist of capping existing paved areas with asphalt or concrete which does not trigger the detention requirement. In reviewing and permitting these improvements, the city does

Attachment 1

review the site grading to correct any deficiency that directs runoff towards neighboring properties.

## 2. Stormwater Management Planning

The task force recognizes that not all problems with the current Royal Oak stormwater management program will be solved by rewriting the ordinance alone. Because the ordinance only applies to private developments and does not address any type of public right-of-way facilities or school properties, the task force reviewed other communities with successful stormwater management programs.

The task force reviewed the highly regarded stormwater management programs in the cities of Seattle, WA and Ann Arbor, MI. Both communities are required by the provisions of the federal and Clean Water Act to apply for and receive a National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System (MS4) Permit to discharge stormwater into Waters of the United States. For more information on these two communities, see Appendix B – Case Studies. As a component of their applications for the NPDES MS4 permit, federal and state rules require each community to develop a stormwater management plan. Detailed requirements for a stormwater management plan are set forth in federal rules. U.S. Environmental Protection Agency (EPA) (www.epa.gov) and the Michigan Department of Environmental Quality (MDEQ) (www.mich.gov.deq) both have detailed information about stormwater management plan requirements on their websites.

The MS4 permit regulates stormwater from public entities such as cities, counties, hospitals and school districts which discharge stormwater directly into waters of the state or the U.S. In our area, the Rochester Community Schools is classified as an MS4 permit entity. The school system has 24 buildings or facilities which discharge stormwater directly into drains which then discharge into the Clinton River and/or its tributaries. The school district is an active participant in the Clinton River Watershed Council and is required to prepare a stormwater management plan as a component of its MS4 permit application. A copy of the 2016-2020 stormwater management plan for the school district can be found on its website: (www.rochester.k12.mi.us/pages/5160/rochester.schools.stormwater.management.plan).

As previously described, the City of Royal Oak is part of a larger network of combined sewer systems which convey the combined stormwater and wastewater to the DWSD facility or GWK Retention and Treatment Facility, which discharges into the Detroit River or the Red Run Drain. Because Royal Oak is not required to obtain an MS4 permit and because it is not classified as a municipal separated storm sewer system (MS4) community for permitting purposes, Royal Oak is not required to develop, approve and implement an official stormwater management plan.

Although Royal Oak is not required to have a stormwater management plan it can be useful in helping a community organize efforts to handle stormwater issues. Non-MS4 communities can also utilize the format and structure of plans that permit-holding communities must follow.

MS4 Stormwater management plans all have the following required elements:

- Public Participation/Involvement
- Public Education
- Illicit Discharge Elimination
- Construction Stormwater Runoff control
- Post-Construction Stormwater Runoff

- Pollution Prevention
- Total Maximum Daily Load Implementation

Royal Oak would need to contract with an outside consulting firm to assist in the development of a stormwater management plan and such an undertaking would require funding.  Funding for a stormwater management plan and other related stormwater management activities could possibly be funded through the creation of a stormwater utility, which is discussed in the following section.

In January 2017, HB 4100 was introduced in the Michigan House of Representatives and in January 2018 SB 756 was introduced in the Michigan Senate. If enacted, these bills would require (among other things) that any community creating a stormwater utility develop a stormwater management plan using the plan elements required by the EPA rules. HB 4100 and SB 756 have both been sent to their respective local government committees for review and hasn't begun to move through the legislature, but this legislation may become a factor if Royal Oak were to consider developing its own stormwater management plan with or without creating a stormwater utility.

**Recommendations for Stormwater Management Planning**

The task force recommends the city consider developing, adopting and implementing a stormwater management plan. Coordination of all stormwater management activities through an official stormwater management plan would improve the city's efforts to meet the objectives identified earlier in this report.

The stormwater management plan should cover a multitude of aspects and best management practices. One of the most important aspects to the plan will be a component for public education. Efforts to educate the public on the impacts of stormwater runoff will be essential to help residents, businesses and other property owners understand how they can help reduce risks of flooding and backups in the future.

Initially, Royal Oak's plan should address and include the following:
- a more equitable stormwater management ordinance that can be consistently applied
- a program to include every property in some manner
- the use of green infrastructure, especially when cost effective
- a reduction in the overall imperviousness of the city
- an increase green space and tree canopy
- be consistent with city commission goals, objectives and direction - protect and preserve existing trees
- a vigorous program of public education
- an effective and reliable source of funding

The plan should also address the required elements identified in the Michigan Stormwater Utility Act if it is enacted to ensure that the city will be able to maintain possible future funding options as described in the next section of this report.

## 3.  Funding Stormwater Improvements

**Current Funding System**

Between 1993 and 2015, the City of Royal Oak completed approximately $10 million worth of projects to maintain, improve or increase the capacity of the combined sewer system in the city. Combined with the over $33 million spent on debt service for the GWK improvements over $43 million has been spent on the stormwater system. The city identified these projects based upon code requirements, engineering studies, or best practices within the industry.

Historically, projects relating to stormwater activities have been funded through the fees paid by rate payers into the city's water/sewer fund and through various state and federal grants. The city water and sewer fund is the primary funding source for operations, maintenance, and replacement of the system, as well as fees paid to the transmission system and debt service to cover major improvements to the both the distribution and transmission system.

The total amount of funding available for stormwater management activities is, unfortunately, very limited. The limited available funding makes the current funding model difficult to rely upon to maintain and improve or expand the current stormwater system. A more reliable funding mechanism will be necessary to improve the city's ability to evaluate and address stormwater needs.

**Legal Limitations on Increasing or Imposing Additional Stormwater Fees**

The current funding model also presents exposure to potential legal challenges. In 1998, a landmark Michigan Supreme Court decision (*Bolt v. City of Lansing*) held that the City of Lansing's fee schedule within its stormwater utility constituted a tax, not a fee, in violation of the state's Headlee amendment which requires voter approval of any new tax.

The court determined that in order for a fee to be valid it must meet three criteria. The fee must serve a regulatory purpose, not just a revenue raising purpose (such as regulating the amount of stormwater entering the system). The fee must be proportional to the necessary operational and capital costs of providing the service. Finally, the fees must be voluntary. For a fee to be voluntary, a user must have the ability to limit or opt out of the service.

In 2011, the City of Jackson's stormwater utility fee scheme faced a similar challenge. The court ultimately ruled that Jackson's fee schedule was also a tax which had not been approved by the voters because it failed to satisfy the three criteria set forth in the *Bolt* decision.

In Schroeder vs City of Royal Oak, plaintiff alleged that the water and sewer rates violated the Headley Amendment because charges assessed were in fact a tax intended to raise revenue rather than cover the costs of the water and waste water system. The city ultimately settled the lawsuit for $2 million payable into a fund to reimburse rate payers. The agreement also mandates that, by July 1, 2018, the city develop a new method by which to fund debt service for the GWK drainage district. The city needs to find a method that provides adequate funding and is able to withstand a potential legal challenge.

**Stormwater Utility**

Other municipalities in Michigan, including Marquette, New Baltimore, Ann Arbor, and Birmingham have created a "stormwater utility" to fund their stormwater management activities, Ann Arbor's is the oldest, dating to 1984.

While a stormwater utility does impose an additional cost on property owners, the size of the cost is relatively modest. Table 3, below, shows some examples of local costs for a single-family residence. This table uses an example of a single-family home with a lot that is 6,100 square feet with 3,000 square feet of impervious surface.

|  | Service Fee | Commodity Fee | Annual Total |
|---|---|---|---|
| Ann Arbor | 6.77 | $29.75 | $146.08 |
| Detroit | $0 | $750 per Impervious Acre | $206.61 |
| Birmingham - Evergreen Farmington District (EF) | $0 | $45.75 | $183.00 |
| Birmingham - South Oakland District (SO) | $0 | $59.50 | $238.00 |

Table 2: Sample Stormwater Fees in Michigan

Ann Arbor has a tiered fee system for residential properties based upon the impervious surface square footage of the property. For all other properties, Ann Arbor charges a flat fee per acre. Residents can opt out of the fees by installing rain barrels for roof runoff, by installing a rain garden, a cistern, or a dry well, or by participating in the Washtenaw County Riversafe Home program. Commercial property owners can opt out if they participate in the Community Partners for Clean Streams program, install a stormwater management system that reduces their discharge rate by at least 29.5%, or by instituting best stormwater management practices by installing retention ponds, green roofing, or a new wetland.

**Recommendations for Funding Stormwater Improvements**

The task force recommends the city explore creating and implementing a stormwater utility. A stormwater utility would provide the city with a stable and predictable source to fund stormwater system improvements and maintenance and perform condition assessment and asset management within the stormwater system. User fees would fund a stormwater utility. A user fee would also be an effective tool to implement and encourage better stormwater management, including the use of green infrastructure and compliance with a stormwater detention ordinance on private property.

To comply with the mandate from *Bolt*, the stormwater utility would have to be designed with opt out and credit provisions for both residential and non-residential property owners like those in the Ann Arbor stormwater utility (for examples of possible credits, see the Ann Arbor case study – Appendix B). For a property to completely opt out, the property would have to retain all stormwater on the site in perpetuity.

Instituting a stormwater utility would allow the city to be able to assess property owners a fee directly correlated to water runoff and the amount of impervious area on their property. A stormwater utility could also provide a method for ensuring compliance with the stormwater detention ordinance, encourage the use of green infrastructure, and would make all property owners responsible for stormwater management regardless of zoning classification.

The fees charged by a stormwater utility would be limited to the amount necessary to cover the cost of oversight and management of the utility, fund stormwater charges from DWSD and OCWRC, and fund programs that improve storm and combined sewer capacity and integrity.

Depending on how complicated a stormwater utility code becomes, implementation of a stormwater utility could require an increase in city personnel to staff the utility operation. Additional staff would oversee and manage the operations of the utility. Staff in this department would be responsible for identifying and programing improvements, implementing a stormwater management plan (including public education components), as well as processing and assessing requests for credits.

Eventually, the fees generated by the utility would pay for the additional staff costs. But the initial establishment of a stormwater utility will be very labor intensive and could be quite costly. Every property in the city will need to be evaluated to determine the impervious and permeable area to establish a rate methodology that is related to either an equivalent residential unit (ERU), intensity of development (ID) or equivalent hydraulic area (EHA). Once a methodology is established, a rate structure based on the actual costs to operate the utility and the costs for future improvements, based upon a capital improvement plan will need to be established and regularly updated. Only then will the utility be an effective method to finance improvements, maintenance and operations of the stormwater system.

**Conclusion**

The task force did not make these recommendations to establish a stormwater utility lightly. The task force understands the political, practical and budgetary implications of imposing additional fees on property owners in the city. The task force believes, however, that the implementation of the recommendations summarized in the following section will meet the goal of improving the current stormwater management program by including the entire city in stormwater management, securing a stable and legal funding source, and expanding the use of green infrastructure.

**Appendix A – Detention Lot Designs and Costs**

**Underground Detention Design and Estimated Cost**



9,000 SF Building
on 20,000 SF lot -
requires 2,357 CF Detention:

| | |
|---|---|
| Retail | 38 varience 1 |
| General Office | 40 varience 3 |
| Medical Office | 72 won't work |

ADDITIONAL COSTS-
UNDERGROUND

| | |
|---|---|
| Parking Lot | $ 32,500* |
| 48" Pipe (190') | $ 30,000 |
| 8" Pipe | $ 250 |
| Structures (4 ea) | $ 8,500 |
| ROW Work | $ 3,500 |
| TOTAL | $ 74,750 |

CONSTRUCTION COST PER
20,000 SF LOT = $3.74

200'

11

37 Parking spaces

8

6     6     6

48" PIPE

100'

* ASSUMES NEW HMA AND NEW STONE BASE IN
LOCATION OF UNDERGROUND PIPE

**Surface Detention Design and Estimated Cost**



**Appendix B Case Studies**

**A Brief Overview of the City of Ann Arbor's Stormwater Program**

The City of Ann Arbor is located approximately 45 miles west of Detroit and is part of the Middle Huron River Watershed. The city makes up approximately 27.8 square miles and has a population nearing 114,000 people. Ann Arbor has a municipal separated storm sewer system (MS4) that is made up of over 23,000 inlets and catch basins and 540 miles of storm sewer pipes that discharge untreated stormwater into the Huron River.

The city conveys stormwater runoff to help prevent localized flooding, but it also works to improve the quality and quantity of the stormwater that it ultimately discharges into the Huron River. It does this in a number of different ways.

**Stormwater Code**

The first is by regulating the amount of stormwater runoff that occurs from properties within the city. This is accomplished through the enforcement of their storm water code. The stormwater code regulates what properties require which types of stormwater management systems.

Whenever a residential property (one and two-family homes) increases impervious surface by 200 square feet they are required to do storm water management. In order to determine how much and what kind of management system to use, the city created a worksheet for residents providing all of the options (Appendix A).

Properties that have (or plan to have) more than 5,000 square feet of impervious surface require differing levels of stormwater management systems. Table 1 below shows the differing requirements for these properties. As you can see in the table, all properties require the infiltration or retention of the first flush (the initial runoff during a rainstorm) and as the size of the impervious area increases, so too does the size of the rain event that must be detained.

| Amount of Impervious Surface (by square feet) | Required Retention/Infiltration of First Flush | Require Detention of 1-2 Year Storm Events | Require Detention of 100-Year Storm Event |
|---|---|---|---|
| | | | |
| 5,000 to 9,999 | Yes | No | No |
| 10,000 to 14,999 | Yes | Yes | No |
| 15,000 and above | Yes | Yes | Yes |

Table 1: Infiltration and Retention Requirements by Impervious Area

For properties that already have existing impervious surface and sites within the Downtown Development authority, the code allows properties that provide stormwater detention to the maximum amount feasible to not meet the same criteria as illustrated in Table 1. In these circumstances, an impact fee of $2.00 per square foot for residential properties and $2.50 per square foot of commercial properties is required. These fees are used to improve stormwater management systems within the watershed. (Note: another option is the donation of land, with city council approval, instead of the impact fee).

**Green Infrastructure**

Another method that the City of Ann Arbor uses to help control the quality and quantity of stormwater discharged into the Huron River is through the use of green infrastructure. One example of the city's use of green infrastructure is the installation of a green roof. Simply put, a green roof is created by planting vegetation on a building's roof to allow for the infiltration of stormwater. Green roofs also create recreational opportunities (i.e. aesthetically pleasing natural areas for employees to enjoy lunches or breaks) where none existed prior.

Other green infrastructure initiatives that the City of Ann Arbor has used have been the installation of bio-swales and rain gardens during road improvement projects. Rain gardens are depressed areas with natural landscaping that allow for a greater infiltration of stormwater. As the water is infiltrated, it is filtered and eventually helps recharge the ground water table. In February of 2014 the city codified these efforts and created a Green Streets Policy. This policy requires the city to implement green infrastructure during all street construction and reconstruction projects.

**Stormwater Management Program**

As an MS4 community with over 100,000 residents, the City of Ann Arbor is required to have a National Pollution Discharge Elimination System Permit that requires the city have a Stormwater Management Program (SWMP). As the City of Royal Oak is not an MS4 community, but rather a combined sewer system community, there is no requirement to have an NPDES Permit or a SWMP. However, a SWMP could help guide any improvements in the Royal Oak system.

Ann Arbor's NPDES Permit outlines the specific topics that must be covered by the Program. The SWMP must include sections on public education, public involvement/participation, illicit discharge elimination program, post-construction stormwater management, construction stormwater runoff control and pollution prevention/good housekeeping for municipal operations. The Ann Arbor SWMP describes their pollution prevention compliance activities that they currently do as well as proposed activities, their operations and maintenance activities, and their public education activities.

**Ann Arbor Stormwater Utility**

In 1980, the city of Ann Arbor established a stormwater utility for the purposes of generating funds to improve, expand and maintain their stormwater system. Currently, the stormwater utility operates with an annual budget of roughly $6 million. Of this between $3.5 million and $4 million is spent on capital improvements.

The rate structure for the utility incorporates a customer fee that all customers pay and a fee based on the total amount of impervious area on a property. Customers are able to apply for credits when they create stormwater facilities or other actions that result in a quantifiable cost savings to the city. There are different credits for different types of properties.

One or two-family residential credits include the use of rain barrels, cisterns or dry wells, one or more rain gardens resulting in at least 130 square feet and three to six inches deep and the participation in the River Safe Home Program. For nonresidential properties, credits are given for facilities that are constructed in accordance to the stormwater code, for participants in the Community Partners for Clean Streams Participants and for facilities that do not fully meet the code but do capture 50 percent of impervious area, capture the half inch of rain and release the captured volume to the city system in less than 24 hours.

Attachment 1

The City of Ann Arbor has an extensive stormwater management program and system funded through their stormwater utility. This steady funding source allows the city to utilize a combination of both green and grey infrastructure to continue to meet the needs of their residents as well as the requirements of their NPDES Permit.

**The City of Seattle, WA**

## Background

The City of Seattle, WA is often regarded as having one of the most robust stormwater management programs in the country. This is in large part due to their need to comply with the 2013 National Pollution Discharge Elimination System (NPDES) Phase I Municipal Stormwater Permit which establishes minimum performance requirements for the discharge of pollutants from their separate storm sewers. While this differs from the City of Royal Oak's combined sewer system which is treated, many of the quality objectives set by Seattle are addressed through quantity reduction methods which could be applicable in our case. These requirements must be reconciled with Seattle's primary purpose for its drainage infrastructure, to convey stormwater runoff in a manner that protects people and property.



The City of Seattle has three types of drainage systems. Requirements of the stormwater management program apply only to the separated system.

## Stormwater Management Requirements

### Stormwater Code

The City of Seattle's stormwater code is applies to all grading and drainage and erosion control, all land disturbing activities, all discharges directly or indirectly to a public drainage system or a public combined sewer, all discharges directly or indirectly into receiving waters within or contiguous to the city limits, all new and existing land uses, and all real property. The code applies regardless of whether a project requires a permit, and does extend to municipal properties. There are some exceptions to activities such as agriculture and forestry which are subject to other state requirements. Additional exceptions may be granted by the department director responsible for conducting a specific action.

All projects are required to maintain natural drainage patterns to the extent possible and to minimize changes to the pattern of flooding on and runoff to neighboring sites. The following table outlines minimum requirements for various project types.

| Single-Family Residential | | Trails & Sidewalks | |
|---|---|---|---|
| Requirements/Applications | BMPs | Requirements/Applications | BMPs |
| Applies to:<br><br>Lots created or adjusted after January 1, 2016 where:<br>• Total new or replaced hard surface is 750 square feet or more,<br>• 7,000 square feet or more of land is disturbed, and<br>For lots that were drawn before January 1, 2016:<br>• Any project that creates new or replaces 1500 square feet of hard surface, or<br>• Disturbs 7,000 square feet of land or more | • Full Dispersion<br>• Infiltration Trenches<br>• Dry Wells<br>• Rain Gardens<br>• Infiltrating Bioretention<br>• Rainwater Harvesting<br>• Permeable Pavement Facilities<br>• Permeable Pavement Surfaces<br>• Sheet Flow Dispersion<br>• Concentrated Flow Dispersion<br>• Splashblock Downspout Dispersion<br>• Trench Downspout Dispersion<br>• Non-infiltrating Bioretention<br>• Vegetated Roofs<br>• Cisterns<br>• Perforated Stub-out Connections<br>• Newly Planted Trees | Must retain and protect any undisturbed top soil and must amend all new, replaced, or disturbed topsoil.<br><br>Must manage stormwater onsite for:<br>• All sidewalk and trail projects with 2,000 square feet or more of replaced or new hard surface, or<br>• That disturb 7,000 square feet or more of land | • Full Dispersion<br>• Rain Gardens<br>• Permeable Pavement Facilities<br>• Permeable Pavement Surfaces<br>• Sheet Flow Dispersion<br>• Concentrated Flow Dispersion |
| Parcel-Based Projects | | | |
| Requirements/Applications | | BMPs | |

| Lots created or adjusted after January 1, 2016 where:<br><br>• Total new or replaced hard surface is 750 square feet or more,<br>• 7,000 square feet or more of land is disturbed, and<br><br>For lots that were drawn before January 1, 2016:<br>• Any project that creates new or replaces 1500 square feet of hard surface, or<br>• Disturbs 7,000 square feet of land or more<br><br>If water discharges into wetlands:<br>• Total new plus replaced hard surface is greater than 5,000 square feet<br>• Project converts more than ¾ acre of vegetation to lawn or landscaping, or<br>• 2.5 or more acres is being converted to pasture<br><br>There are additional basin specific requirements for discharges into high risk waterways.<br><br>For discharges into combined sewer systems requirements are triggered when new plus replaced hard surface equals 10,000 square feet or more. | • Full Dispersion<br>• Infiltration Trenches<br>• Dry Wells<br>• Rain Gardens<br>• Infiltrating Bioretention<br>• Rainwater Harvesting<br>• Permeable Pavement Facilities<br>• Permeable Pavement Surfaces<br>• Sheet Flow Dispersion<br>• Concentrated Flow Dispersion<br>• Splashblock Downspout Dispersion<br>• Trench Downspout Dispersion<br>• Non-infiltrating Bioretention<br>• Vegetated Roofs<br>• Cisterns<br>• Perforated Stub-out Connections<br>• Newly Planted Trees |

| **Roadway Projects** | | **On-Site Stormwater Management** |
|---|---|---|
| **Requirements/Applications** | **BMPs** | **Requirements** |
| Must retain and protect any undisturbed top soil and must amend all new, replaced, or disturbed topsoil.<br><br>Must manage stormwater onsite for:<br>• All roadway projects with 2,000 square feet or more of replaced or new hard surface, or<br>• That disturb 7,000 square feet or more of land<br><br>There are additional basin specific requirements for discharges into high risk waterways.<br><br>For discharges into combined sewer systems requirements are triggered when new plus replaced hard surface equals 10,000 square feet or more. | • Full Dispersion<br>• Rain Gardens<br>• Infiltrating Bioretention<br>• Permeable Pavement Facilities<br>• Permeable Pavement Surfaces<br>• Sheet Flow Dispersion<br>• Concentrated Flow Dispersion | If hard surface coverage is less than 35 percent:<br>• Post-development discharge durations should match forested pre-development discharge rates between 8-50 percent of a 2-year storm.<br><br>For all other projects:<br>Post-development discharge duration shall meet the pasture pre-developed discharge rates between 1-10 percent of a 10-year storm |

**Other Plan Elements**

The City of Seattle is undergoing an extensive mapping process of its entire stormwater infrastructure, including that which is installed on private property. All projects are required to map stormwater infrastructure on their property which is turned into the city and incorporated in its GIS mapping system.

Additionally, the City of Seattle maintains extensive public engagement in its stormwater management including budget public hearings for the allocation of monies related to NPDES stormwater management, the creation of several citizen advisory groups, and an education and outreach component. Education initiatives can target school aged children, public, businesses, or professionals in the construction industry. A list of topics may be found in the table to the right.

| Education and Outreach Topics |
|---|
| • General impacts of stormwater on surface waters |
| • Impacts from impervious surfaces |
| • Impacts of illicit discharges and reporting them |
| • Low Impact Development BMPs |
| • Stewardship activity opportunities |
| • Technical standards for site control and erosion plans |
| • Stormwater treatment facilities |
| • Use and storage of auto chemicals |
| • Equipment maintenance |
| • Prevention of illicit discharges |
| • Yard care for water quality |
| • Use and storage of yard and household chemicals |
| • Vehicle, equipment, and home/building maintenance |
| • Pet waste management |
| • Stormwater facility maintenance |
| • Dumpster maintenance |

**Seattle reLeaf**

The Seattle Releaf is a program designed to educate the public on the value of urban canopy and to encourage them to help build a well-maintained urban forest. Each year program staff and resident volunteers plant 1,000 trees.

**RainWise**

The RainWise program provides education to the public and landscapers on low impact development techniques including the installation of rain retention, permeable paving, and rain gardens. The primary goal of this program is to slow the flow of runoff and increase infiltration. Program materials include a rain gardens website, guidebook, and plant list. Staff for the program led at least two public workshops each year and several rain garden demonstrations throughout the city.

**The City of Birmingham, MI**

Attachment 1

**Background**

With a population of over 20,000 people and covering approximately 4.7 square miles, Royal Oak's neighbor, Birmingham, operates a sewer system like that of Royal Oak. As a combined sewer system, Birmingham conveys both wastewater and stormwater through a series of underground pipes and eventual is treated and discharged by the Great Lakes Water Authority (formerly Detroit Water and Sewer Department).

Like Royal Oak, sewer disposal fees for Birmingham are based off metered water consumed by the system. For many years communities like Royal Oak and Birmingham have also based stormwater costs associated with debt service through this same methodology. These debt services charges have been the basis of lawsuits against many communities in the area.

**Birmingham Stormwater Utility**

Because of the lawsuit, Wolf v Birmingham, the City of Birmingham was required to restructure their stormwater fees. To do so, Birmingham set out to develop a methodology for charging the fees that would conform to the three tests established in Bolt v City of Lansing. Birmingham contracted with Hubbell, Roth & Clark Inc (HRC) to perform a stormwater apportionment study from which to establish stormwater rates.

To look at the entire city, the study established seven categories of property (six single-family categories and one category for all others). To study the single-family residential, HRC created six property classes based on the size of the parcels. HRC then looked at the total impervious and pervious area for each property in the class and created an average runoff potential for the property class. Using the class with the most parcels in the city (.125 - .250 acres) as the standard unit, HRC

> The runoff potential from a property is based on hydrologic engineering principles for calculating runoff that use both the impervious surface area and pervious surface area.

established units for all other classes. This is done to create some standardization in billing rates. For the non-single-family properties HRC determined a runoff potential for each property. This runoff potential was then compared to the standard unit to determine the unit for that property.

Birmingham also established a credit system for properties to potential limit their use of the stormwater system and thereby reduced their cost for the system and a process for property owners to appeal their assessment. To date, Birmingham has only received one appeal.

**Appendix C**

**Birmingham Stormwater Utility Ordinance**

ARTICLE VI. - STORM WATER UTILITY FEE
Sec. 114-400. - Definitions.

The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Combined sewer system:* Public sewers, drains, ditches, roads and retention ponds used for collecting and transporting storm water and non-storm water in the city.

*Director:* The city engineer or such other person as the city manager may designate.

*Equivalent storm water unit (ESWU):* A subunit of measurement which relates the volume of storm water discharged from a lot based on the amount of total and impervious lot area, compared to the standard unit. The formula for an equivalent storm water unit (ESWU) is as follows:

$$1 \text{ ESWU} = (0.15 \, (TA_s - IA_s) + (0.90 \, (IA_s))$$

where,

$TA_s$ = total area of standard unit;

$IA_s$ = impervious area of standard unit;

0.15 = runoff coefficient for pervious area;

0.90 = runoff coefficient for impervious area.

One ESWU in the city is equal to the average runoff potential of the standard unit.

*Impervious lot area:* Impervious area means a surface area that is resistant to permeation by surface water.

*Industrial sites* Those sites that contain industrial activities which require wastewater discharge permits as set forth in section 114-202 of this Code.

*Nonstorm water:* All flows to the combined sewer system not defined as storm water in section 114-199, or as determined by the director.

*Pervious lot area:* All land area that is not impervious. Pervious lot area equals the total lot area, minus the impervious lot area. Pervious lot area has a runoff coefficient equal to 0.15.

*Runoff potential:* The runoff potential from a property is based on hydrologic principles for calculating runoff that use both the impervious surface area and the pervious surface area. Runoff potential is measured in square feet using the following formula:

Runoff Potential = 0.15x [Total Area - Impervious Area] + 0.9 x [Impervious Area]

*Separated storm water sewer system:* Public sewers, drains, channels, ditches, roads and retention ponds used for collecting and transporting storm water in the city.

*Standard unit:* Single-family residential parcel in the city within a lot size between 1.126 and 0.250 acres.

*Storm water:* Storm water runoff, snow melt runoff and surface runoff and drainage.

*Storm water utility fee:* The fee imposed for the use of that portion of the combined system that transports storm water, based on the number of ESWU's for a lot or parcel of land determined as provided in section 114-402.

*Storm water sewer system:* That portion of the combined sewer system and separated storm water sewer system that is attributable to the transportation and treatment of storm water.

*User:* An owner of property which directly or indirectly contributes to the combined sewer system.

(Ord. No. 2204, 12-5-16)

## Sec. 114-401. - Storm water utility fees.

(a)   All users shall pay a storm water utility fee proportional to the volume of storm water which is projected to discharge into the combined sewer system and storm water sewer system from their property.

(b)   The city commission shall, by resolution, set storm water utility fees at a rate which will recover from each user its share of the costs of the storm water sewer system attributable to the discharge of storm water from the users' property to the storm water system. The city shall use the revenues of the storm water utility fees to pay the costs of the water treatment operation and maintenance of the storm water sewer system, and for necessary improvements and additions to the storm water sewer system.

(c)   The city may also collect from users fees imposed to pay the implementation and operation of any of the following:

(1)   Monitoring, inspection and surveillance procedures;

(2)   Reviewing discharge procedures and construction;

(3)   Discharge permit applications; or

(4)   Other fees as the city may deem necessary to operate the storm water sewer system.

(Ord. No. 2204, 12-5-16)

## Sec. 114-402. - Calculation of fees and appeals.

(a)    Single-family residential ESWU. All single-family residential properties in each of the lot-size categories are assigned the same ESWU for that category. The ESWU values for the single-family residential categories are summarized in the fee schedule.

| Property Type | SFR Class |
|---|---|

| Single-Family Residential, 0.125 acres or less | Class A |
|---|---|
| Single-Family Residential, 0.126 acres to 0.250 acres | Class B |
| Single-Family Residential, 0.251 acres to 0.500 acres | Class C |
| Single-Family Residential, 0.501 acres to 0.750 acres | Class D |
| Single-Family Residential, 0.751 acres to 1.000 acres | Class E |
| Single Family Residential, 1.001 acres or larger | Class F |

(b)   Non-single family ESWU. The storm water utility fee for non-single family lots shall equal the number of ESWU's for a given lot, multiplied by the annual rate established by the city commission per ESWU per year. The formula for determining the number of ESWU's per non-single family lot shall be calculated from the amount of pervious and impervious lot area as follows:

Number    of    ESWU's    =    0.15    (TA    -    IA)    +    0.90    (IA)
Average runoff potential of the standard unit/ESWU

where,

TA = total area of each lot (reported in square feet);

IA = impervious area of each lot (reported in square feet).

(c)   Any non-single-family residential property owner liable for a storm water utility fee may appeal the determination that the property utilizes the storm water system or the amount of a storm water utility fee, including a determination on a reduction in or the elimination of the fee under subsections (a) and (b). An appeal may be based on the quantity of storm water runoff generated, the reductions established, the reductions allocated, or any other matter relating to the determination of the storm water utility fee.

(d)   A single-family residential property owner may appeal the determination that the property utilizes the storm water system, however, such an appeal shall be limited to the following reasons:

(1)   The size of the lot has been miscalculated, or

(2)   All or part of the storm water runoff drains to an open drainage course, such as a river, lake or creek, which affects the quantity of the storm water runoff generated that gets into the storm water sewer system.

(e)   An appeal under subsection (c) shall be heard by a storm water utility appeals board appointed by the local unit of government. The appeals board shall consist of three members, two of whom shall be licensed professional engineers not employed by the local unit of government.

(f)   An appeal of a storm water utility fee shall not be brought more than one year after the fee was billed.

(g)   To prevail in an appeal of a storm water utility fee, the appellant shall demonstrate in accordance with the requirements of the plan for a non-single-family residential property that the use of the system by the property is less than the amount used by the local unit of government in the calculation of that property's storm water utility fee, or for all properties the classification of the property type is in error, or there was a mathematical error in the calculation of the fee.

(h)   The sole remedy for a property owner who prevails in an appeal of a storm water utility fee is a prospective correct recalculation of the storm water utility fee.

(i)   If in an appeal of a storm water utility fee the appeals board finds that the requirements of subsection (g) have not been met, that finding is conclusive until the property is modified to either increase or

decrease the utilization of the system. The property owner remains eligible for reduction or elimination of fees under the storm water utility ordinance.

(j)    A property owner making an appeal shall provide the appeals board with information necessary to make a determination.

(k)    A person aggrieved by a decision of the appeals board on an appeal under this section may appeal to the circuit court in which the property is located. An appeal to the circuit court must be filed within 30 days of the appeals board's decision.

(Ord. No. 2204, 12-5-16; Ord. No. 2248, 9-11-17)

## Sec. 114-403. - Credits.

(a)    The purpose of this section is to provide for each property owner's control over contributions of storm flows to the storm water utility system and the related storm water utility fees and to advance protection of the public health, safety, and welfare.

(b)    The city shall offer credits on an annual basis that will enable any property owner, through voluntary action, to reduce the storm water utility fees calculated for that property owner's property and will provide a meaningful reduction in the cost of service to the storm water system, or that shall be reasonably related to a benefit to the storm water system.

(1)    Credits will only be applied if requirements outlined in this chapter and other applicable sections of the City Code are met, including, but not limited to: completion of ongoing maintenance, guaranteed right-of-entry for inspections, and submittal of annual self-certification reports.

(2)    Credits will be defined as either set fee reduction or percent (%) reductions applied as a credit adjustment to the fee calculation equation.

(3)    Credits are additive to each credit category.

(4)    As long as the storm water facilities or management practices are functioning as approved, the credit reduction will be applied to the fee. If the approved practice is not functioning as approved or is terminated, the credit reduction will be cancelled and the fee will return to the baseline calculation. Once the credit reduction has been cancelled, a customer may not reapply for credit for a period of 12 months and only then if the deficiency has been corrected, as determined by city inspection.

(5)    Credits will be applied to the next complete billing cycle after the application has been approved.

(c)    The director shall define a method for applying and granting credits on an annual basis, as well as criteria for determining the credits a property owner may receive. The director may, by regulation, establish credits for one or more of the following:

(1)    Installation and maintenance of rain barrels, rain gardens, bioswales, cisterns, dry wells, infiltration trenches, porous pavement or pavers, or disconnecting footing drains;

(2)    Installation and maintenance of a storm water control facility, or other water quantity controls; and

(3)    Other actions of the property owner that, in the judgment of the director, result in a measurable reduction in storm water runoff.

(Ord. No. 2204, 12-5-16)

§                                    STORMWATER DETENTION

### Sec. 114-404. - Billing.

The billing for the storm water utility may be combined with the billing for other utility services. Final determinations on measurements per ESWU will be determined by the director.

(Ord. No. 2204, 12-5-16)

### Sec. 114-405. - Collection.

Unpaid storm water utility fees shall constitute a lien against the property affected. Fees which have remained unpaid for a period of six months prior to April 30 may be certified to the city treasurer who shall place the fees on the next tax roll of the city. In the alternative, the city commission may direct the city attorney to take appropriate legal action to collect unpaid fees.

(Ord. No. 2204, 12-5-16)

**Appendix D**

**Royal Oak Stormwater Detention Ordinance (Current)**

## Chapter 644 STORMWATER DETENTION

### GENERAL REFERENCES

| | |
|---|---|
| Fences — See Ch. 323. | Weeds — See Ch. 757. |
| Flood damage prevention — See Ch. 351. | Zoning — See Ch. 770. |
| Property maintenance — See Ch. 556. | |

### § 644-1. Short title.

This chapter shall be known and cited as the "Stormwater Detention Ordinance of the City of Royal Oak" and will be referred to herein as "this chapter."

### § 644-2. Purpose.

This chapter is intended to specifically apply to stormwater detention which is a prevailing need and which the absence of detention could endanger the property, health, safety and general welfare of the residents and property owners of the City.

### § 644-3. Definitions.

As used in this chapter, the following terms shall have the meanings indicated:

ADDITION — Any addition to an existing building.

APPROVAL — Written approval by the City Engineer of the City of Royal Oak, Michigan, or by his duly authorized agents, assistants, or representatives, limited to the specific duties assigned or entrusted to them.

BASIN — All designated or specified areas or devices where stormwater is detained to meet the requirements of this chapter.

CITY — The City of Royal Oak, Michigan. When used in this chapter in connection with any filing, submittal, delivery or payment to, or review, approval or other action, refers to the City Engineer.

CITY'S RIGHT-OF-WAY OR RIGHT-OF-WAY — Any and all public rightsof-way, streets, highways, roads, sidewalks, alleys, thoroughfares, public easements and public places located within the City, including within any curbs, shoulders, landscaped areas and/or other areas incidental and/or appurtenant.

DEVELOPMENT — Any new building, or paved driveway, parking lot or sidewalk, not including public roadways.

644-3 § 644-5

§                          STORMWATER DETENTION

ENGINEER or CITY ENGINEER — City Engineer of the City of Royal Oak, Michigan, or his duly authorized agents, assistants or representatives, limited to the specific duties assigned or entrusted to them.

PUBLIC EASEMENT — Any area of land which has been granted or dedicated to the City or to public use, including, but not limited to, road or right-of-way, utility, water main, sewer line, access, drainage, recreation, conservation and other public areas, whether in easements or in fee.

RENOVATION — Any existing building converted to other use or structurally altered, and which requires a City building permit and/or site plan for City Plan Commission review and approval as described in § 770-12, Site plan review, or any similar ordinance. Also, any paved parking lot, private street, drive or sidewalk removal and replacement. Renovation shall also include the pulverizing and/or crushing of existing pavement for use as a new pavement base material.

SITE IMPROVEMENTS — Additions, developments and renovations proposed for a specific property as defined.

STORM DETENTION SYSTEM — All features that comprise the requirements of this chapter, including but not limited to storm detention basins and their required components and finishes, restrictors, pumps and freeboard structures; and all collection and outlet piping, drainage structures and conveyance features, including curbing, swales, ditches; and all fences, gates and signage.

### § 644-4. Scope.

Any development, renovation or addition to an existing development within the City, excluding property in the Central Business District Zones and properties used for one- and two-family residential purposes, must detain the stormwater runoff from the improvement on-site.

### § 644-5. Temporary exemption.

A.  Developments, renovations or additions less than 0.14 acre or 6,100 square feet in area will not require stormwater detention at the time of the improvement. For such case, a recordable lien to the City must be executed by the property owner. The recordable lien shall state that when the next future improvement occurs on the property which will make the accumulated area of the recorded lien(s) and the future improvement greater than 0.14 acre or 6,100 square feet, the property owner will make the stormwater detention improvements as specified in this chapter on the accumulated area.

B.  Renovations and additions that do not involve parking lot, private street, drive or sidewalk removal and replacement will not require stormwater runoff detention at the time of the improvement, unless adequate undeveloped land is available for detention on the property. If stormwater detention is not included as part of the renovation, a recordable lien to the City must be executed by the property owner. 644-5   § 644-7

The recordable lien shall state that when the next future improvement occurs on the property, the property owner will make the stormwater detention improvements as specified in this chapter on the accumulated area.

C.  Lien(s) shall be prepared by the property owner using the standard form available from the City Engineering Department.

Attachment 1

§                          STORMWATER DETENTION

**§ 644-6. Method used.**

The Oakland County Method of Detention Basin Design, as made available by the Oakland County Drain Commissioner's office, shall be utilized in determining the volume of detention required. Basins with orifice or pumped outlets will be required to hold the volume for a ten-year storm while basins with no outlets will be required to hold two one-hundred-years storms. Discharge on an orifice or pumped outlet must be throttled to a restricted rate of 0.2 cfs per acre, or throttled to a restricted flow of 0.3 cfs if the total property area requiring detention is 1.5 acres or less.

**§ 644-7. Submittal procedure.**

For City approval of stormwater detention, the applicant shall furnish the City Engineering Department three sets of detention plans, 24 inches by 36 inches, with detention calculations shown on the plans.

A.   A professional engineer, licensed in the State of Michigan, shall affix his or her seal on the plans.

B.   The plans shall not be drawn to a scale smaller than one inch equals 30 feet. The City Engineer shall review the plans and calculations for conformity to the standards set forth in this chapter, and certify that they are consistent with the overall utility plans of the City, after which he will return a letter of review with appropriate comments. The applicant, after making any changes requested, shall resubmit three sets of the revised plans to the Engineering Department for approval. The applicant may be required to obtain approval of the City of Royal Oak Building Department, Oakland County Drain Commissioner, the Road Commission for Oakland County or the Michigan Department of Transportation when the outlet discharges to facilities under their jurisdiction.

C.   The detention plans shall clearly indicate the perimeter of all acreage contributing to the detention basin. The perimeter of the water surface for the volume of detention provided shall also be indicated on the plans including the water surface elevation.

D.   The plans shall include the calculation of an overall coefficient of runoff for the acreage contributing to the detention basin. The range of this coefficient shall vary from 0.15 for completely grassed areas to 0.90 for completely paved areas.

644-7                                                        § 644-8

E.   The detention calculations for each site shall include the number of total acres calculated to the nearest hundredth contributing to the detention basin. The total cumulative volume of required detention shall be calculated using all areas of proposed site improvements and shall include previous site improvement areas covered by this chapter.

F.   The detention calculations shall include the sizing of the restricting orifice or structure cover. The calculations for the restricting orifice size or restricted structures cover openings shall be made using a coefficient for a sharp-edged orifice entrance. Details for the restrictor are to be clearly indicated on submitted plans. The smallest pipe orifice size allowed is 2.5 inches in diameter. The orifice size shall be rounded down to the nearest one-half inch from the actual calculated size.

G.   Calculations for the volume of detention provided shall be included on submitted plans. The volume calculations shall be made using standard geometric formulas to determine the volume between appropriate contour elevations. For irregular-shaped basins, the

Attachment 1

§                          STORMWATER DETENTION

geometric formula for the volume of a frustum of a cone or pyramid shall be used to estimate the volume between appropriate contour elevations.

H.   Plan approval constitutes conformance with this chapter in regards to calculations and method used to control runoff and achieve the required detention. Plan approval does not infer sanction or approval of construction governed by any other permit or subsequent approvals.

I.   After approval of plans, any change to the storm detention system shall be submitted to the City Engineer for approval prior to its construction.

**§ 644-8. General basin construction.**

A.   All basin design shall incorporate components that allow for visual inspection and maintenance by mechanical means of all areas designated for stormwater storage or restricted outflow.

B.   Acceptable means of detention can be achieved through standing water in parking areas, landscaped ponds, or buried vaults, chambers, pipes or other approved buried device. Either one or any combination of these designs may be utilized to achieve the required detention.

C.   All components of storm detention systems shall be constructed entirely on the private property of the proposed development, except for discharge piping and connections to public sewers. No portion of a basin shall be installed within a publicly owned utility easement. Connections to public sewers shall be at locations as approved by the City Engineer.

D.   Basins with orifice or pumped outlets must be constructed to drain entirely unless designed to retain a permanent water level that conforms to a Plan Commission approved landscape plan.

644-8                                                                                        § 644-9

E.   Basins with no outlets must be constructed in soils that have a saturated hydraulic conductivity of at least 0.004 feet per minute.

F.   A minimum of 12 inches of freeboard must be provided above the retained water surface of all detention basins and below the finished floor of all adjacent buildings. A minimum of six inches of freeboard must be provided above the maximum water surface created by the required positive nonerodable overflow to both adjacent buildings and adjacent properties.

G.   A positive nonerodable overflow capable of handling the capacity of a one-hundred-year storm must be provided and clearly identified on the plans, which shall not discharge onto abutting private property.

H.   Drainage from a development, renovation and addition shall not be diverted onto abutting private property. Drainage from a development, renovation and addition requiring detention shall be directed to the detention basin. Discharge from the basin and overflow shall not be diverted onto abutting private property.

I.   The City requires a building permit for all piping and drainage structures for compliance with other codes and ordinances including the current Michigan Plumbing Code

requirements for approved materials and drainage pipe cleanouts. Section P-708 of the code requires that manholes be provided as cleanouts at each major change of direction for underground piping over 10 inches in diameter.

J.    All storm detention systems shall be maintained in proper working order, free of debris, trash or anything else that may adversely affect the operability of the system, the required volume and outlet capacity. The storm detention systems shall be kept free of vermin and any creatures that may cause the system to become inoperable or harm the public. Maintenance of the storm detention system also requires treatment to prevent and control insects and microbes.

### § 644-9. Open pond basin construction.

A.    A paved open channel must be provided along the bottom of all detention basins designed to drain entirely. The open channel shall begin at the outlet for the basin and shall run the entire length of the basin with the channel extending to all pipes discharging into the basin. The channel shall be sized to equal the capacity of the outlet for the basin when flowing full with no pressure head. The channel shall provide a minimum velocity of two feet per second when the basin outlet is flowing full with no pressure head.

B.    The entire basin must be either sodded, paved, or have some other City approved method of stabilization. The maintenance of all stabilization and fencing in and around the detention basin shall be the responsibility of the property owner.

644-9                                                                                              644-10

C.    All grass and noxious weeds growing in or around the basin shall be maintained in accordance with Chapter 757, Weeds, as amended, or other similarly adopted property maintenance code.[1] No hydrophilic plants such as rushes, reeds, water iris, willow or cattails shall be allowed to grow or thrive within an open basin, or any tree, shrub or plant not specifically shown and approved on the required plans.

D.    Minimum grade on the bottom of the detention basin shall be 1.2% when sodded. For paved open channels in basins, the minimum grade shall be 0.5%.

E.    All pipes entering a detention basin shall have either a headwall or end section at the end of the pipe. Bar screens must be installed on all open ends of pipe 12 inches or larger in diameter. Restricting orifices shall be located in an accessible structure outside of the basin limits.

F.    Fencing.

(1)    All open pond detention basins must be fenced if the side slopes exceed one vertical to six horizontal, or if the basin is designed to hold water to a depth of more than 18 inches when filled to capacity. This requirement may be waived by the City Plan Commission when the design is an integral part of the landscaping and the location and depth does not present a potential hazard.

(2)    A three-foot minimum shoulder shall be provided between the fence and the side slopes for the basin. The side slopes shall not exceed one vertical to three horizontal.

_____

[1] . Editor's Note: See also Ch. 556, Property Maintenance.

§                          STORMWATER DETENTION

(3) Fences shall be a minimum of four feet high chain link or other fencing material of comparable durability and safety as approved by the City Plan Commission with a locked access gate, 10 feet wide with double opening. A key for a City Engineer approved lock shall be supplied to the City Public Service Department.

(4) Depending upon location in relation to adjoining properties or rights-of-way, the City Plan Commission may require a landscape screen in front of the fencing.

(5) All gates constructed directly in front of a paved roadway are to have an end of roadway marker (ER-1) and a "road ends" sign (W-14-2-a) securely fastened to the gate in accordance with the "Michigan Manual of Uniform Traffic Safety Control Devices." The sign material shall be high intensity reflectorized Scotchlite on 0.080 aluminum.

(6) All fencing related shall be maintained to conform to Chapter 323, Fences, or other similarly adopted ordinance, as amended.

644-10                                                                      § 644-11

## § 644-10. Pumped basins.

In cases where the drain outlet for the detention basin is not deep enough to completely dewater the basin by gravity, pumps must be installed. The pumps shall be installed in duplicate with each pump capable of handling the flow. Controls shall be set in the receiving water to regulate the flow.

A. The controls may be electrodes placed inside a galvanized pipe stilling well at a location adequately protected from the backwater curve during discharge.

B. A bubbler system in a stilling well protected as in Subsection A above. The operating controls and pumps shall be set in a fully designed pump house with adequate dimensions for working area. The pump house and west well must be located inside the fenced area.

C. Pump controls shall be designed in a manner that accounts for the water level in the receiving sewer.

D. Complete specifications for the pumps and controls and performance curves for the pumps called for must be submitted to the City Engineer for approval, including two operation manuals provided from the manufacturer.

E. The City requires a building permit for all piping, electrical work and concrete structures for compliance with other codes and ordinances.

F. A manhole with inside diameter of six feet is required between the lift station and the outlet. The twin discharge lines shall be ductile iron. They shall enter the manhole and a storm sewer shall be installed from the manhole to the outlet. The manhole cover shall be East Jordan Iron Works (EJIW) No. 8247A hinged type or equivalent.

G. The pump house and gate to the detention basin shall be locked at all times. A key for a City Engineer approved lock to the pump house shall be supplied to the City Department of Public Service and Recreation.

## § 644-11. Easements.

A. Easement for discharge piping. The property owner of any development, renovation or addition that contains a detention basin, excluding surface basins within vehicular parking areas, shall grant the City an easement for the detention basin discharge piping and all discharge piping appurtenances. The easement shall be a minimum 12 feet wide, unless otherwise determined by the City Engineer. The grant of easement shall provide the City the rights to access, inspect, and to rectify any City ordinance violation within the easement if the property owner fails to commence work on compliance within 21 days from the date of written notification by the City of a violation unless emergency circumstances dictate immediate compliance. All costs incurred by the City in rectifying an ordinance violation shall be assessed to the property owner.

644-11                                                                                                 644-14

B. Easement for basin. The property owner of any development, renovation or addition that contains a detention basin, excluding surface basins within vehicular parking areas, shall grant the City an easement encompassing the detention basin. The limits of the easement shall be a minimum three feet outside any fencing, or six feet from the tip of the side slope for the detention basin and shall include a minimum twelve-foot width to access the gate for the basin. The grant of easement shall provide the City the rights to access, inspect, and to rectify any City ordinance violation within the easement if the property owner fails to commence work on compliance within 21 days from the date of written notification by the City of a violation unless emergency circumstances dictate immediate compliance. All costs incurred by the City in rectifying an ordinance violation shall be assessed to the property owner.

C. Easement grants. The property owner shall be responsible for providing the City Engineering Department with all property and easement descriptions. All grants of easement shall be executed by the property owner prior to City issuance of occupancy permits for the development.

### § 644-12. As-built plans.

A. Prior to formal written acceptance by the City of the storm detention system, all turf must be established in open basins. In addition, a licensed professional engineer must furnish the City Engineer two sets of sealed as-built detention plans. As-built plans shall verify that the required detention volume has been provided using calculations based on newly constructed elevations within and surrounding the basin(s). Newly constructed elevations within and surrounding the basin shall be shown on the plans in sufficient quantity and interval to verify and correspond to the calculations. The required outlet, pump or restrictor installation, grading that conforms to the approved plans, and freeboard features constructed with overflow provided shall also be indicated on the as-built plans.

B. All differences and deficiencies shall be noted. Plans to correct deficiencies in detention volume, outlet, pump or restrictor, freeboard and overflow features shall be submitted for City Engineer approval and included with the as-built plans. All deficiencies in detention volume, outlet, pump or restrictor, freeboard and overflow features shall be corrected prior to City issuance of occupancy permits for the development.

### § 644-13. Permit required for installation of parking lot pavements.

A permit will be required from the City for the installation of all parking lot pavements as addressed under this chapter. The permit allows for one post

construction site inspection by the City Engineer upon submittal of the required as-built plans to verify compliance with the permit provisions. The City Commission shall establish the permit fee by resolution.

**§ 644-14. Enforcement; variance. [Amended 8-20-2007 by Ord. No. 2007-13; 6-15-2015 by Ord. No. 2015-13]**

A.   The City Engineer is charged with the enforcement of this chapter. The City Engineer shall have the authority to grant variances from the stormwater detention regulations contained in this chapter upon a showing of practical difficulty by a property owner. A property owner requesting a variance shall submit a written request specifically stating which provision a variance is being requested from and describing the practical difficulty involved in strict compliance.

B.   The City Engineer shall have the authority to promulgate rules to allow for pilot projects that may vary from the stormwater detention regulations contained in this chapter as long as any development, renovation or addition to an existing development within the City, excluding property in the Central Business District Zones and properties used for one- and two-family residential purposes, detains stormwater runoff from the improvement on site. The City Commission shall adopt the rules before they become effective.

**§ 644-15. Violations and penalties.**

A.   Any person, permittee, owner, developer or subsequent property owner who violates any provision of this chapter, including failure to submit plans, obtain permits, pay any fees, charges or surcharges imposed, or any condition or limitation of a permit issued pursuant or who knowingly makes false statements, representations or certification in any application, record, report or plan or other document filed or required to be maintained pursuant to this chapter or who tampers with, alters or fails to maintain, or knowingly renders inoperable any detention basin, restrictor, fence or freeboard required under this chapter is guilty of a civil infraction and shall, upon conviction, be punished by the following:

(1)   A person violating this chapter for the first time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $100 for each day of the violation, plus costs.

(2)   A person violating this chapter for the second time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $250 for each day of the violation, plus costs.

(3)   A person violating this chapter for the third time is responsible for a municipal civil infraction and subject to payment of a civil fine of not less than $500 for each day of the violation, plus costs.

B.   The City Engineer, Royal Oak Building Official and City of Royal Oak Code Enforcement are hereby authorized to seek, through any authorized prosecutorial official, prosecution of charges against any person violating any provision of this chapter.

Attachment 1

§                          STORMWATER DETENTION

**§ 644-16. Ownership and registration.**

Ownership of a storm detention system and its subsequent maintenance and liability fall to the legal ownership of the property. In the case of condominiums or other development where shared ownership of the storm detention system is owned by multiple property owners, associations or entities, the association or joint owners of the detention system shall register the legal owner's name(s), contact representative, current address and telephone numbers with the City Clerk office annually before January 30 or 30 days after any change in ownership.

**Appendix E**

**Senate Bill 756 – Stormwater Utility Act**

# SENATE BILL No. 756

January 18, 2018, Introduced by Senators KNOLLENBERG and PAVLOV and
referred to the Committee on Local Government.

A bill to regulate the creation of stormwater management
utilities by local units of government; to regulate the adoption
and content of stormwater utility ordinances; to provide for the
allocation of the costs of planning, constructing, operating,
maintaining, financing, and administering a stormwater system to
real property served by the system; to provide for the
establishment and collection of stormwater utility fees; to provide
for the reduction or elimination of fees; to provide for appeals;
and to prescribe the powers and duties of certain local
governmental officers and entities.

THE PEOPLE OF THE STATE OF MICHIGAN ENACT:

Sec. 1. This act shall be known and may be cited as the

"stormwater utility act".

Sec. 2. As used in this act:

(a) "Fund" means a stormwater fund established pursuant to
section 8.

(b) "Impervious area" means a surface area that is resistant

00707667-1

Attachment 1

to permeation by surface water.

(c) "Local unit of government" or "local unit" means a city, village, township, or county.

(d) "Operation and maintenance costs" means all costs, direct and indirect, of materials, labor, professional services, utilities, and other items for the management and uninterrupted operation of a stormwater system in a manner for which the stormwater system was designed and constructed.

(e) "Property" means real property or a parcel of real property, as indicated by the context.

(f) "Stormwater" means that term as defined in 40 CFR 122.26(b)(13).

(g) "Stormwater management" means 1 or more of the following:

(*i*) The quantitative regulation through the stormwater system of the volume and rate of stormwater runoff from property. Quantitative regulation includes, but is not limited to, flood control.

(*ii*) The qualitative regulation of stormwater runoff into the stormwater system or of stormwater discharged from the stormwater system. Qualitative regulation includes, but is not limited to, stormwater treatment, pollution prevention activities, and administration and enforcement of ordinances to reduce, eliminate,

or treat pollutants carried from property into the stormwater system by stormwater.

(*iii*) Notifying property owners about the stormwater
management program, including, but not limited to, how to obtain a
reduction or elimination of fees for use of the stormwater system.

(h) "Stormwater management plan" or "plan" means a plan
described in and adopted pursuant to section 4.

(i) "Stormwater management program" means aspects of
stormwater management undertaken by a local unit of government.

(j) "Stormwater system" means those features that are located
or partially located within the geographic limits of a local unit
of government and that are designed or actively managed by the
local unit for collecting, storing, treating, or conveying
stormwater, which may include roads, streets, highways, catch
basins, curbs, gutters, ditches, storm and combined sewers and
appurtenant features, pipes, interceptors, conduits, lakes, ponds,
channels, swales, storm drains, county drains, canals, creeks,
streams, gulches, gullies, flumes, culverts, bridges, siphons,
retention or detention basins, treatment, screening, or
disinfection facilities, dams, floodwalls, levees, pumping
stations, and other similar facilities, and natural watercourses.

(k) "Stormwater utility fee" or "fee" means a fee provided for
under section 5.

(*l*) "Stormwater utility ordinance" means an ordinance
described in and adopted pursuant to section 3.

Sec. 3. (1) A stormwater management utility shall accomplish 1
or more of the following regulatory purposes:

Attachment 1

(a) Protect against economic loss, property damage, threats to public health and safety, and damage to the environment and natural resources from water pollution or from flooding or other instances of high volumes or rates of stormwater runoff.

(b) Enable property owners to fulfill legal obligations pertaining to increases in the quantity or reduction in the quality of stormwater runoff resulting from voluntary choices made in the manner of development of the property, including, but not limited to, obligations under section 3109 of the natural resources and environmental protection act, 1994 PA 451, MCL 324.3109, the natural flow doctrine, and the law of trespass and nuisance.

(c) Provide property owners paying stormwater utility fees with proportionate benefits described in subdivision (a). These benefits include reciprocal benefits to a property owner when other property owners pay fees to support the stormwater system and thereby fulfill their legal obligations to that property owner described in subdivision (b).

(2) To create a stormwater management utility, the legislative body of a local unit of government shall do both of the following:

(a) Adopt a stormwater management plan by resolution.

(b) Adopt a stormwater utility ordinance that is consistent with the adopted stormwater management plan.

Sec. 4. (1) A stormwater management plan shall include all of the following:

(a) The time period covered by the plan.

(b) The service area of the stormwater management utility. The service area may consist of all of the territory of the local unit of government, a portion of the territory of the local unit, or all or a portion of the territory of 2 or more local units that jointly develop the plan.

(c) The type and level of stormwater management services to be provided by the stormwater management utility, including system reliability, level of flood protection, pollution control, and structural condition of system components.

(d) Projected direct and indirect costs to provide services as described in the plan pursuant to subdivision (c) for the stormwater management utility, including cost of planning, capital, operations, maintenance, permit compliance, and asset replacement.

(e) Recommendations for efficiencies to minimize costs.

(f) Current and projected impervious area and, if applicable under section 7(2), an inventory of impervious surfaces and parcel areas for properties within the stormwater management utility's service area.

(g) A determination of which properties will be subject to any stormwater utility fee for voluntary use of a stormwater system owned and operated by the local unit of government, as required under section 10(1), and the process and method that was used to make that determination.

Attachment 1

(h) The method of calculating any stormwater utility fees proportionate to the cost of providing the locally determined level of service of stormwater management.

(i) Provisions to ensure that the cost of those elements of the stormwater management program directly or indirectly related to the amount of stormwater managed will be allocated in proportion to

the amount of stormwater runoff from a property conveyed by the stormwater system, employing methods that are relatively accurate considering available technology.

(j) A description of the components of the stormwater system owned and operated by the local unit of government.

(k) A description of how a stormwater utility fee may be reduced or eliminated as provided under section 9.

(2) Before preparing a stormwater management plan, a local unit of government must give notice that it intends to prepare a stormwater management plan. The notice shall be given by all of the following means:

(a) If the local unit has a website that is accessible to the public free of charge, by posting on the website.

(b) By publication in a newspaper of general circulation within the local unit. If there is no newspaper of general circulation within the local unit, notice shall be given by first-class mail to all persons to whom real property taxes are assessed and to the occupants of all structures within the local unit.

00707667-1

(c) By first-class mail to the county drain commissioner or water resources commissioner and to each local unit located adjacent to or located, in whole or in part, within the local unit preparing the plan. The notice under this subdivision shall request the recipient's cooperation in and comment on the preparation of the plan, including comment on jointly managing stormwater.

(3) Before adopting a stormwater management plan, a local unit of government must hold at least 1 public hearing on the proposed plan. The local unit shall give notice specifying the time, place, and purpose of the hearing and the place where a copy of the proposed plan is available for public inspection. The notice shall be given by all of the following means:

(a) If the local unit has a website that is accessible to the public free of charge, by posting the notice on the website at least 14 days before the hearing and maintaining the posting until the time of the hearing. The posting shall include a copy of the proposed plan.

(b) By publication in a newspaper of general circulation within the local unit. If there is no such newspaper, notice shall be given by first-class mail to all persons to whom real property taxes are assessed and to the occupants of all structures within the local unit. If the local unit has a website that is accessible to the public free of charge, the notice under this subdivision shall include the website address at which a copy of the proposed

plan is posted under subdivision (a). The notice under this subdivision shall be published or deposited in the United States mail at least 14 days before the date of the hearing.

(c) By first-class mail to the county drain commissioner or water resources commissioner and to each local unit located adjacent to or located, in whole or in part, within the local unit preparing the stormwater management plan. If the local unit has a website that is accessible to the public free of charge, the notice under this subdivision shall include the website address at which a copy of the proposed plan is posted under subdivision (a). The notice under this subdivision shall be deposited in the United States mail at least 14 days before the date of the hearing.

(4) A stormwater management plan may be extended or otherwise amended by resolution subject to the same procedure set forth in this section for the adoption of the original plan.

Sec. 5. (1) A stormwater utility ordinance shall identify the regulatory purposes under section 3(1) served by the ordinance.

(2) A stormwater utility ordinance may provide for a stormwater utility fee on property serviced by a stormwater system to pay the proportionate costs of the stormwater management program. A stormwater utility fee shall not include components other than as described in this section and sections 6 and 7.

(3) A stormwater utility ordinance shall describe the method or methods used to determine any stormwater utility fee.

00707667-1

Attachment 1

(4) A local unit of government may develop a corresponding stormwater utility fee, calculation method, or both for each stormwater management utility described in the stormwater management plan.

(5) A stormwater utility fee shall be proportionate to the direct and indirect cost to the local unit of government of providing stormwater management to each property in a stormwater management utility that uses the stormwater system that is not financed by revenue received by the local unit of government from any other source.

(6) A stormwater utility ordinance may define rate categories for classes of properties for which the proportionate cost of providing service is similar.

Sec. 6. (1) A stormwater management utility may assess a 1-time stormwater utility fee for connection to the stormwater system

of newly developed or modified property benefited by the stormwater system. The purpose of the fee is to finance the capital costs to the local unit of government of elements of the public stormwater system needed to serve that property and not otherwise financed by the property developer or by revenue received by the local unit of government from any other source.

(2) A stormwater utility fee under subsection (1) shall be computed based on the newly developed or modified property's proportionate share of the local unit of government's cost to

expand the stormwater system to manage the additional stormwater from that property, including, if appropriate, the newly developed or modified property's proportionate share of the local unit of government's existing capital investment in the stormwater system. This proportionate share shall be calculated consistent with the method used by the local unit of government under section 7 considering the available data at the time of the property's development or modification.

Sec. 7. (1) A stormwater management utility may assess a stormwater utility fee for the use of a stormwater system.

(2) The method for determining a stormwater utility fee under subsection (1) shall be based on the quantity or quality, or both, of stormwater runoff from each property or category of property.

(3) A stormwater utility fee or portion thereof charged to a property for those elements of the stormwater management program whose cost is attributable to the quantity of stormwater runoff from each individual property or category of properties shall be calculated, consistent with stormwater management plan provisions under section 4(1)(i), using 1 or more methods generally accepted by licensed professional engineers or regional or national professional groups associated with stormwater experts, including, but not limited to, the following methods:

(a) Impervious area, based solely on the impervious area of the property.

Attachment 1

(b) Equivalent residential unit or equivalent service unit, based on the impervious area of the property in comparison to the typical impervious area associated with single-family residential properties within the service area of the stormwater management utility.

(c) Intensity of development, based on the total area of the property multiplied by a rate category. A rate category shall apply to properties with statistically similar stormwater-runoff-generating characteristics. The stormwater utility fee shall be proportionate to the percentage of the property's impervious area to its total area.

(d) Equivalent hydraulic area, calculated as follows:

($i$) Multiply the impervious area of the property by a stormwater runoff factor.

($ii$) Multiply the pervious area of the property by a stormwater runoff factor.

($iii$) Add the products under subparagraphs ($i$) and ($ii$).

(e) Other billing methodologies that can be demonstrated to provide an equitable distribution of costs in proportion to the property's use of the stormwater system.

(4) A stormwater utility fee or portion thereof charged to a property for those elements of the stormwater management program whose cost is attributable to the quality of stormwater managed and is not covered by other revenue shall be proportionate to the cost

Attachment 1

of those elements of the stormwater management program.

Sec. 8. (1) A stormwater utility ordinance that establishes a stormwater utility fee shall establish a stormwater fund. All stormwater utility fees collected by the local unit of government shall be deposited into the fund. The treasurer of the local unit of government may receive money or other assets from any other source for deposit into the fund. Money in the fund shall be invested pursuant to 1943 PA 20, MCL 129.91 to 129.97a. The treasurer shall credit to the fund interest and earnings from fund investments. Money in the fund at the close of the fiscal year shall remain in the fund and shall not lapse to the general fund of the local unit.

(2) The treasurer of the local unit of government shall expend money from the fund, upon appropriation, only for the regulatory purpose of defraying any of the following stormwater management program costs:

(a) Operation, maintenance, planning, engineering, acquisition, construction, installation, improvement, or enlargement of a stormwater system, including financing and debt service costs and indirect and overhead costs that are fairly chargeable to such activities under applicable generally accepted accounting principles and the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a.

(b) Administration of the stormwater management program.

(c) Development of a stormwater management plan.

(d) Providing user education related to the stormwater management plan or required by federal or state regulations or required by permits issued to the local unit of government by federal or state regulatory bodies.

(3) If the local unit of government has a website that is accessible to the public free of charge, the local unit shall post on its website the most recent audit report for the fund under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a.

Sec. 9. (1) Subject to subsection (2), a stormwater utility ordinance that imposes a stormwater utility fee shall provide for the reduction or elimination of the stormwater utility fee for a property if a modification or improvement made to that property or to that and 1 or more other properties reduces the rate or volume of or eliminates runoff of or pollutant loadings in excess of natural levels of stormwater entering the stormwater system. Each property owner has the burden of demonstrating that the stormwater utility fee reduction or elimination is justified for that property, using methods that are reasonably accurate considering available technology.

(2) A reduction in or elimination of the stormwater utility fee under subsection (1) shall be proportionate to the reduction of the cost of service of the stormwater system to the property or

Attachment 1

properties.

Sec. 10. (1) To ensure that stormwater utility fees are voluntary, property is not subject to a fee unless the local unit of government demonstrates both of the following:

(a) That the property utilizes the stormwater system.

(b) That such utilization imposes a net cost to the stormwater system when offset by any activities or conditions that reduce the cost of service to the stormwater system or are reasonably related to a benefit to the stormwater system provided by that property or its owner, including, but not limited to, modifications or improvements described in section 9(1).

(2) The local unit of government shall provide the owner of property initially determined to be subject to a stormwater utility fee under subsection (1) with the opportunity to demonstrate that the property either does not utilize the stormwater system or does not utilize the stormwater system to the extent calculated by the local unit of government in establishing the stormwater utility fee and is therefore entitled to the elimination of or a reduction in the fee. The stormwater utility ordinance shall set forth procedures to implement this subsection.

(3) A stormwater utility ordinance that establishes a stormwater utility fee shall provide that, when additional property begins to utilize the stormwater system, a stormwater utility fee, as determined by the local unit of government, accrues.

Attachment 1

Sec. 11. A stormwater utility ordinance shall designate an entity within the local unit of government to administer the stormwater management utility and shall establish the administrative duties. A stormwater utility ordinance shall establish administrative policies and procedures or authorize the administrator to establish the administrative policies and

procedures. The administrative policies and procedures shall include at least the following topics, as applicable:

(a) Criteria used to determine whether a stormwater utility fee will be billed to the property owner.

(b) Procedures for updating billing data based upon changes in property boundaries, ownership, and stormwater runoff characteristics, and stormwater runoff calculation methods.

(c) Billing and payment procedures of the stormwater management utility including the billing period, billing methodology, credit application procedures, and penalties.

(d) Policies establishing the type and manner of service that will be provided by the stormwater management utility.

(e) Regulations governing the resolution of stormwater management disputes that arise between property owners within the stormwater management utility.

(f) Procedures for granting and modifying the reduction or elimination of a fee, as authorized pursuant to section 9.

(g) Procedures for appeals as described in section 13.

Attachment 1

(h) Enforcement policies and procedures.

(i) A process by which fees, formulas for calculating fees, and formulas for calculating fee reductions will be reviewed and updated at least every 3 years.

Sec. 12. (1) A stormwater utility ordinance shall establish remedies for any unpaid stormwater utility fees as described in this section.

(2) A local unit of government may collect a stormwater utility fee by any method authorized by law.

(3) A partial payment of delinquent stormwater utility fees shall be applied to the oldest delinquent fees, and remaining fees may continue to accrue interest and penalties.

Sec. 13. (1) A stormwater utility ordinance or the administrative policies and procedures adopted under the ordinance shall provide a procedure for appeals, the establishment of an appeals board, and the reduction or elimination of any stormwater utility fee. The procedure shall include at least all of the following:

(a) Any property owner liable for a stormwater utility fee may appeal the determination that the property utilizes the stormwater system or the amount of a stormwater utility fee, including a determination on a reduction in or the elimination of the fee under section 9. An appeal may be based on the quantity or quality of stormwater runoff generated, the reductions established, the

reductions allocated, or any other matter relating to the determination of the stormwater utility fee.

(b) An appeal under subdivision (a) shall be heard by a stormwater utility appeals board appointed by the local unit of government. The appeals board shall consist of 3 members, 2 of whom shall be licensed professional engineers not employed by the local unit of government.

(c) An appeal of a stormwater utility fee shall not be brought more than 1 year after the fee was billed.

(d) To prevail in an appeal of a stormwater utility fee, the appellant must demonstrate in accordance with the requirements of the stormwater management plan that the property does not use the system to the extent determined by the local unit of government in the calculation of that property's stormwater utility fee or that there was a mathematical error in the calculation.

(e) The sole remedy for a property owner who prevails in an appeal of a stormwater utility fee is a prospective correct recalculation of the stormwater utility fee.

(f) If in an appeal of a stormwater utility fee a local unit of government finds that the requirements of subdivision (d) have not been met, that finding is conclusive until the property is modified to either increase or decrease the utilization of the system. The property owner remains eligible for a reduction in or elimination of fees under the stormwater utility ordinance.

Attachment 1

(g) A property owner making an appeal shall provide the appeals board with information necessary to make a determination.

(2) A person aggrieved by a decision of the appeals board on an appeal under this section may appeal to the circuit court in which the property is located.

Sec. 14. (1) This act does not expand existing authority of local units of government.

(2) This act does not limit existing authority of local units of government to cooperate with respect to or jointly create and operate stormwater management utilities, subject to section 3(1).

Enacting section 1. This act takes effect 90 days after the date it is enacted into law.

Attachment 1

**Appendix F**

**OHM Advisors 2014 Combined Sewer Analysis**

A copy of the OHM Sanitary and Combined Sewer Study can be found at:

https://www.romi.gov/DocumentCenter/View/19851

# EXHIBIT G

**Edward Kickham Jr.**

| | |
|---|---|
| **From:** | Gregory Hanley |
| **Sent:** | Thursday, March 20, 2025 8:31 PM |
| **To:** | Timothy Ferrand |
| **Cc:** | Jamie Warrow; Edward Kickham Jr. |
| **Subject:** | RE: Woodward Pier et al v. City of Royal Oak |

Tim,

Agreed, but when can we expect some real engagement from the City about the issues raise in the draft Complaint?



Gregory D. Hanley
Kickham Hanley PLLC
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, Michigan 48073
248-544-1500 (main)
248-544-7430 (direct)
248-613-1790 (cell)

---

**From:** Timothy Ferrand <tferrand@cmda-law.com>
**Sent:** Thursday, March 20, 2025 1:55 PM
**To:** Gregory Hanley <ghanley@kickhamhanley.com>
**Cc:** Jamie Warrow <jwarrow@kickhamhanley.com>; Edward Kickham Jr. <ekickhamjr@kickhamhanley.com>
**Subject:** RE: Woodward Pier et al v. City of Royal Oak

Greg,

I tried to call you today. The City will agree to toll the statute of limitations as of today. We do not need not need to agree on the accrual date. Any claim that is timely filed (if filed today) will be timely when (and if) the case is untimely filed once the tolling agreement ends.

Please let me know if you agree. Thanks.

**Timothy S. Ferrand**
***Cummings, McClorey, Davis & Acho, PLC***
19176 Hall Road, Suite 220
Clinton Township, MI 48038
Ph. (586) 228-5600 ext. 4201
Fax (586) 228-5601

tferrand@cmda-law.com

---

**From:** Gregory Hanley <ghanley@kickhamhanley.com>
**Sent:** Tuesday, March 18, 2025 8:25 PM
**To:** Timothy Ferrand <tferrand@cmda-law.com>
**Cc:** Jamie Warrow <jwarrow@kickhamhanley.com>; Edward Kickham Jr. <ekickhamjr@kickhamhanley.com>
**Subject:** Woodward Pier et al v. City of Royal Oak

Tim,

The City has had our complaint since January 23 and thus has had ample time to evaluate our claims.  We have been very patient in holding off on the filing in the hopes that the City will work with us to resolve the claims short of litigation.

I chose the April 15 date because it is well in advance of the accrual date for any claims governed by a three-year statute of limitations, but still gives the parties time to explore and complete a resolution.

We will wait until the end of the day on Thursday, March 20, 2025 for a response to our simple request.  Absent the City's commitment to the April 15 date, we will proceed to file the federal court complaint on Friday.

Greg



Gregory D. Hanley
Kickham Hanley PLLC
300 Balmoral Centre
32121 Woodward Avenue
Royal Oak, Michigan  48073
248-544-1500 (main)
248-544-7430 (direct)
248-613-1790 (cell)

---